**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>1411 K St. NW, Suite 1300<br>Washington, D.C. 20005,<br><br>    Plaintiff,<br> v.<br><br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street, NW<br>Washington, D.C. 20240,<br><br>MARTHA WILLIAMS, in her official<br>capacity as acting Director of the U.S. Fish<br>and Wildlife Service,<br>1849 C Street, NW<br>Washington, D.C. 20240,<br><br>   *and*<br><br>SECRETARY OF THE U.S. DEPARTMENT<br>OF THE INTERIOR,<br>1849 C Street, NW<br>Washington, D.C. 20240,<br><br>   Defendants. | **COMPLAINT FOR DECLARATORY**<br>**AND INJUNCTIVE RELIEF**<br><br><br>Case No.: |

**INTRODUCTION**

1. This action challenges federal defendants' unlawful reclassification of the American burying beetle under the Endangered Species Act ("ESA" or "the Act"), 16 U.S.C. §§ 1531–1544, from "endangered" to "threatened." *See* "Reclassification of the American Burying Beetle from Endangered to Threatened with a Section 4(d) Rule, 85 Fed. Reg. 65,241 (Oct. 15, 2020) ("Down-Listing Rule" and "4(d) Rule"). Defendants' reclassification eliminates key substantive protections for this species, which is still endangered, survives in a small portion of its vast historic range, faces the same dire threats that led to its listing in 1989, and is now at even

greater risk of extinction due to climate change. As the defendants acknowledged, one of few surviving populations of the species will likely be gone from the southern Great Plains, a focus of recovery efforts and a significant portion of the species' range, within just 19 years.

2.      The American burying beetle (also hereinafter "the beetle") was "once ubiquitous" across 35 eastern U.S. states and three Canadian providences. 54 Fed. Reg. 29,652 (July 13, 1989) ("1989 Listing Rule"). However, during the early-to-mid-20th century, the species disappeared from over 90 percent of its range.

3.      This drastic decline, recognized by the federal government as "one of the most disastrous" of any insect, prompted defendant U.S. Fish and Wildlife Service ("the Service") to list the American burying beetle as an "endangered species" in 1989. Endangered status afforded the species the full scope of the ESA's substantive protections. At the time, only two disjunct natural populations were known to exist in Oklahoma and Rhode Island.

4.      Once it gained protection as an endangered species, the American burying beetle was able to survive the extinction threat, but this threat has not dissipated. Increased recovery efforts led to surveys that located some additional populations. However, as the Service has also acknowledged, those additional populations are just as precarious. The additional populations face the same threats that led to the species' listing as endangered, which are being exacerbated by the existential threat of climate change.

5.      In 2015, the Independent Petroleum Association of America (also known as the "IPAA") petitioned to de-list the America Burying Beetle, citing delays and restrictions to the oil and gas industry due to the presence of the beetle.

6.      In response to the IPAA's de-listing petition, the Service published a proposed rule to down-list (and not de-list) the American burying beetle from endangered to threatened, as

"all populations [remain] exposed to a combination of risk factors" and thus the species had not recovered. 84 Fed. Reg. 19,013, 19,024 (May 3, 2019). Even as the agency implicitly acknowledged that the species remained at risk, the Service proposed to reduce protections for the beetle based on false claims that threats to the species have been reduced or eliminated. The down-listing was opposed as premature by American burying beetle experts.

7.     Despite the opposition from the scientific community, the Service reclassified the American burying beetle as "threatened" in 2020 and issued the 4(d) Rule. 85 Fed. Reg. 65,241.

8.     The 4(d) Rule eliminates key substantive protections that have helped the beetle stave off extinction and survive the ongoing destruction and fragmentation of the species' dwindling habitat.

9.     The American burying beetle remains "in danger of extinction throughout all or significant portion of its range," 16 U.S.C. § 1532(6), and thus the Down-Listing Rule and 4(d) Rule violate the ESA and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"). To remedy these violations, plaintiff asks this Court to order defendants to vacate the Down-Listing Rule and 4(d) Rule and reinstate the beetle's proper and lawful status as a fully protected, "endangered" species under the ESA.

## JURISDICTION AND VENUE

10.     Plaintiff brings this action pursuant to the ESA citizen-suit provision, 16 U.S.C. § 1540(g), which waives defendants' sovereign immunity. As required by 16 U.S.C. § 1540(g), plaintiff provided defendants with its notice of intent to sue, which was received by defendants on January 22, 2020. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §§ 2201-2202 (declaratory judgments and further relief); 16 U.S.C. §

1540(c) (district court jurisdiction), 16 U.S.C. § 1540(g)(1)(C) (action arising under the ESA

citizen-suit provision), and 5 U.S.C. § 702 (Administrative Procedure Act).

11.     Venue in this Court is proper pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28

U.S.C. § 1391(e) because this civil action is brought against agencies of the United States, and

against officers and employees of the United States acting in their official capacities under the

color of legal authority; because a substantial part of the events giving rise to the claim occurred

in the District of Columbia; and because no real property is involved in this action. Plaintiff also

maintains an office in this judicial district.

## **PARTIES**

12.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-

profit organization that is dedicated to the protection of native species and their habitats through

science, policy, and environmental law. The Center is incorporated in California and

headquartered in Tucson, Arizona, with additional offices in California, Colorado, Florida,

Hawai'i, Nevada, New York, North Carolina, Oregon, Virginia, Washington, Washington, D.C.,

and La Paz, Mexico. The Center has more than 84,000 active members, including members

within the American burying beetle's current and historic range. The Center and its members

have a long-standing interest in conserving native species and have consistently advocated for

the conservation and protection of native species, including the American burying beetle.

13.     Plaintiff, both organizationally and on behalf of its members, has deep and long-

standing interests in the preservation and recovery of imperiled species, including the American

burying beetle. To further these goals, plaintiff supports strong and effective protections for the

species and has participated in various administrative and legal proceedings and public comment

opportunities to protect and recover the American burying beetle.

14.     Plaintiff has members who live near and/or visit areas in and around: the Red River in the southern Great Plains; the Arkansas River in the Great Plains; the Flint Hills in Oklahoma; Block Island in Rhode Island; and Loess Canyons, the Sandhills, and the Niobrara River in Nebraska. Plaintiff's members engage in these areas for their recreational, scientific, and aesthetic interests, including viewing and photographing American burying beetles in their natural habitat. Plaintiff's members have interests in the recovery of the American burying beetle, which are being and will be negatively impacted by the reclassification of the American burying beetle from endangered to threatened. Plaintiff's members have visited and plan to continue to visit in the future areas where the American burying beetle still survives in the Red River in Oklahoma. Plaintiff's members plan to pursue their interests in conservation and recovery of the American burying beetle.

15.     Plaintiff's interests in conserving and recovering the American burying beetle are harmed by defendants' reclassification of the beetle as a "threatened species." Specifically, plaintiff's professional, spiritual, aesthetic, and recreational interests have been and will continue to be injured as the American burying beetle will continue to decline without full protection as an endangered species under the ESA. As such, the Down-Listing Rule and 4(d) Rule diminish the opportunities of plaintiff and its members to view and otherwise enjoy the American burying beetle.

16.     Plaintiff also has an interest in the effective and lawful implementation of the ESA. Plaintiff is injured by defendants' premature reclassification of the American burying beetle as a threatened species and by the arbitrary-and-capricious 4(d) Rule, which undermine both the agency's effective and lawful implementation of the ESA as well as the conservation of endangered and threatened species.

17.     For these reasons, defendants' Down-Listing Rule and 4(d) Rule have harmed and will continue to harm plaintiff's interests. The injuries described above are actual, concrete injuries presently suffered by plaintiff and its members and they will continue to occur unless this Court grants relief. These injuries are directly caused by defendants' actions, and the relief sought herein would redress those injuries. Plaintiff has no other adequate remedy at law.

18.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the Department of Interior. The Service has been delegated the responsibility for administering the ESA for terrestrial wildlife including the American burying beetle, meeting nondiscretionary obligations under the ESA, and otherwise complying with the ESA.

19.     Defendant MARTHA WILLIAMS is the acting Director of the United States Fish and Wildlife Service and is charged with ensuring agency decisions comply with the law.  Acting Director Williams is sued in her official capacity.

20.     Defendant Secretary of the United States Department of the Interior has the ultimate responsibility for implementation of the ESA, and supervisory authority for the Service. The Secretary is sued in her official capacity.

## STATUTORY BACKGROUND

### I.     The Endangered Species Act

21.     Congress enacted the ESA in 1973 to provide a "program for the conservation of . . . endangered species and threatened species" and "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). To receive the ESA's substantive protections, a species must first be listed as "endangered" or "threatened" under Section 4 of the ESA. 16 U.S.C. § 1533.

22.     The ESA delegates responsibility for administering the ESA to two cabinet-level Secretaries: Interior and Commerce. 16 U.S.C. § 1532(15).  The Secretary of the Interior has, in turn, delegated authority for terrestrial species including the beetle to the Service. 50 C.F.R. § 402.01(b).

23.     In making decisions to list or reclassify the status of a species, the ESA requires the Service to "determine whether the species is an endangered species or a threatened species" based on the following statutory factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). A species may be listed based on any one or a combination of these five "listing factors."

24.     The ESA defines an "endangered species" as one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

25.     A "threatened species" is a species that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20); 50 C.F.R § 424.11(d). The term "foreseeable future" in the definition of "threatened" means "so far into the future as the Service can reasonably determine that both the future threats and the species' responses to those threats are likely." 50 C.F.R § 424.11(d). The Service must apply the "best available data" to construe the "foreseeable future" for a particular species, and consider "the species' life-history characteristics, threat-projection timeframes, and environmental variability." *Id.*

7

26.     The ESA and its implementing regulations protect species that are listed as "endangered" or "threatened" in several ways. For instance: (1) Section 4(f) requires the Secretary, through the Service, to develop a "recovery plan" for each listed species, 16 U.S.C. § 1533(f); and (2) Section 7 requires federal agencies (a) to carry out their programs for the "conservation" of listed species, *id*. § 1536(a)(1), and (b) to avoid activities that are likely to "jeopardize" listed species' continued existence, *id*. § 1536(a)(1)-(2).

27.     However, the ESA provides more stringent substantive protections for endangered species than for threatened species. Endangered species generally receive higher priority for the preparation and implementation of recovery plans, and the Service is more likely to determine that particular actions jeopardize the continued existence of endangered species, leading to better conservation measures under Section 7(a)(2) of the Act.

28.     Also, the ESA prohibits any "person," meaning any individual, corporation, federal agency, State official, or other entity subject to the Court's jurisdiction, *id*. § 1532(13), from engaging in activities that cause the "take" of any member of an endangered species without a permit. "Take" means any act which will directly or indirectly "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19).

29.     Section 9(a)(1)(B) applies the "take prohibition" to all endangered fish and wildlife species, but the take prohibition currently applies to threatened species only by special regulation promulgated by the Service under Section 4(d) of the Act. *See id*. §§ 1538(a)(1)(B), 1533(d).

30.     When classifying a species as "threatened," Section 4(d) of the ESA requires the Service to assess whether the ESA's take prohibition is "necessary and advisable to provide for

the conservation" a threatened species. *Id*. § 1533(d). If so, the Service "shall issue such regulations" as needed for the conservation of that threatened species and to regulate specific activities as take. *Id.*

31.     When making listing determinations or reclassifying the status of a listed species—whether a determination to "down-list" from endangered to threatened, or to "up-list" from threatened to endangered—the Service must do so "*solely* on the basis of the best scientific and commercial information regarding a species' status," without reference to possible economic or other impacts of such determination. 50 C.F.R. § 424.11(b) (emphasis in original).

32.     A species may be down-listed when it has met the objectives for reclassification in a recovery plan, 16 U.S.C. § 1533(f)(1)(B)(ii), or when the best available scientific and commercial data warrants its reclassification as threatened based on the five listing factors. 50 C.F.R. § 424.11(c).

33.     The Service may not de-list a species altogether until the species has recovered "to the point at which listing is no longer appropriate" under the listing factors, 50 C.F.R. § 402.02, because "threats to the species as analyzed under [the listing factors] have been removed," 51 Fed. Reg. 19,926, 19,935 (June 3, 1986), and de-listing criteria in the species' recovery plan have been met. 16 U.S.C. § 1533(f)(1)(B)(ii).

## II.     The Administrative Procedure Act

34.     The APA provides the relevant standard for judicial review for plaintiff's ESA citizen-suit claims. 5 U.S.C. § 706(2)(A). That standard of review provides that a reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id*. The APA also provides an

alternative right to judicial review of agency action that does not fall within the ESA's citizen-suit provision.

## FACTUAL BACKGROUND

35.     The American burying beetle is the largest carrion beetle in North America and is recognizable by orange and black markings on its back.

36.     The American burying beetle is named for its unique reproductive behavior of burying vertebrate carcasses (carrion) in soil, coating them in anal secretions, then feeding them to larvae during early development. Both parents participate in the preparation of the carrion and the rearing of their offspring, a rare trait in the insect world.

37.     The beetle once existed in 35 eastern states in the United States and three southeastern Canadian provinces. However, during the early to mid-20th century, as native prairie grasses were converted to crops, pastures, and industrial and urban development, and as the passenger pigeon, which may have been a primary source of carrion, was lost to extinction, the beetle was lost from over 90 percent of its range.

### Endangered Listing and Recovery Plan

38.     Citing this vast curtailment of the species' historic range as a primary factor, the Service listed the American burying beetle as an endangered species in 1989. 54 Fed. Reg. 29,652. At the time, the Service believed that only two small populations existed: one in New England and another in eastern Oklahoma. *Id.*

39.     When it listed the beetle as endangered, the Service recognized that search efforts may result in the discovery of additional populations, but it cautioned that "the extent of the species decline suggests that any newly discovered populations are also vulnerable to whatever factors have caused their disappearance elsewhere." 54 Fed. Reg. at 29,653.

10

40.     In a 1991 recovery plan for the beetle, the Service set two "recovery objectives" for the beetle. American Burying Beetle (*Nicrophorus americanus*) Recovery Plan 31 (1991) ("Recovery Plan").

41.     First, the Service sought to "reduce the immediacy of the threat of extinction" to the beetle, an objective to be satisfied when "the extant eastern and western populations are sufficiently protected and maintained" and "at least two additional self-sustaining populations of 500 or more beetles are established" in each of the eastern and western parts of the beetle's historic range ("Objective 1"). *Id.*

42.     Second, the Service sought to improve the beetle's status so that the species may be reclassified from endangered to threatened ("Objective 2"), *id.* at 32, to be satisfied when: (1) three populations of at least 500 adult individuals are "established (or discovered)" within each of four geographical areas, i.e., the Northeast, Southeast, Midwest, and the Great Lake areas; (2) each population is "self-sustaining for 5 consecutive years," and; (3) "ideally, each primary population contains several satellite populations." *Id.* The Service predicted that if these criteria were met, reclassification might be warranted starting in 2012. *Id.*

**2008 5-Year Review**

43.     After the Service classified the American burying beetle as endangered in 1989, the Service engaged in extensive surveys which eventually documented additional populations in Oklahoma, Nebraska, and South Dakota. 85 Fed. Reg. at 65,242. However, in a "five-year review" of the beetle prepared in 2008 to satisfy Section 4(c)(2) of the ESA, 16 U.S.C. § 1533(c)(2), the Service cautioned that these discoveries were the result of "better knowledge," not "repatriation of previously unoccupied habitat." U.S. Fish and Wildlife Service, American Burying Beetle (*Nicrophorus americanus*): 5-Year Review 30 (2008) ("5-Year Review"). These

efforts also did not locate or re-establish additional extant occurrences of at least 500 beetles in the eastern and western populations as required under Objective 1. Recovery Plan at 31.

44.     In the 5-Year Review, the Service assessed the beetle's status and determined that except for one recovery area (the Midwest), criteria for Objective 2 had not been met, as "the species presumably remains extirpated in most of its historic range," and therefore the Service concluded reclassification of the beetle as "threatened" was not warranted. 5-Year Review at 5.

45.     In the 5-Year Review, the Service determined that habitat loss, alteration and fragmentation, reduced carrion availability, and increased competition are the overriding cause of the species' decline; that these factors continue to suppress extant beetle populations across the species' range; and that agriculture and grazing will likely render the majority of remaining habitat unsuitable. 5-Year Review at 27. Moreover, the Service emphasized, the beetle remains extirpated throughout most of its historic range, and habitat loss and fragmentation—from new pipelines, access roads, drill pads, and other industrial facilities associated with petroleum and natural gas drilling, development, and transportation—continue to threaten the beetle in its remaining habitat. *Id*.

46.     Oklahoma, where the Southern Plains recovery area is located, is the third-largest gas-producing state in the nation. *Id.* In the 5-Year Review, the Service disclosed that thousands of acres of American burying beetle habitat in the Southern Plains are affected by oil and gas development. *Id.* Approximately 4,545 acres of land are disturbed annually from new pipelines in Oklahoma and this number is increasing. *Id.*

47.     For these reasons, the Service determined in the 5-Year Review that the beetle should retain its status as "endangered," emphasizing that endangered status would retain important regulatory safeguards and protect local populations from extirpation. *Id.* at 32.

**2019 Species Status Assessment**

48.     Threats to the beetle have not abated since the Service's 2008 5-Year Review, and in fact, threats to the beetle's survival have increased.

49.     In 2019, the Service prepared a "species status assessment" for the species and found that the beetle remains extirpated throughout most of its historic range, primarily because habitat loss and fragmentation are ongoing and threaten the beetle in the Southern Plains and Northern Plains recovery areas. The Service attributed habitat loss to agriculture and intensive grazing; logging; fire suppression; and pipelines, access roads, drill pads, and industrial facilities for petroleum and natural gas drilling, development, and transportation. U.S. Fish and Wildlife Service, Species Status Assessment Report for the American Burying Beetle (*Nicrophorus americanus*) 27 (2019) ("SSA").

50.     New and significant threats to the American burying beetle have emerged since 2008. For instance, wind energy development is a growing threat, as is urban development. Also, invasive fire ants are increasingly competing with beetles for available carrion in the southeastern United States, "mak[ing] restoration and recovery of [American burying beetle] populations there difficult." *Id*. at 33.

51.     Additionally, climate change now poses a grave and existential threat to the species." *Id* at 157.

52.     The beetle is most at risk from climate change in the Southern Plains, which accounts for about 60 percent and a "significant portion" of the beetle's remaining range, according to the Service. 85 Fed. Reg. at 65,254.

53.     Average soil temperatures in the Southern Plains now exceed temperatures beyond which the species cannot successfully reproduce, and monitoring data shows

corresponding population declines. SSA at 76. In the Red River area in southern Oklahoma, average temperatures have already eviscerated any resiliency the beetle might have in this area. *Id.* at 158.

54.     The Service found in its SSA that temperatures in this area will "likely extirpate all *Nicrophorus* species in the Southern Plains" as soon as 2040—less than 20 years from now. *Id*. at 160.

55.     As soon as 2070, the Service has predicted, all but the New England population of the American burying beetle could be lost due to climate change. SSA at 167.

56.     The loss of the American burying beetle from the Southern Plains would mean its elimination from what has been an important recovery area and, until now, a stronghold for the species. The Service has acknowledged that the likely loss of the Southern Plains population within two decades would "limit our ability to recover the species," especially if the Northern Plains population is also gone. 85 Fed. Reg at 65,254.

57.     In addition to climate change, the Service has acknowledged the American burying beetle continues to be exposed to the same threats that led to its listing as endangered in 1989.

**2020 Down-Listing Rule**

58.     Despite the acknowledged exposure to increased threats, in 2020 the Service abandoned recovery and down-listed the American burying beetle from "endangered" to "threatened." 85 Fed. Reg. 65,241.

59.     The down-listing was a result of pressure from the oil and gas industry. In 2015, the Independent Petroleum Association of America and other organizations opposed to protecting the American burying beetle under the ESA petitioned the Service to de-list the

14

American burying beetle. The IPAA based its request for de-listing the beetle on what it considered to be inconvenient regulatory protections for the beetle that interfere with land development, transportation, and pipeline and utility operations. The petitioners argued that de-listing the beetle would be beneficial because it would remove these inconvenient regulatory hurdles and allow for unrestricted exploration and production activities to proceed.

60.     After receiving the IPAA's de-listing petition, the Service prepared the 2019 Species Status Assessment and subsequently published a listing determination and a proposed rule to down-list the beetle's status from "endangered" to "threatened." 84 Fed. Reg. 19,013. However, pointing to ongoing threats to the beetle from increasing temperatures and ongoing land use activities, the Service did not propose to de-list the beetle altogether as the petitioners had requested.

61.     In the Proposed Rule, and ultimately the Final Rule, the Service once again acknowledged that habitat loss and fragmentation and reduced carrion resources remain primary threats to the beetle. 84 Fed. Reg at 19,019, 19,020; 85 Fed. Reg. at 65,246. Yet the Service concluded, without explanation, that it now considers those threats "relatively minor"—thus abandoning its oft-repeated prior position that habitat loss and fragmentation is a primary, ongoing threat to the beetle's survival. 84 Fed. Reg. at 19,020. The Service based this change in position on the speculation that additional suitable habitat may become available in the Southern Plains at some point, and would buffer the effects from ongoing and projected land use changes. *Id*.; 85 Fed. Reg. at 65,254. Yet at the same time, the Service acknowledged that large areas of this potential habitat in Southern Plains will become uninhabitable due to climate change within two decades.

62. Recognizing the ongoing threats to the beetle and its habitat, the Service proposed and issued a 4(d) Rule for the beetle. The 4(d) Rule regulates soil-disrupting activities that cause take of beetles in the Northern Plains. Yet, the Service did not apply these same conservation measures in the Southern Plains, where habitat destruction and fragmentation from soil-disturbing activities also threaten the beetle's survival and recovery, just as in the Northern Plains.

63. Several American burying beetle scientists submitted comments opposing the down-listing.

64. One of these experts was the Service's lead biologist on the recovery team for the American burying beetle from 1989 to 2009. In his comments on the proposed down-listing, Mr. Michael J. Amaral—who coordinated and prepared the 1991 Recovery Plan and 5-Year Review—characterized the Service's conclusion that the beetle is no longer endangered as "inconsistent with the scientific analyses that are presented" and based on "several inherent contradictions and misleading findings." Comments from other American burying beetle experts echoed these concerns.

65. On the other hand, commenters from the oil and gas industry welcomed the proposed down-listing and 4(d) Rule, many of them emphasizing that the beetle's endangered status has hindered their investment opportunities—particularly in Oklahoma, the Southern Plains recovery area.

66. The Service acknowledged that the recovery plan objectives and criteria had not been met, but simply decided that they should no longer apply. 85 Fed. Reg at 65,244.

67.     The Service instead decided to base the decision to down-list the beetle on the rationale that the beetle's current range is "much larger than originally thought," and on that basis, declared that the risk of extinction has been averted. 85 Fed. Reg at 65,254.

68.     In determining whether the American burying beetle is endangered in the Southern Plains, a significant portion of the species' remaining range, the Service reasoned that the "bulk of the impact" of climate change to the species' survival in the Southern Plains will not be felt until 20 to 49 years in the future, as it will be that point in time when the future consequences of climate change—the result of human activities and choices that occurring now—will cause the extinction of the species in this area. 85 Fed. Reg at 65,256.

69.     The Service down-listed the beetle, concluding that the species is not at *imminent* risk of extirpation, meaning that its existence there is not at risk *at this precise moment*, even though it predicted that it may take only 20 years for the beetle to disappear from the Southern Plains. *Id.*

70.     Thus, the Service simultaneously relied on what has been the beetle's relative stability and potential new habitat in the Southern Plains to rationalize the decision to down-list the species, even as the agency predicted that beetle will be lost from the Southern Plains within 20 years. *Id.*

71.     On this illogical basis, the Service determined that the species is not currently endangered in the Southern Plains, a "significant portion" of the beetle's dwindling range. Had the Service concluded it was, it would have no option but to maintain the species' status as "endangered."

72.     With its decision to reclassify the beetle as threatened, the Service issued a 4(d) Rule under Section 4(d) of the ESA. 85 Fed. Reg. at 65,256.

73. The 4(d) Rule regulates various activities in the beetle's analysis areas that result in "take" of the American burying beetle. 85 Fed. Reg. at 65,257.

74. Thus, the 4(d) Rule prohibits incidental take of beetles from soil-disturbing activities in New England and the Northern Plains because it destroys and fragments the remaining habitat. *Id.*

75. In the Southern Plains analysis area, incidental take is prohibited only in certain "conservation lands." *Id.* "Conservation lands" include lands within the existing boundaries of Fort Chaffee in Arkansas (approximately 64,000 acres), and McAlester Army Ammunition Plant (approximately 45,000 acres) and Camp Gruber/Cherokee Wildlife Management Area (approximately 64,000 acres), both in Oklahoma. *Id.*

76. Incidental take is not prohibited outside of these "conservation lands" in the Southern Plains. Specifically, the 4(d) Rule does not prohibit take of beetles in areas in Oklahoma that are slated for oil and gas development and where American burying beetles are believed to exist. 5-Year Review at 27.

77. The contrasting 4(d) Rule for the Northern Plains and Southern Plains are at odds with the threats to those populations. Threats to the beetle in the Northern Plains analysis area exist in the Southern Plains but are more amplified due to climate change and threats from oil and gas development. The Service limited protections to the beetle in the Southern Plains, where it is the most endangered, only in areas where it is already protected and not in those areas where it faces clear threats to its survival.

## FIRST CLAIM FOR RELIEF

<u>Violation of the Service's Nondiscretionary Duties under Section 4 of the Endangered Species Act</u>

78.     Plaintiff hereby incorporates all preceding paragraphs.

79.     The American burying beetle warrants listing as an endangered species because the best available science demonstrates that the species is in danger of extinction through all or a significant portion of its range.

80.     In determining that the American burying beetle should be reclassified as a "threatened" species, the Service failed to make a rational connection between the Down-Listing Rule and the agency's prior determinations that the species remains in danger of extinction throughout all or a significant portion of its range, due to ongoing threats that led to its "endangered" listing as well as new threats including climate change.

81.     In determining that the American burying beetle should be reclassified as a "threatened" species throughout all its range, the Service ignored and failed to apply "the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1), which conclusively shows, as the Service has acknowledged, that the overwhelming threats causing a decline in the species throughout its range are habitat destruction, habitat fragmentation, and reduced carrion availability.

82.     In determining that the American burying beetle should be reclassified as a "threatened" species throughout a significant portion of its range, the Service ignored and failed to apply "the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1), which conclusively shows that a significant portion of the American burying beetle's range will be extinct in the foreseeable future and is, therefore, currently in danger of extinction.

83.     In determining that the American burying beetle should be reclassified as a "threatened" species throughout all or a significant portion of its range, the Service failed to adequately apply the listing factors as required by 16 U.S.C. § 1533(a)(1)(A)–(E).

84.     The Service's Down-Listing Rule failed to provide a rational connection between the facts found and the choice made, and it failed to provide a reasoned explanation for why the American burying beetle should be reclassified as a "threatened" species. The Down-Listing Rule is therefore arbitrary and capricious and not in accordance with the ESA, in contravention of the standard of review in the APA.

**SECOND CLAIM FOR RELIEF**

Violation of the Administrative Procedure Act
(in the alternative to Plaintiff's First Claim for Relief)

85.     Plaintiff hereby incorporates all preceding paragraphs.

86.     The Service consistently determined that the American burying beetle remains endangered, as threats to the species have not been abated sufficiently to show that the American burying beetle is no longer in danger of extinction, even with the discovery of additional American burying beetle populations since the species was listed as endangered in 1989.

87.     The Down-Listing Rule fails to articulate a rational connection between the facts the Service found and the choice the agency made to reclassify the species' status, fails to explain the Service's determination to reclassify the American burying beetle as "threatened," and fails to explain the Service's reversal of its prior determinations that the species is "endangered."

88.     The Down-Listing Rule fails to adhere to the requirement in the ESA that the agency base its listing determinations *solely* on the best available scientific data, which conclusively shows that the species continues to be in danger of extinction due to historic and

20

ongoing habitat destruction and fragmentation, reduced carrion availability, and climate change throughout all and/or a significant portion of its range.

89.     Thus, the Down-Listing Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law, 5 U.S.C. § 706(2)(A), in contravention of the APA.

### THIRD CLAIM FOR RELIEF

<u>Violation of the Service's Duty to Provide for the Conservation of Threatened Species under Section 4(d) of the Endangered Species Act</u>

90.     Plaintiff hereby incorporates all preceding paragraphs.

91.     ESA Section 4(d) requires the Secretary to issue regulations that are "necessary and advisable to provide for the conservation of [threatened] species." 16 U.S.C § 1533(d).

92.     The 4(d) Rule will not bring the American burying beetle to the point at which the measures provided by the ESA are no longer necessary.

93.     The 4(d) Rule for the American burying beetle does not provide for the conservation of the American burying beetle.

94.     The 4(d) Rule gives an exemption from the prohibition of incidental take for the Southern Plains population that is inconsistent with the threats facing the population.

95.     The Service is unable to provide a rational explanation for its decision to apply a different 4(d) rule to the Southern Plains population and the Northern Plains population. The same threats exist for the species in both populations and are heightened in the Southern Plains population.

96.     The Service has abused its discretion by failing to articulate a rational connection between the facts found and the choice made and by issuing regulations that are neither

necessary nor advisable for the conservation of the American burying beetle, in violation of the

APA and the ESA. 5 U.S.C. § 706(2)(A); 16 U.S.C § 1533(d).

## REQUEST FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

A.  Declare that the Service violated the ESA with its decision to down-list the American burying beetle from endangered to threatened;

B.  Declare that the Service violated the APA with its decision to down-list the American burying beetle from endangered to threatened;

C.  Hold unlawful and vacate the Down-Listing Rule;

D.  Order the Service reinstate the American burying beetle's status as an "endangered" species under the ESA;

E.  Declare the 4(d) Rule violates the ESA;

F.  Vacate the 4(d) Rule;

G.  Award plaintiff their reasonable fees, costs, and expenses, including attorney fees and expert witness fees; and

H.  Grant plaintiff such further and additional relief as this Court may deem just and proper.


DATED this 25th day of March, 2021.          Respectfully submitted,

 /s/ Amy R. Atwood
Amy R. Atwood (DC Bar No. 470258)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: 971-717-6701
Email: atwood@biologicaldiversity.org

Kristine Akland (MT Bar No. 13787)
*Seeking admission *pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
Tel: 406-544-9863
Email: kakland@biologicaldiversity.org

*Attorneys for Plaintiff*