**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | Case No.: 1:21-cv-00791-TJK |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. FISH AND WILDLIFE SERVICE, *et al.,* | |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND .................................................................................................. 3

   A.  STATUTORY BACKGROUND ...................................................................... 3

   B.  FACTUAL AND PROCEDURAL BACKGROUND ......................................... 5

       i.    The Disastrous Decline of the Once-Ubiquitous American Burying Beetle, and the Service's Decision to List the Beetle as "Endangered." ................................................ 5

       ii.   The Service's 5-Year Review Determining that the Beetle's Endangered Status Should Be Retained Notwithstanding the Discovery of New Populations.................................... 8

       iii.  The Petition to Delist and the Service's Species Status Assessment ............................. 10

       iv.  The Service's Proposed Downlisting and Adoption of a 4(d) Rule Stripping the Beetle of Vital Safeguards in the Southern Plains Portion of its Range. .................................... 13

       v.    The Service's Adoption of Final Downlisting and 4(d) Rules. ...................................... 16

III.   ARGUMENT .................................................................................................... 18

   A.  Standard of review. .................................................................................... 18

   B.  The Service's determination that the American burying beetle is not endangered in a significant portion of its range is contrary to the plain language of the ESA and arbitrary and capricious. .......................................................................................... 19

       i.    The Service's approach requires the Court to rewrite the plain language of the ESA's definitions of "endangered" and "threatened." ........................................................... 20

       ii.   The record shows that American burying beetle is endangered in the Southern Plains because all beetles in this analysis area will be extirpated within the next 17-27 years. 22

       iii.  By making its significant portion of the range determination for the first time in the final rule, the Service violated the public's right to comment. ........................................ 25

   C.  The Service failed to adequately explain its change in position from its prior determinations, particularly in the 5-Year Review, that the American burying beetle should remain listed as endangered. ............................................................................................... 26

       **i.**    The Service failed to explain its departure from its 2008 determination that the beetle should remain endangered even in light of the discovered populations...............29

       **ii.**   The Service's failure to explain its reversal of position is especially egregious when the record demonstrates that threats facing the American burying beetle are worse now than when the Service determined that the beetle should remain endangered in 2008……………………………………………………………………………………….31

D. The 4(d) Rule violates the ESA because it failed to provide for the conservation of the American burying beetle and arbitrarily eliminates essential protections in the Southern Plains portion of the range....................................................................................... 37

E. The Downlisting *and 4(d)* Rules must be set aside and the 1989 Endangered Rule must be reinstated. ................................................................................................................. 42

IV. CONCLUSION ........................................................................................................ 42

## TABLE OF AUTHORITIES

**Cases**

*BP P.L.C. v. Mayor of Balt.*,
141 S. Ct. 1532 (2021) ............................................................................................... 21

*Citizens Coal Council v. Norton*,
330 F.3d 478 (D.C. Cir. 2003) .................................................................................. 19

*Cnty. of L.A. v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ................................................................................ 41

*CSX Transp., Inc. v. Surface Transp. Bd.*,
584 F.3d 1076 (D.C. Cir. 2009) .......................................................................... 25, 26

*\*Ctr. for Biological Diversity v. Everson*,
435 F. Supp. 3d 69 (D.D.C. 2020) .............................................................................. 4

*Ctr. for Biological Diversity v. Salazar (In re Polar Bear Endangered Species Act Listing)*,
794 F. Supp. 2d 65 (D.D.C. 2011) ........................................................................ 24, 37

*\*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) ............................................................................... 26, 36

*\*Ctr. for Biological Diversity v. Haaland*,
998 F.3d 1061 (9th Cir. 2021) ...................................................................... 27, 28, 31, 36

*Defs. of Wildlife v. Norton*,
239 F. Supp. 2d 9 (D.D.C. 2002) ................................................................................ 4

*\*FCC v. Fox TV Stations, Inc.*,
556 U.S. 502 (2009) ..................................................................................... 27, 28, 31

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998) .................................................................................................. 42

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ................................................................................................ 18

*\*Humane Soc'y of the U.S. v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017) .................................................................................. 30

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ................................................................................................ 18

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) .......................................................................................... 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...................................................................... 19, 24, 36, 40

*Org. Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) ................................................................................ 27

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ...................................................................................... 3, 21

*U.S. Sugar Corp. v. EPA*,
   830 F.3d 579 (D.C. Cir. 2016) ............................................................................ 27

**Statutes**

5 U.S.C. § 553 ........................................................................................................ 5, 25

5 U.S.C. § 706(2) ......................................................................................................... 19

5 U.S.C. § 706(2)(A) .................................................................................................. 3, 42

16 U.S.C. § 1531 *et seq.* ............................................................................................... 1

16 U.S.C. § 1531(b) ....................................................................................................... 3

16 U.S.C. § 1532 ........................................................................................................... 2

16 U.S.C. § 1532(3) ..................................................................................................... 37

16 U.S.C. § 1532(6) .......................................................................................... 3, 14, 19

16 U.S.C. § 1532(19) ................................................................................................. 4, 22

16 U.S.C. § 1532(20) ................................................................................................. 3, 21

16 U.S.C. § 1533 ........................................................................................................... 3

16 U.S.C. § 1533(a)(1) .................................................................................................. 5

16 U.S.C. § 1533(b)(1)(A) ............................................................................................. 5

16 U.S.C. § 1533(b)(4) ............................................................................................... 5, 25

16 U.S.C. § 1533(c) ....................................................................................................... 5

16 U.S.C. § 1533(c)(2) .......................................................................................... 8, 26, 29

16 U.S.C. § 1533(c)(2)(A) ............................................................................................. 5

16 U.S.C. § 1533(c)(2)(B)(ii) ........................................................................................ 5

16 U.S.C. § 1533(d) ...................................................................................... 3, 4, 37, 40

16 U.S.C. § 1533(f)(1) ............................................................................................... 7, 14

16 U.S.C. § 1536(a)(2) ............................................................................................... 4, 38

16 U.S.C. § 1536(b)(4) ................................................................................................. 38

16 U.S.C. § 1538(a)(1) ............................................................................................. 4

16 U.S.C. § 1538(a)(1)(B) ........................................................................................ 4

16 U.S.C. § 1539(a)(1)(B) ...................................................................................... 10

16 U.S.C. § 1540(g) ............................................................................................... 18

## Regulations

50 C.F.R. § 424.11(b) ............................................................................................. 5

50 C.F.R. § 424.11(d) ............................................................................................. 4

## Federal Register

Endangered and Threatened Wildlife and Plants; Reclassification of the American Burying Beetle From Endangered to Threatened with a 4(d) Rule, 85 Fed. Reg. 65,241 (October 15, 2020) ....... 1

Endangered and Threatened Wildlife and Plants; Determination of Endangered Status for the American Burying Beetle, 54 Fed. Reg. 29,652 (July 13, 1989) ................................................ 7, 42

Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the Endangered Species Act's Definitions of 'Endangered Species' and 'Threatened Species,' 79 Fed. Reg. 37,578 (July 1, 2014) ............................................................... 15

Oil and Gas Industry Conservation Plan for the American Burying Beetle in Oklahoma; Finding of No Significant Impact for Environmental Assessment; Receipt of an Incidental Take Permit Application for Participation From Canyon Creek Energy Operating, 79 Fed. Reg. 43,504 (July 25, 2014).................................................................................................. 10

Endangered and Threatened Wildlife and Plants; Reclassifying the American Burying Beetle From Endangered to Threatened on the Federal List of Endangered and Threatened Wildlife With a 4(d) Rule, 84 Fed. Reg. 19,013 (May 3, 2019) ............................................................... 13

## Other Authorities

Dino Grandoni, *Shocked and disappointed': Pair of researchers say they felt pressed by federal wildlife officials to bury risk on endangered beetle,* Washington Post, Sept. 3, 2018, https://www.washingtonpost.com/energy-environment/2018/09/03/shocked-disappointed-pair-researchers-say-they-felt-pressed-by-federal-wildlife-officials-bury-risk-endangered-beetle/ ..... 13

## I.       INTRODUCTION

Plaintiff Center for Biological Diversity (the "Center") challenges the decision by the U.S. Fish and Wildlife ("Service")  to reclassify—or  "downlist"—the American burying beetle from "endangered" to "threatened" status, Endangered and Threatened Wildlife and Plants; Reclassification of the American Burying Beetle From Endangered to Threatened with a 4(d) Rule, 85 Fed. Reg. 65,241 (October 15, 2020), FWS177, (Downlisting Rule), which, in effect, denies this highly imperiled species the full statutory protections of the Endangered Species Act, 16 U.S.C. § 1531 *et seq*. ("ESA" or "Act")—protections that are essential to avoid extinction of the species.

The American burying beetle (also hereinafter the "beetle") was once ubiquitous in the eastern U.S. and three Canadian provinces but has since disappeared from over 90 percent of its range. The federal government dubbed this decline "one of the most disastrous" of any insect, prompting the Service, in 1989, to list the beetle as endangered under the Act. Following listing, increased survey and research efforts revealed some additional populations, as the Service had anticipated at the time of the endangered listing. Nonetheless, in a 2008 "5-Year Review" of the species—a review mandated by the ESA for the purpose of assessing whether a change in status is justified—the Service *again* concluded that the American burying beetle warranted endangered status due to the myriad of severe threats it continues to face from habitat loss and fragmentation and other impacts.

Since that time, no new beetle populations have been located and none of the threats that led to the beetle's endangered listing have disappeared. However, a new and even more dire, threat to the species' continued existence has emerged—climate change—that renders the beetle even more gravely imperiled than it was when first listed as endangered or when that endangered status was reaffirmed in 2008. Nevertheless, in its 2020 rule downlisting the species, the Service reached the counterintuitive conclusion that a species now facing the existential threat of climate change *in*

1

*addition to* the myriad threats previously found to support endangered status, should be relegated to the lesser status of threatened.

In announcing that conclusion, the agency made no effort to explain what, if anything, had so materially changed since the 2008 reaffirmation of endangered status to warrant affording the beetle *less* protection under the ESA. Despite recognizing that populations have declined at an alarming rate and that conditions facing the beetle are rapidly worsening, the Service downlisted the beetle without even addressing its finding in the 5-Year Review that the (unsurprising) discovery of additional populations should not prevent the beetle from remaining listed as endangered due to the imminence and severity of threats facing the species.

Far from justifying downlisting, the Service conceded that the beetle's "Southern Plains" portion of its range, which comprises about 60 percent of the species' total remaining habitat in the wild and, until recently, was the most secure population, is now at imminent risk of being completely lost—as soon as only 17 years from now—as a consequence of climate change along with other ongoing threats. Since the ESA requires an endangered listing when a species is "in danger of extinction throughout all *or a significant portion of its range*," 16 U.S.C. § 1532 (emphasis added), the beetle's especially dire status in more than half of its remaining range is alone sufficient to support maintaining an endangered listing. Yet the Service declared in its final listing rule that even the Southern Plains portion is not endangered—a finding that not only flies in the face of the ESA's plain language and overriding purpose, but was never even subjected to advance public notice and comment.

Making matters still worse, the Service relied on the downlisting to simultaneously issue a special "4(d) Rule" that strips the beetle of vital ESA safeguards in the very portion of the species' range most at risk of imminent extinction. In effect, the rule authorizes the oil and gas industry and

others to destroy beetle habitat in the Southern Plains without adopting any protective measures at all. Yet the Service has not explained how this harmful rule "provide[s] for the conservation" of the beetle—the statutory standard governing 4(d) rules. 16 U.S.C. § 1533(d). Nor has the agency set forth a reasonable factual basis for affording the beetle the *least* protection in the portion of the species' range where, according to the Service itself, the beetle is *most* imperiled.

In view of the Service's violations of its obligations under the ESA and the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"), the Center respectfully requests that the Court grant summary judgment in its favor, vacate the Downlisting and 4(d) Rules, and reinstate the endangered listing for the beetle pending any further consideration of these matters on remand.

## II.   BACKGROUND

### B.  STATUTORY BACKGROUND

The Endangered Species Act has been described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978). Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.,* 437 U.S. at 184.

To receive any of the ESA's substantive protections, a species must first be listed as "endangered" or "threatened" under Section 4 of the ESA. 16 U.S.C. § 1533. An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."

*Id*. § 1532(20). The term "foreseeable future" in the definition of "threatened species" means "so far into the future as the Service can reasonably determine that both the future threats and the species' responses to those threats are likely." 50 C.F.R. § 424.11(d). The Service must apply the "best available data" to construe the "foreseeable future" for a particular species, and consider "the species' life-history characteristics, threat-projection timeframes, and environmental variability." *Id.*

The ESA provides the most stringent substantive protections for species listed as endangered. "If a species is listed as endangered, it is entitled to greater legal protections than a species that is listed as threatened." *Ctr. for Biological Diversity v. Everson,* 435 F. Supp. 3d 69, 92 (D.D.C. 2020) (citing 16 U.S.C. § 1538(a)(1) and *Defs. of Wildlife v. Norton*, 239 F. Supp. 2d 9, 13 (D.D.C. 2002)). Endangered species generally receive higher priority for the preparation and implementation of recovery plans, and the Service is more likely to determine that particular actions jeopardize the continued existence of endangered species, leading to better conservation measures under Section 7(a)(2) of the Act. 16 U.S.C. § 1536(a)(2). In addition, a designation of "endangered" triggers a categorical prohibition in Section 9(a)(1) on "taking" individual members of the species without authorization from the Service. See 16 U.S.C. § 1538(a)(1)(B); *see also id.* § 1532(19) ("The term take means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."). In contrast, with regard to a species classified as "threatened," Section 4(d) provides that the Service "shall issue such regulations" as are "necessary and advisable to provide for the conservation of such species," and "may by regulation prohibit" the take of the species. 16 U.S.C. § 1533(d).

When making any listing determinations, the ESA requires the Service to "determine whether the species is an endangered species or a threatened species" based on any of the following statutory factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). A species may be listed based on any one or a combination of these five "listing factors." *Id*. In making listing decisions, the Service must adhere to the notice and comment rulemaking requirements of the APA, 16 U.S.C. § 1533(b)(4) (citing 5 U.S.C. § 553), and must make determinations "*solely* on the basis of the best scientific and commercial information regarding a species' status," i.e., without reference to possible economic or other impacts of such determination. 50 C.F.R. § 424.11(b) (emphasis in original); *see also* 16 U.S.C. § 1533(b)(1)(A).

After a species is listed as endangered or threatened, the ESA requires the Service to periodically make a formal determination whether the listing status should be changed. Hence, Section 4(c)(2) provides that the Service "shall" "conduct, at least once every five years, a review" of all listed species and, as pertinent here, "determine on the basis of such review whether any species should . . . be changed in status from an endangered species to a threatened species . . . ." 16 U.S.C. § 1533(c)(2)(A), (c)(2)(B)(ii). Such 5-year reviews and decisions must be based on the same factors that apply to initial listing decisions. *Id*. § 1533(c).

## C. FACTUAL AND PROCEDURAL BACKGROUND

### i. The Disastrous Decline of the Once-Ubiquitous American Burying Beetle, and the Service's Decision to List the Beetle as "Endangered."

Recognizable by its striking orange-red and black markings, the American burying beetle is the largest member of the carrion beetle family in North America, an important group of beetles that recycle decaying materials and contribute to nutrient cycling into the ecosystem. FWS2664.



The beetle is named for its unique reproductive behavior whereby a mating pair will work cooperatively to bury suitable carcasses as a food source for larvae. FWS2664. Both parents participate in the preparation of the carrion and the rearing of their offspring, a rare trait in the insect world. FWS680.

The beetle was "once ubiquitous" in 35 eastern states in the U.S. and three southeastern Canadian provinces. FWS5889, 5890; *see also* Species Status Assessment for the American Burying Beetle (2019) ("SSA"), FWS1336. However, during the early to mid-20th century, as native prairie grasses were converted to crops, pastures, and industrial and urban developments, and as the passenger pigeon, which may have been a primary source of carrion, was lost to extinction, the beetle vanished from over 90 percent of its range. American Burying Beetle 5-Year Review (2008) ("5-Year Review"), FWS5052; *also see* FWS691, 693, 696. The Service's biologists and other beetle experts recognized this decline as "one of the most disastrous declines of an insect's range ever to be recorded." American Burying Beetle Recovery Plan (1991), FWS4967, 4515.

Therefore, citing this vast curtailment of the species' historic range and ongoing threats to its existence, the Service listed the beetle as an endangered species in 1989. 54 Fed. Reg. 29,652, 29,653 (July 13, 1989), FWS5890. The Service also based its "endangered" determination on the fact that "there is no known way to reverse any decline that might occur in the known populations" and the vulnerability of any subsequently discovered populations to the same threats that caused the species' drastic decline. *Id*. Thus, at the time of listing, the Service stressed that "it is not improbable that other remnant populations will be discovered in the future," but it determined that this prospect should not foreclose the beetle's listing as endangered because "it is likely that those populations remain vulnerable to the factors that have caused the general decline of the species." *Id*.; *see also id*. ("It is possible that future search efforts may result in discovery of another extant population. However, the extent of the species' decline suggests that any newly discovered populations are also vulnerable to whatever factors have caused their disappearance elsewhere."). The determination of endangered status said nothing about climate change because that was not a known threat to the species at the time.

In 1991, pursuant to Section 4(f) of the ESA, the Service issued a formal Recovery Plan for the beetle. *See* 16 U.S.C. § 1533(f)(1) (requiring that the Service "shall develop and implement" recovery plans for listed species). The Recovery Plan pointed to habitat loss and fragmentation and reduced carrion as primary factors in the species' decline. FWS4969, 4971. The Service determined that large expanses of beetle habitat have been fragmented by agricultural and grazing practices which increase competition for food sources available to the beetle. FWS4969 ("Fragmented habitat not only support[s] fewer or lower densities of indigenous species that historically may have supported *N. americanus* populations, but there is a great deal more competition for those limited resources among the 'new' predator/scavenger community.").

The Recovery Plan therefore set two "recovery objectives" for the beetle. FWS4979. First, it sought to "reduce the immediacy of the threat of [extinction]," an objective that would be satisfied if the known extant populations were "sufficiently protected and maintained" and "at least two additional self-sustaining populations of 500 or more beetles are established" in each of the eastern and western parts of the beetle's historic range ("Recovery Objective 1"). *Id.* Second, the Service said it could reclassify the beetle from endangered to threatened status ("Recovery Objective 2"), when: (1) three populations of at least 500 adult individuals are "established (or discovered)" within each of four geographical areas, i.e., the Northeast, Southeast, Midwest, and the Great Lake areas; (2) each population is "self-sustaining for 5 consecutive years," and; (3) "ideally, each primary population contains several satellite populations." FWS4980.

### ii.   The Service's 5-Year Review Determining that the Beetle's Endangered Status Should Be Retained Notwithstanding the Discovery of New Populations.

In 2008, as required by Section 4(c) of the ESA, the Service reevaluated whether the beetle's endangered status should be changed. 16 U.S.C. § 1533(c)(2). The Service's 5-Year Review set forth a detailed account of the current status of the beetle decision and whether the beetle should retain its endangered status in light of the ESA listing factors. The Review explained that, as had been anticipated at the time of listing, more intensive surveys had found a number of additional extant populations. FWS5030, 5037, 5039. However, also consistent with the prior listing decision, the 5-Year Review determined that the beetle should retain its endangered status because "[e]ven with the discovery of additional [beetle] populations, the species remains extirpated from about 90 percent of its historic range" and continues to face myriad threats from "habitat modification and fragmentation, vertebrate competition, [and] loss of ideal carrion." FWS5052, 5061. The Service determined that "threats to the species have not been abated sufficiently to show that the [beetle] is no longer in danger of extinction," FWS5061, and, in particular, that "range

curtailment" of nearly all the beetle's former range, a "primary reason for the original listing," continued to warrant "endangered" status. FWS5056.

Further, applying the five listing factors, the 5-Year Review specifically found that Listing Factor A—the "present or threatened destruction, modification, or curtailment of [the beetle's] habitat or range"—continued to support endangered status because, "[s]ince listing, the body of scientific literature confirming the adverse effects of habitat modification and fragmentation of burying beetle abundance, diversity, and success has been growing." FWS5052. The Review identified a plethora of ongoing threats to beetle habitat and concludes that "[o]verall, the habitat-related factors under Factor A continue to affect the species within its current range." FWS5056.

The 5-Year Review also specifically found that the Recovery Plan criteria for downlisting the beetle to threatened status—i.e., reestablishment of populations in four geographical areas—had not been satisfied and, indeed, that there was no evidence that "reintroduced populations can be successfully established." FWS5060. At the same time, the Service found that the largest remaining populations, in Arkansas and Oklahoma, are at risk due to "multiple bottleneck events, small population size, and high levels of inbreeding." FWS5042.

Following this comprehensive review of the species' status, the Service concluded

> [b]ased on information available at this time, we find that the [beetle] *remains endangered throughout its current range and thus meets the ESA definition of endangered*, i.e., a species that is in danger of extinction throughout all or a significant portion of its range.

FWS5061 (emphasis added).

Because the 5-Year Review determined that the beetle remains endangered throughout *all* of its remaining range, the Service stated that "a 'significant portion of the range' analysis [was] moot at th[at] time." *Id*. However, the Review did identify an emerging threat—climate change—that, particularly in the Southern Plains portion of the range, was projected to further exacerbate threats

to the beetle by raising ground soil temperatures, increasing the frequency of extreme weather events such as drought, and expanding the range of exotic fire ants, a new competitor for carrion. FWS5059, 5060 (disease and climate change "pose risks" to the beetle "irrespective of land protection measures").

### iii.   The Petition to Delist and the Service's Species Status Assessment.

As a consequence of its endangered listing, the beetle has benefited from a number of ESA protections that have helped the species stave off immediate extinction while still allowing various industrial activities to occur in beetle habitat. Of particular relevance, in 2014, pursuant to Section 10 of the ESA—which provides for the issuance of "incidental take" permits so long as private parties commit to measures to minimize and mitigate the adverse effects of their actions, *see* 16 U.S.C. § 1539(a)(1)(B)—the Service approved an "Oil and Gas Industry Conservation Plan Associated with Issuance of [ESA] Section 10(a)(1)(B) Permits for the American Burying Beetle in Oklahoma." 79 Fed. Reg. 43,504 (July 25, 2014), FWS708. The plan and associated permit authorized "take of the [beetle] that is incidental to covered activities associated with oil and gas development," in exchange for "measures necessary to minimize and mitigate impacts to the maximum extent practicable." *Id*. The plan resulted in protection of a number of areas for the beetle in Oklahoma as mitigation for loss of habitat elsewhere to development.

However, in 2015, several organizations—including the Independent Petroleum Association of America, which represents the oil and gas industry—formally petitioned the Service to delist the beetle. FWS948. The petitioners asserted that the discovery of new populations since listing and the purported absence of ongoing threats meant that it was an "error" to afford the beetle any ESA protection. FWS1336.

 In response to the petition, the Service prepared a Species Status Assessment ("SSA") in 2019. As described by the Service, an SSA (a document nowhere mentioned in the ESA itself) "is

not a decision document" but, rather, is "intended [by the Service] to support an in-depth review of the species' biology and threats, an evaluation of its biological status, and an assessment of the resources and conditions needed to maintain long-term viability." FWS1322.

The SSA for the beetle identified three distinct geographical areas with populations of American burying beetle: The Southern Plains, Northern Plains, and New England analysis areas. Within these larger analysis areas, the Service further delineated smaller analysis areas. As shown on the map below, the Southern Plains area includes the Red River analysis area, the Arkansas River analysis area, and the Flint Hills analysis area. FWS1323. The Northern Plains area includes the Loess Canyons, Sandhills, and Niobrara River. *Id.* The New England analysis area includes Block Island off the coast of Rhode Island, and a reintroduced population on Nantucket Island off the coast of Massachusetts, both of which are artificially supplemented with carrion to ensure survival. *Id.;* FWS1091; 1430.



FWS1232

11

The SSA again found that, notwithstanding the discovery of some additional populations since the species' listing as endangered, the beetle "has disappeared from over 90 percent of its historical range." FWS1336. The SSA also again documented ongoing habitat loss and fragmentation in the Southern and Northern Plains, FWS1396-7, and attributed the species' drastic decline to agriculture, grazing, logging, fire suppression, wind energy development, and urban development, FWS1357-13. The Service also reemphasized threats from catastrophic (or stochastic) events, such as a species-specific disease, and encroaching carrion competitors like fire ants. FWS1364; *see also* FWS5059.

While not pointing to any discoveries of new populations or alleviation of threats since the Service's 5-Year Review determined that the beetle should retain its endangered status, the SSA did document that the harm from climate change predicted in the 5-Year Review now poses an existential threat to the species, particularly in the Southern Plains. FWS1326. Ominously, the SSA confirmed that climate change is already causing downward pressure on the beetle in the Southern Plains analysis area. FWS1487. The SSA found that increases in ambient air temperatures, prolonged droughts, increased evaporation, and changes in precipitation—all attributed to climate change—are already occurring, and that they stress and kill American burying beetles, reduce reproductive success, increase competition for available carrion, and overwhelm beetles' ability to preserve carrion. FWS1375,1376, 1479, 1482. Further, high air temperatures ranging from 85-90°F are known to "kill or sterilize" captive beetle colonies, meaning that once the ambient air temperature reaches these thresholds, beetles can no longer survive. FWS1375.

In projecting the likely effects of climate change, the SSA found that emissions are now occurring at the high end of possible scenarios described by the most recent report from the Intergovernmental Panel on Climate Change. FWS1325, 1475, 1476, 1481, 1484. The SSA

concluded that as soon as 17 years from now, American burying beetles "in all southern analysis areas would likely be extirpated and this is a loss of about 59% of the current range." FWS1500. According to the SSA, the species is already at or near its temperature and moisture-related limits at the southern and western edges of this analysis area; hence, the species is likely *already* extirpated from Texas and Arkansas due to climate change, as no burying beetles have been found despite extensive survey efforts since 2008. FWS1485, 1487, 1484.[1]

> ### iv.   The Service's Proposed Downlisting and Adoption of a 4(d) Rule Stripping the Beetle of Vital Safeguards in the Southern Plains Portion of its Range.

Notwithstanding the findings in the SAA that the Southern Plains analysis area faces the prospect of complete extinction due to climate change in less than two decades, that climate change has already extirpated the beetle in portions of its range, and that other threats that led to the species' endangered listing are ongoing, the Service proceeded with publication of the Proposed Downlisting Rule in May 2019. 84 Fed. Reg. 19,013 (May 3, 2019), FWS158. The Service's principal rationale for relegating the beetle to this less protective status was that "*[s]ince the time of listing*, numerous searches and surveys have resulted in the discovery of additional American burying beetle

---

[1] Although the SSA paints a dire picture of the species' prospects for survival and recovery, particularly from climate change, outside beetle experts criticized the SSA process for downplaying other threats. For example, Dr. Douglas Leasure, who was asked by the Service to assess the threat that agriculture posed to the beetle, complained that in compiling the SSA, the agency had disregarded both his views and those of another expert, Dr. Wyatt Hobeck, concerning the seriousness of the threat posed by agricultural conversion. FWS5858; *see also* Dino Grandoni, *Shocked and disappointed': Pair of researchers say they felt pressed by federal wildlife officials to bury risk on endangered beetle,* Washington Post, Sept. 3, 2018, https://www.washingtonpost.com/energy-environment/2018/09/03/shocked-disappointed-pair-researchers-say-they-felt-pressed-by-federal-wildlife-officials-bury-risk-endangered-beetle/ (describing how the Service, over the objections of Leasure and Hobeck, had distorted certain data to "show[] the beetle population to be more spread out and far safer from agriculture than it actually is").

occurrences," FWS169 (emphasis added), as the Service itself had anticipated when it listed the beetle as endangered in 1989. *See supra* at 8.

Aside acknowledging that "we completed a status review ('5-year review') under section 4(c)(2)(A)" for the beetle in 2008 that "recommended that this species remain classified as endangered," FWS159, the Proposed Rule did not point to any beetle populations that had been discovered since 2008. Nor did the Service set forth any other explanation for what, if anything, had improved so significantly in the time since the 5-Year Review to justify affording the beetle *less* protection than the agency deemed warranted in 2008. On the contrary, the Service not only conceded that "*all* populations are exposed to a combination of risk factors," FWS169 (emphasis added), but stated that "since the time of listing" there are "*increasing* threats from increasing temperatures and ongoing land use changes . . ." *Id.* (emphasis added).[2]

While conceding that climate change has already extirpated the beetle in portions of the Southern Plains and that the remainder of this area faces imminent extinction, FWS163, 167, the Proposed Rule failed even to address whether the beetle is "in danger of extinction throughout . . . *a significant portion of its range*" within the meaning of the ESA's definition of an endangered, 16 U.S.C. § 1532(6) (emphasis added). This is because (as explained in the Proposed Rule), at the time the Proposed Rule was issued, the Service had in effect a policy providing that the Service "should

---

[2] The Service acknowledged that, in proposing downlisting, it was abandoning the 1991 Recovery Plan recovery objectives, stating that the Recovery Plan information is "considered to be out of date," because, in some respects, it was insufficiently ambitious to further recovery of the species. FWS179. Of note, the Service determined that the Recovery's Plan's population objective of 500 adults is "inadequate" because a "minimum viable population for most species would be considerably larger than 500 individuals." *Id.* Additionally, the Service conceded that objectives in the Recovery Plan will not be able to be met because "current projections indicat[e] that southern portions of the historical range would not be suitable for future recovery." *Id.* But rather than *update* the Recovery Plan with new "objective, measurable" criteria for downlisting and/or delisting, 16 U.S.C. § 1533(f)(1), the Service opted to proceed with downlisting while dispensing with its existing Recovery Plan.

first consider whether the species warrants listing 'throughout all' of its range and proceed to conduct a 'significant portion of its range' analysis if, and only if, a species does not qualify for listing as either an endangered or threatened species according to the 'throughout all' language." FWS169. Hence, because the Service proposed to "reclassify the American burying beetle as a threatened species across its entire range," it did not undertake *any* analysis of whether any "significant portions" of the range qualified as endangered. *Id.*; *see also* Final Policy on Interpretation of the Phrase "Significant Portion of Its Range," 79 Fed. Reg. 37,578 (July 1, 2014).

Along with proposing downlisting to threatened status, the Service proposed a 4(d) rule that effectively eliminates key substantive protections that have helped the beetle stave off extinction. FWS196. Stating that "[u]nder section 4(d) of the Act, the Service has discretion to issue regulations that we find necessary and advisable to provide for the conservation of threatened species," the agency proposed that in two of the three analysis areas—New England and Northern Plains— incidental take would continue to be "prohibited in suitable habitat when the take is the result of soil disturbance." FWS170. Thus, in those areas, entities wishing to engage in ground-disturbing activities that kill or otherwise take beetles would still have to obtain authorization from the Service by committing to conservation measures for the beetle. Yet the Service proposed, with minor exceptions, to eliminate the prohibition on incidental take in the Southern Plains, where the beetle is most at risk from near-term extinction and where habitat destruction and fragmentation from soil disturbing activities such as oil and gas development continue to threaten to American burying beetles. *Id.*[3]

---

[3] With regard to certain narrowly "defined conservation lands"—i.e., several public land areas, including two military installations—the proposed 4(d) Rule would exempt incidental take "if it occurs in compliance with a Service-approved management plan . . . ." FWS171.

##### v.   The Service's Adoption of Final Downlisting and 4(d) Rules.

Beetle scientists strenuously opposed both the proposed Downlisting and 4(d) Rules. The Service's own lead biologist on the 5-Year Review criticized the Service for finding that beetle populations are declining while simultaneously reducing protections under the ESA. FWS977. He criticized the proposed downlisting as "inconsistent with the scientific analysis that [is] presented" and as suffering from "inherent contradictions and misleading findings." *Id*. Likewise, two scientists from the Roger Williams Park Zoo, where American burying beetle research and captive breeding have been conducted for a quarter-century, opposed the proposal to downlist as "premature" and "extremely premature." FWS1088, 1092. Burying beetle researcher Daniel Snethen stressed that habitat loss and fragmentation were "a major concern." FWS938. Dr. Amy Smith, another beetle expert, explained that the "loss of a large portion of its range does not support the argument that the ABB is [only] threatened," and the added threat that climate change will "claim the southern population of this beetle" only serves to heighten the ABB's endangered status. FWS1221, 1222; *see also* Bedick Declaration, ¶13.

The Nebraska Game and Parks Commission opposed the downlisting as well. FWS1041-1044. In its comments, the Commission stated that downlisting the beetle to threatened "is not warranted from the criteria established in the [beetle] Recovery Plan and is not justifiable from a conservation stand-point." FWS1041. The Commission also recognized that "because the majority of Nebraska land is privately owned, only 0.7% of the Loess Canyons area and 3.9% of the Sandhills area is currently government protected. This small amount of protected land puts the species at great risk of loss, due to private landowner land-use decisions." FWS1042.[4]

---

[4] Four U.S. Senators also questioned the basis for the downlisting, stating that the decision "is scientifically and legally flawed." FWS1055. The Senators stated that, "[w]e fail to understand how a species that is highly likely to go extinct within a significant portion of its range in the next 20-40 years does not currently meet the definition of an endangered species. FWS1055-6.

Nevertheless, the Service published the final Downlisting and 4(d) Rules in October 2020. FWS177. In adopting the Final Rule, the Service again acknowledged the "disappearance of American burying beetles from 90 percent of their historical range," FWS183, and that climate change—a threat not even on the Service's radar when the beetle was listed as endangered—now poses an "existential risk" to the entire Southern Plains part of the species' range. *Id*. The Service also conceded that reintroduction efforts—which the agency's 1991 Recovery Plan had deemed essential for downlisting, *see supra* at 9, and which the Service also conceded "are necessary for the ultimate recovery of the species," have failed to produce even a single "self-sustaining" populations three decades after listing. FWS187. Yet, the Service determined that this dire state of affairs did not warrant retaining the species' endangered status although, once again, the agency made no effort to reconcile that conclusion with the opposite determination in the 5-Year Review.

Thus, while finalizing the reclassification to threatened status throughout the beetle's range, the Service fundamentally shifted its approach to analyzing whether the species is endangered in a significant portion of its range. As the Service explained in issuing the Final Rule, *see* FWS191, following publication of the Proposed Rule, Judge Sullivan of this Court vacated as contrary to the plain language of the ESA, that portion of the Service's "significant portion of its range" policy that precluded the agency from considering endangered status in a portion of a species range if the species was found to be threatened throughout all of its range. *See Everson*, 435 F. Supp. 3d at 89. Consequently, when adopting the Final Rule, the Service addressed *for the first time*—i.e., with no advance public notice or comment—whether the beetle's status in the Southern Plains portion of its range warrants listing as endangered. *See id.* ("Following the court's holding [in *Everson*], we *now* consider whether there are any significant portions of the species' range where the species is in danger of extinction.") (emphasis added).

In doing so, the Service found that, due to climate change alone, "populations in the Southern Plains and 59 percent of the of the existing range of the species are projected to be lost within the mid-century time period"—which the Service described as occurring as soon as 17 years from now. FWS186. The Service further found that, in addition to the ongoing destruction and fragmentation of habitat from various causes, the "Southern Plains analysis areas are *currently* experiencing the effects of climate change," FWS191 (emphasis added), as burying beetles are no longer found anywhere in Texas or Arkansas where temperatures are at or past thresholds where the beetle cannot survive. FWS184. But because the bulk of the predicted climate change effects have not *yet* occurred, the Service declared that the beetle "is not in danger of extinction," and hence can no longer be considered endangered in the Southern Plains as well as the rest of the range. *Id.* Based on that conclusion, the agency did not even consider whether the nearly 60 percent of the species' range in the Southern Plains qualifies as a "significant portion of its range" for purposes of an endangered listing. *Id.*

## III.   ARGUMENT[5]

### A.  Standard of review.

This action is brought under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), and the APA. Both ESA citizen suit and APA claims apply the APA standard of review, which provides

---

[5] Plaintiff Center for Biological Diversity is a national non-profit organization dedicated to the conservation of all species, great and small, hovering on the brink of extinction. The Center has individual members with concrete aesthetic, scientific, professional, and other interests in the continued existence of the American burying beetle in the wild. *Id.*; Bugbee Decl., ¶¶2-5; Bedick Decl., ¶¶ 6-14. These interests are injured by the Downlisting and 4(d) Rules, and their injuries are directly traceable to the Rules and redressable by a favorable decision from this Court remanding and vacating the rules. *See* Bedick Decl. ¶¶14-15; Bugbee Decl. ¶7; *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–84 (2000). Thus, Plaintiff has associational standing to represent its members' interests in the beetle. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).

that reviewing courts "shall [] hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "(D) without observance of procedure required by law." 5 U.S.C. § 706(2). A decision that violates the plain language of a statute cannot pass muster under this standard. *See, e.g.*, *Citizens Coal Council v. Norton*, 330 F.3d 478, 482 (D.C. Cir. 2003) (explaining that a court "begins, as always, with the plain language of the statute in question."). In addition, an agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### B. The Service's determination that the American burying beetle is not endangered in a significant portion of its range is contrary to the plain language of the ESA and arbitrary and capricious.

The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all *or a significant portion of its range*." 16 U.S.C. § 1532(6) (emphasis added). Accordingly, a species must be listed as endangered *either* because it is in danger of extinction "throughout all" of its range "or" because it is in danger of extinction in a "significant portion of its range." *Id*. Moreover, as this Court has held and the Service conceded in the Final Rule, a finding that a species is *threatened* throughout the entirety of its range does not excuse the Service from determining whether a specific portion faces such severe threats that an *endangered* determination is warranted. *Everson*, 435 F. Supp. 3d at 92.

As these principles are applied to the beetle, even if the Service could reasonably justify its downgrading of the species' status to threatened based on the threats it faces throughout *all* of its range—which, as discussed below, it cannot, *see infra* at 27, the agency's determination that the

beetle is not endangered in a "significant portion" of its range cannot be reconciled with the Service's own factual findings. Hence, in addition to finding that "many of the same threats apply to the Southern Plains" as threaten the beetle throughout all of its range, *see* FWS192 (explaining that beetles in the Southern Plains are also harmed by "[u]rban and suburban development, land use change, decreased carrion availability, and competition with other scavengers"), the Service determined that this portion, comprising nearly 60% of the current range, *also* faces an "existential" threat of climate change so severe that it will become completely uninhabitable within 17–27-years, FWS187; 1500.

Consequently, if, as the Service decided, the threats facing the beetle throughout its range are sufficient to support a threatened determination, then it is difficult to understand how the agency could rationally determine that those same threats *in addition to* the concededly devastating effects of climate change effects do not support an endangered finding for the Southern Plains. As discussed below, that determination is not only counterintuitive, but it is also contrary to the plain language of the ESA and the evidence before the agency. Additionally, by failing to subject the "significant portion of its range" determination to any public comment, the Service violated the APA's and ESA's notice-and-comment requirements.

### i. The Service's approach requires the Court to rewrite the plain language of the ESA's definitions of "endangered" and "threatened."

Given the Service's own factual findings regarding the status of the beetle in the Southern Plains, the plain language of the ESA compels the conclusion that the species is endangered in that portion of its range. The Service's concession that, because of climate change, the beetle is *already* losing habitat in the Southern Plains and is destined for *total* extinction in the area as soon as 17 years from now, FWS1490, 1479; FWS191, means that, under any reasonable reading of the definition of "endangered," the beetle is *now* "*in danger of* extinction" in this portion of the range.

20

16 U.S.C. § 1532(20) (emphasis added); *see also BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1542 (2021) (explaining that a reviewing court's "task is to discern and apply the law's plain meaning as faithfully as we can.").

Yet the Service found this extinction scenario does not qualify as being "in danger of extinction" because most of the "impacts from climate change that are likely to put the species at risk of extinction *will occur in the future*." FWS191 (emphasis added). But the mere fact that the predicted extinction will occur in the future cannot be the basis for rejecting an endangered finding. This is because the statutory definition itself is future-oriented; again, it refers to a species that is "in danger of" extinction, not a species that is going extinct *right now*. Moreover, unless an extinction event is literally occurring at the very time the Service is making its decision, *every* anticipated loss of a species will occur at some time "in the future." Accordingly, the Service's approach not only rewrites the language of the statutory definition, but also leads to absurd results. Under the Service's approach, for example, even a species whose habitat will be completely eliminated by a dam within a short time, *see, e.g., Tenn. Valley Auth.,* 437 U.S. at 184, cannot be considered "endangered" because the fatal blow will be dealt "in the future." There is no functional difference between that scenario and the one confronting the beetle in the Southern Plains; if anything, the case for endangered status is even more compelling here because the beetle is *presently* being harmed by the very same threat that is expected to cause its complete extirpation within a short time.

Compounding its distortion of the statutory language, the Service's logic also effectively rewrites the definition of "threatened." The Service determined that the beetle only qualifies as threatened in the Southern Plains because within the foreseeable future conditions will "likely result[] in *extirpation of the American burying beetle from these areas*." FWS192 (emphasis added). But the statutory definition of "threatened" encompasses species that will become "*endangered . . .*

21

within the foreseeable future in all *or a significant portion of its range*," 16 U.S.C. § 1532(19) (emphasis added), not a species that will be entirely *lost* within the foreseeable future. Simply put, if the plain meanings of the statutory definitions are applied to the Service's own factual findings, the American burying beetle is not likely to become an *endangered* species in the Southern Plains analysis area within the foreseeable future; instead, it is likely to become an *extinct* species in that portion of the range in the foreseeable (and very near) future. This necessarily means the species is endangered *now*.

Accordingly, the Service's determination regarding the Southern Plains cannot be sustained. An approach that necessitates rewriting the ordinary meaning of both the endangered and threatened definitions is arbitrary and capricious and not "in accordance with law." *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 140 S. Ct. 2367, 2381 (2020) (explaining that "[i]t is not for [the Court] to rewrite the statute so that it covers only what [a party] thinks is necessary to achieve what [it] thinks Congress really intended").

 **ii.  The record shows that the American burying beetle is endangered in the Southern Plains because all beetles in this analysis area will be extirpated within the next 17-27 years.**

In addition to conflicting with the plain terms of the Act, the Service's finding that the beetle is not endangered in the Southern Plains is impossible to square with the record. It is undisputed that, due to increased temperatures associated with climate change, beetles in the Southern Plains analysis area will likely be extinct as soon as 17 years from now, and that beetles are already being extirpated in the area by temperatures the species cannot tolerate. FWS1490, 1479; FWS191. The Service's own analysis disclosed that under the high emissions scenario, which most closely models current rates of climate change, FWS1497, most of the Southern Plains analysis area will be at or exceeding threshold temperatures by 2039 "with the potential to extirpate [the beetle] from most or

all Southern Plains populations." FWS1484, 1490. In each of the Southern Plains areas analyzed,

the Service determined that the species' future resiliency—the ability to recover from catastrophic

events and grow in size, FWS133—is *zero*, FWS1484, meaning the likelihood of the American

burying beetle surviving in the Southern Plains beyond the 2039 time-frame is non-existent. *Id.*

More specifically, in the Red River Analysis Area, the Service concluded that under both

climate change scenarios, all habitats will likely be unsuitable by 2039. FWS1488. The Service

found that the beetle is likely already extirpated from Texas and parts of Arkansas because the

southern and western edge of its range in Kansas, Oklahoma, and Texas may already be at or near

their temperature limits. FWS1484, 1485, 1487. In the Arkansas River and the Flint Hills analysis

area, "climate change is predicted to make all habitats in this analysis area at or near the presumed

threshold (mean maximum air temperatures of 95° F) for being unsuitable by 2039." FWS1488,

1489. Hence, "with climate change, a major decline in abundance in most or all of this area is

expected by 2039." FWS1489.

The lack of positive survey results in Texas and Arkansas is evidence of extinction

happening in real time as a result of high temperatures caused by climate change. FWS1479. The

Service's own SSA establishes that climate change is *currently* causing the extirpation of the beetle

in the Southern Plains analysis area and that in view of these present and ongoing effects, "no

portion of the [Red River, Arkansas River and Flint Hills] analysis area is expected to support ABB

beyond 2039." FWS1488, 1489. Consequently, the record belies the Service's determination that

the American burying beetle is not endangered in the Southern Plains portion of its range. The

Service's explanation "runs counter to the evidence before the agency" as well as the plain meaning of statutory language. *State Farm*, 463 U.S. at 43.[6]

Because of the Service's unlawful and arbitrary determination that the beetle is not endangered in the Southern Plains, the agency avoided even analyzing whether the Southern Plains constitutes a "significant portion" of the species' range. *See supra* at 19-20. However, since the Southern Plains accounts for more than half of the species' remaining range, FWS1500; FWS 195; *see also infra* at 12 (FWS196, map of analysis areas), and the Service has also found that beetles in the other portions of the range are either at "risk of extinction . . . in the future" (the Northern Plains) or require "ongoing active management" just to survive (New England), FWS192, the conclusion seems inescapable that the Southern Plains constitute a "significant portion" of the beetle's range. At minimum, this issue must be remanded to the Service for further analysis and an opportunity for public comment.

---

[6] The situation here stands in sharp contrast to that addressed in *Ctr. for Biological Diversity v. Salazar (In re Polar Bear Endangered Species Act Listing)*, 794 F. Supp. 2d 65 (D.D.C. 2011), in which the court upheld the listing of the polar bear as threatened. In that case, the Service found that the polar bear was threatened rather than endangered because there was "no information in the Administrative Record to suggest that the species has experienced significant population declines or severe restrictions in its range such that it is currently on the brink of extinction or that it faced a sudden and calamitous threat." *Id.* at 84. Recognizing that the "decision to list a species as threatened or endangered is highly fact-specific," the court upheld the threatened listing while noting that "preliminary" studies showing polar bears at risk in certain ecoregions within 75 years "give the Court pause"; *Id.* at 73 n.28. Here, the beetle indisputably *has* already suffered "severe restrictions in its range"; it *is* already facing a "calamitous threat" in the Southern Plains; and the analyses relied on in the SAA predicting complete loss of that portion of the range in as few as 17 years are not "preliminary." It is also noteworthy that, in the polar bear case, the Service declined to prescribe any generally applicable definition of "endangered" but, rather, set forth four "categories" purporting to summarize when species have been listed as endangered in the past. *Id.* at 83. Since the beetle *is* one such species, it is unsurprising that it falls squarely within several, if not all, of these categories, including that it is a species that has suffered "major reductions in numbers, range, or both, as a result of persistent threats"; it is "found in an extremely limited range that, in addition, [is] facing increasing threats"; it has "been reduced to critically low numbers or restricted ranges and, consequently, [is] at a high risk of extinction"; and, at least in the Southern Plains, it is "facing a catastrophic threat from which the risk of extinction is imminent and certain." *Id.*

### iii. By making its significant portion of the range determination for the first time in the final rule, the Service violated the public's right to comment.

Both the ESA and APA require that the Service afford the public advance notice of, and an opportunity to comment on, proposed listing decisions, including determinations to reclassify a species from endangered to threatened. *See* 16 U.S.C. § 1533(b)(4) (citing 5 U.S.C. § 553). Here, however, the Service never afforded the public any advance notice of, or right to comment on, its determination that the species is not endangered in any significant *portion* of its range—which appeared for the first time in the Final Rule. This constitutes a patent violation of the Service's procedural obligations, which deprived the Center and other interested members of the public of their right to be apprised of and comment on this critical aspect of the decision under review.

The Service cannot claim that the final disposition of this issue was a "logical outgrowth" of the proposed rule, and hence that public comment was unnecessary. The D.C. Circuit has held that a final rule qualifies as a logical outgrowth only "if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009) (internal citations omitted). In contrast, "a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine [the agency's] unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *Id.* at 1079-80 (internal citations omitted).

Here, the Downlisting Rule's determination that the beetle is not endangered in a significant portion of its range is not a logical outgrowth of the Proposed Rule – which, based on a since-vacated and abandoned policy, declined to analyze altogether whether the beetle is endangered in a significant portion of its range. FWS169-70. Thus, the public "would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was" not only "surprisingly distant from the

proposed rule," it bore no relationship with the rationale in the proposed rule. *Id.; CSX Transp., Inc.*, 584 F.3d at 1079-80.

Because the Final Downlisting Rule was the first (and only) time the Service proffered any analysis as to whether the beetle is endangered in a significant portion of its range, the public had no opportunity to explain to the agency why its analysis contravenes the ESA and the record. Therefore, this deprivation of the interested public's right to comment on a critical issue reinforces why, at a minimum, the Rule must be vacated and remanded for further consideration with appropriate public input.

**C. The Service failed to adequately explain its change in position from its prior determinations, particularly in the 5-Year Review, that the American burying beetle should remain listed as endangered.**

In 2008, as part of its statutorily mandated requirement under Section 4(c) to review whether the species should remain listed as endangered, 16 U.S.C. § 1533(c)(2), the Service made a formal determination that despite the presence of more beetles than originally known at the time of listing, the American burying beetle should retain its endangered status due to the severity of threats facing the species and the extirpation from 90% of its historical range. *Supra* at 9-10. Moreover, the record reflects that beetle populations have steadily decreased and the severity of threats have increased since its 2008 endangered determination. However, in 2020, the Service abandoned its previous determinations and downlisted the beetle from "endangered" to "threatened." In doing so, the Final Rule failed even to mention the 5-Year Review, let alone explain the dramatic change in position on the listing status of the beetle. FWS177. This constitutes arbitrary and capricious agency decision-making in violation of the APA and ESA. *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067–68 (9th Cir. 2018) (applying this principle to set aside the Service's change in position on whether a species warrants protection under the ESA).

When an agency changes its position, it must, at minimum, "display[ ] awareness that it is changing position" and set forth "good reasons" for deviating from its prior position. *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). In addition, an agency "'must provide a more substantial explanation or reason for a policy change' when 'its new policy rests upon factual findings that contradict those which underlay its prior policy.'" *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 626 (D.C. Cir. 2016) (quoting *Fox*, 556 U.S. at 515). "In that circumstance, 'it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Id.* (quoting *Fox*, 556 U.S. at 515-16); *see also Org. Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (explaining that "a policy change violates the APA if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so").

In *Ctr. for Biological Diversity v. Haaland*, the Ninth Circuit applied this principle in rejecting the Service's failure to provide a reasonable explanation for its change in position on the listing of the Pacific walrus. 998 F.3d 1061, 1067 (9th Cir. 2021). There, the Court held that the decision document failed to offer a reasoned explanation for the Service's reversal of its prior determination that the Pacific walrus warranted listing under the ESA due to the loss of sea-ice habitat, among other factors. *Id.* at 1063–65. The Service previously found that while listing was warranted, it was precluded by other more urgent listing actions, but then the agency reversed that determination and decided that the Pacific walrus no longer warranted listing. *Id.* at 1066.

The Ninth Circuit held that the Service failed to "offer more than a cursory explanation of why the findings underlying its [previous warranted finding] no longer apply," *id.* at 1068, and that the species status assessment underlying the not-warranted finding "did not offer a comparison

between its findings and those in the 2011 decision, only mentioning the 2011 process on limited occasions, and indicated uncertainty in several critical conclusions." *Id*. at 1065. Ultimately, the Ninth Circuit determined that "although the [a]ssessment contain[ed] some new information, the actual decision document does not explain why this new information resulted in an about-face from the Service's 2011 conclusion that the Pacific walrus met the statutory criteria for listing." *Id*. at 1069. As a result, the Service's not-warranted finding for the Pacific walrus was arbitrary because the Service had failed to provide a reasoned explanation for "disregarding facts and circumstances that underlay ... the prior policy." *Id*. at 1068.

The Service's downlisting of the American burying beetle suffers from similar but even more egregious flaws as those in *Haaland* because, here, the Service completely failed to come to grips with either the factual underpinnings or the conclusions drawn in the 5-Year Review. The core rationale for the decision to downlist is that the "current range is much larger than originally thought *when the species was listed*" in 1989, due to the discovery (as anticipated when the beetle was listed) of new populations. FWS190 (emphasis added). But these populations were *known* to the Service when it conducted the 5-Year Review in 2008, and the Service determined that the beetle should nevertheless remain listed as endangered due to the species' severe range contraction and myriad threats.

Consequently, it was incumbent on the Service to not only "display awareness" that it was rejecting the factual and analytic basis for the 2008 determination, but to set forth a "reasoned explanation" for doing so. *Fox*, 556 U.S. at 515-16. The downlisting decision's failure to do so is therefore arbitrary and capricious, particularly because the record reflects that the current landscape and conditions facing the American burying beetle now are far worse than when the Service determined that the beetle should remain endangered in 2008.

### i. The Service failed to explain its departure from its 2008 determination that the beetle should remain endangered even in light of the discovered populations.

The Service's failure to address its reversal of the 2008 decision to retain the endangered listing is especially glaring when the details of the 5-Year Review are considered in conjunction with the original listing decision. At the time of listing, the Service anticipated that new populations might be discovered with additional search effort, but stressed that "the extent of the species decline suggests that any newly discovered populations are also vulnerable to whatever factors have caused their disappearance elsewhere." FWS5890.

As predicted, by 2008, new populations had, in fact, been discovered. FWS5059. And, consistent with the original decision, when the Service conducted its mandatory reassessment of whether the species should remain listed as endangered or reclassified, 16 U.S.C. § 1533(c)(2), it determined that, regardless of the discovery of new populations, the beetle should remain listed as endangered: "Even with the discovery of additional ABB populations, *the species remains extirpated from about 90 percent of its historic range* and there is a significant disparity in distribution between the eastern and western portions." FWS5061 (emphasis added).

Following an extensive review of the species' status and various threats, the Service determined that "overall, information available for this review leads us to conclude that threats to the species have not been abated sufficiently to show that the ABB is no longer in danger of extinction"; that "[a]lthough the demographic outlook for the species is brighter than thought at the time of listing, extant ABB populations vary in level of protection"; and that "most if not all populations continue to be exposed to the factors that led to listing as well as factors that have come to light since then." *Id.*

In its 2020 downlisting decision, the Service neither disputed the central factual premises underlying the 5-Year Review, nor explained why that review was wrong in concluding that the

facts support retaining an endangered listing. On the contrary, the downlisting decision reiterated that the beetle has suffered a severe 90% decline in its historic range, FWS182—a factor that the Service properly took into consideration when listing the beetle as endangered and then reaffirming that listing in 2008. *See Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (holding that "an adequate evaluation of the threats confronting the survival of a species within its current range requires looking at more than just the current moment in time" and that the Service "*also needs to consider the scope of the species' historical range*, and the impact that material contraction or relocation might indicate for the survival within a currently constricted or confined range.") (emphasis added).[7]

Moreover, while relying on the unsurprising fact that more populations had been discovered since the time of listing," FWS190, the Service did not identify a single population that was unknown when the 5-Year Review was conducted. Nor did the Service even acknowledge its previous conclusion that the beetle should remain listed as endangered *despite* the larger range.

In fact, no new populations of beetles have been found since 2008. The record instead reflects a *decline* in the beetle populations across its current range since the 5-Year Review was conducted. The Service disclosed in the SSA that "populations appeared to be declining by 2008" in the Red River analysis area. FWS1404. In 2005, 223 American burying beetles were captured at Camp Maxey in Texas. FWS1408. However, by 2008, only 8 beetles were captured, FWS1405, and "[n]o [beetles] have been documented at Camp Maxey from 2009-2017, despite intensive

---

[7] As explained by the D.C. Circuit, the Service's own listing policy provides that a species may be endangered in its current range "because [a] loss of historic range is so substantial that it undermines the viability of the species as it exists today." *Humane Soc'y*, 865 F.3d at 606 (citation omitted). But while the Service properly took the extreme loss of historic range into consideration in 1998 and 2008, its downlisting decision "failed to contend with the implications of massive range loss for the species' endangered or threatened status within its current environment." *Id*.

surveying." *Id.* "Existing information suggests that the [beetle] population has declined and may be extirpated from portions of [the Red River] analysis area." FWS1406.

In short, the Service offered no "comparison between its [2008] findings and those in the [Downlisting Rule]," *Haaland,* 998 F.3d at 1065, and failed to provide any reasoned explanation for "disregarding facts and circumstances that underlay . . . the prior policy." *Id.* at 1068; *Fox*, 556 U.S. at 515. Indeed, the agency's final decision document does not even "display awareness that it *is* changing position," *Fox, 556* U.S. at 515, which alone is sufficient to find the decision arbitrary and capricious. *Id*.

> ### ii. The Service's failure to explain its reversal of position is especially egregious when the record demonstrates that threats facing the American burying beetle are worse now than when the Service determined that the beetle should remain endangered in 2008.

The threats addressed during the 2008 5-Year Review are not only still present today, but they have increased in severity, thus rendering the Service's failure to engage at all with the 5-Year Review still more arbitrary.

By 2008, large areas of the species' historic range were no longer suitable to the beetle due to habitat fragmentation from agriculture, grazing, and development, all of which preclude the presence of carrion. FWS5029, 5053. The 5-Year Review found that "[h]abitat changes and competition for limited carrion resources, primary factors in the species' listing as endangered, continue to affect extant [beetle] populations across their current range." FWS5060. The Service further disclosed that the best available science determined that habitat fragmentation increases competition for carrion, making it a major factor in the decline of the species. FWS5058. "Recent studies have reinforced the longstanding hypothesis that reduction in carrion availability due to land use changes and increased competition was the overriding cause of the species' decline." *Id.* Thus, based on the threats from habitat fragmentation and carrion availability, as well as the lack of

conservation measures, and the need for a naturally occurring representative distribution of the species as further explained below, the Service found in the 2008 5-Year Review that despite more beetle populations existing than previously thought, it remains endangered throughout its current range. *Id.*

In contrast, the Downlisting Rule, while confirming that the beetle is still lost from 90 percent of its former range due to habitat loss and fragmentation and reduced carrion availability, asserted that it now considers those same threats to be "relatively minor." FWS165. But not only did the Service fail to explain what it meant by "relatively minor," the record contradicts that assertion. The SSA conceded that the beetle remains extirpated throughout most of its historic range, primarily because habitat loss and fragmentation are ongoing and threaten the beetle in the Southern Plains and Northern Plains analysis areas. FWS1396-7. The SSA found that "[t]here is little doubt that habitat loss and alteration affect this species at local or even regional levels, and could account for the extirpation of populations once they become isolated from others." FWS1356. The SSA attributed ongoing habitat loss to, among other causes, agriculture and intensive grazing, logging, and suppression of low-intensity fires that maintain beetle habitat. FWS1357, 1358, 1389 1394.

While the record reflects that these habitat-destroying and altering activities have continued unabated since the 5-Year Review, the risk posed by climate change during that time frame has gone from serious to critical. In the 5-Year Review, the Service predicted that increasing temperatures and the frequency of extreme weather events and drought would further threaten the American burying beetle. FWS5059-60. In the years between that prediction and the Downlisting Rule, that prediction has proven to be an understatement of the threat posed by climate change. As explained in detail above, the beetle is most at risk from climate change in the Southern Plains, an

area where the Service has said the threat is "existential" and will no longer be able to support the beetle by as soon as 2039. FWS1488.

The record underscores that dire scenario. The SSA reported that "[s]outhern portions of the Red River analysis area already have mean maximum temperature of 91-95° F in July and August and recent survey information suggests *the beetle may be extirpated in portions of this analysis area, including portions of this analysis area in Texas and Arkansas*." *Id*. (emphasis added); FWS1479, *see also* FWS1488 (SSA determination that "the effects of climate change. . . are predicted to make all habitats in this analysis area unsuitable by 2039"), FWS1489 (SSA finding that "[a] major decline in abundance and potential extirpation for most or all of [the Arkansas River] analysis area is expected by 2039"), *id*. ("SSA finding that "[w]ith climate change, a major decline in abundance in most or all of this [Red River] analysis area is expected by 2039.").[8]

In view of the threat posed by climate change in the Southern Plains and the fact that the small New England populations require active management even to persist, *see* FWS1091; FWS1430 (explaining that the New England populations are supplied with prey and not considered self-sustaining), the Service concedes that the Northern Plains populations are likely to be the *only* self-sustaining populations "remaining within 20–30 years." FWS189. But these populations are also already being affected by the "change in climate [that] is occurring now," FWS192, as well as

---

[8] To support the Downlisting, the Service stated that "large areas of known and potential habitat in the Southern Plains buffer the effects of lost land use changes," a threat previously considered to be the primary reason for the beetle's decline. FWS190. Yet, at the same time, the Service acknowledged that climate change poses such an immediate and existential threat to the species that it makes "all other future risk factors irrelevant" and will cause the Southern Plains to be uninhabitable by 2039. FWS1487. In other words, the availability of potential habitat in the Southern Plains cannot "ameliorate threats" to the beetle because climate change will inevitably render that potential habitat uninhabitable in any event.

"[r]isks such as conversion to cropland, cedar expansion, and wind energy development [that] also affect portions of the Northern Plains analysis area." *Id.*

In addition, as the Service disclosed in its 2008 endangered determination, the majority of the beetles found in the Niobrara River analysis area in Nebraska are on private lands. FWS1400. As the Service noted in the 5-Year Review, "habitat on private lands remains subject to land use changes and incompatible land management." FWS5056. Likewise, "[e]lsewhere in the range (Nebraska, South Dakota, and Kansas), the species occurs almost exclusively on private land." *Id.* Hence, based on conditions identified in the 5-Year Review that have only worsened since that time, the record confirms that as soon as 17 years from now when the Southern Plains populations are gone, the *only* naturally occurring populations of American burying beetle left anywhere will be those that are most susceptible to habitat destruction and fragmentation and least susceptible to successful conservation efforts.

The Downlisting Rule failed to account for this seemingly inevitable scenario—a major concern identified in the 5-Year Review, FWS1400; FWS5056, as well as by American burying beetle experts and the Nebraska Game and Parks Department. *See, e.g.,* FWS1100 (comment by Dr. Hoback, the lead American burying beetle expert in the Northern Plains, that the Loess Canyon population in Nebraska is "not very secure at all"); FWS1042 (Comments from Nebraska Game and Parks confirming that almost all of the beetles are found on private lands); FWS1100, 1091 (statements by American burying beetle experts confirming that the Northern Plains populations are isolated, sensitive to unpredictable weather patterns, and will become less resilient over time). Hence, in addition to failing to come to terms with the rationale for an endangered listing in the 5-Year Review, the Downlisting Rule neglected to address whether the now-certain loss of the entire Southern Plains population *coupled with* the Northern Plains population's increasingly precarious

dependence on private property should support an endangered listing irrespective of the 5-Year Review.

Finally, in reaffirming the beetle's endangered status, the Service found in the 5-Year Review that the biggest obstacle to the beetle's recovery is adequately protecting essential habitat. FWS5057. The Service noted that habitat fragmentation remains a risk to the species because habitat conservation at the landscape level has not been initiated. FWS5060. The Service found that "[c]onserving a representative distribution of a formerly widespread species allows for redundancy, an essential hedge against catastrophic losses or reduced carrying capacity in portions of the range." FWS5060. Because efforts to reestablish the species have not been shown to be successful, FWS186, "long-term viability of the species appears to be contingent on the persistence of naturally occurring populations, and these populations appear to be at some level of risk throughout the current range of the species." FWS5060. "Simply put, the ecology of this species requires landscape-level conservation rather than a perpetual attempt to protect specific [beetle] occurrences in response to smaller-scale project review." *Id.* Importantly, the Service also found that the regulatory protections afforded by an endangered listing "provide an important safeguard for the [beetle] in lieu of landscape-level conservation measures." FWS5058, *see also id.* (explaining that the removal of the protections afforded by listing "could leave local populations more vulnerable to population- and/or habitat-related impacts through the species' current range").

In view of the increasing threats posed by climate change, the need for "landscape-level conservation," and the stringent safeguards afforded by an endangered listing are, if anything, even more urgent than when the 5-Year Review was conducted. Yet the Downlisting Rule failed to address these previous findings and, likewise, failed to explain why removing the "important safeguards" granted to the beetle as an endangered species, will not "leave local populations more

vulnerable to population- and/or habitat-related impacts through the species' current range."

FWS5058 (5-Year Review discussing the importance of the beetle remaining listed as endangered.)

Indeed, the final decision contains no analysis of the extent to which downlisting the species from endangered to threatened status will, as a practical as well as a legal matter, result in the reduction of protections and conservation efforts for a species that now needs them more than ever. Such a reclassification to a less protective status inevitably conveys the message to the public that protections for the species can be relaxed and recovery efforts lessened—whereas the 5-Year Review along with the record compiled since 2008 reflect that the opposite is the case. The record also confirms that the species' endangered listing has in fact resulted in concrete conservation measures for the species which have allowed the species to stave off extinction to date, including those adopted in conjunction with incidental take permits, *see supra* at 11, but there is no discussion in the Downlisting Rule regarding what will become of these measures with the elimination of endangered status. This is still another deviation from the 5-Year Review and an "important aspect of the problem" that the Service failed to address in the final downlisting decision. *State Farm*, 463 U.S. at 43.

In sum, as in the walrus listing case, the Service "did not offer a comparison between its [2008] findings and those in the [Downlisting Rule]." *Haaland*, 998 F.3d at 1065. In fact, the Downlisting Rule is completely lacking any mention of the 5-year Review and thus failed to explain the resulting "about-face from the Service's [2008] conclusion" that the American burying beetle should remain listed as endangered. *Id.* at 1069. The Service's failure to provide a reasoned explanation for "disregarding facts and circumstances that underlie . . . the prior policy," *id.* at 1068, is especially egregious given the even bleaker outlook for the beetle since 2008. This renders the decision arbitrary and capricious. *See also Ctr. for Biological Diversity v. Zinke*, 900 F.3d at 1070

(finding that the Service failed to provide "any additional evidence or scientific studies" explaining its change in position from its prior finding that the artic grayling was threatened by warm water temperatures).

**D. The 4(d) Rule violates the ESA because it failed to provide for the conservation of the American burying beetle and arbitrarily eliminates essential protections in the Southern Plains portion of the range.[9]**

Unlike endangered species, the ESA does not categorically prohibit the taking of threatened species. However, Section 4(d)—which is entitled "Protective regulations"—provides that "[w]henever any species is listed as a threatened species ... the [Service] shall issue such regulations as [it] deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). "Conservation" is defined by the ESA as those "methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary," *id.* § 1532(3), i.e., *recovery* of the species to the point where it may be removed from the list of endangered and threatened species. Section 4(d) also authorizes the Service to extend any or all of the Section 9 take prohibitions, as well as other necessary protective measures, to any threatened species. *See In re Polar Bear*, 818 F.Supp.2d at 220.

The 4(d) Rule adopted for the beetle does not satisfy the statutory "conservation" standard and is otherwise arbitrary and capricious. In particular, it arbitrarily omits any protection against incidental take from soil disturbing activities in the vast majority of the Southern Plains, the area where the beetle is most at risk from habitat destruction and climate change, while maintaining such protections in the Northern Plains. On the record here, the Service's application of different incidental take prohibitions for the Northern Plains and the Southern Plains analysis areas has

---

[9] If the Court agrees that the Downlisting Rule must be vacated, thus reinstating the endangered listing, then there is no need for the Court to address the legality of the 4(d) Rule.

nothing whatsoever to do with recovering the beetle and is arbitrary and capricious because, while essentially the same threats from soil disturbing activities to the beetle exist in both of the analysis areas, they are treated dramatically differently.

Thus, for beetles found in the Northern Plains as well as New England, the 4(d) Rule prohibits incidental take of beetles from soil-disturbing activities in suitable American burying beetle habitat subject to authorization from the FWS, i.e., through incidental take permits or otherwise. FWS196.[10] But for beetles found in the Southern Plains, incidental take is prohibited only in certain narrowly defined "conservation lands." *Id.* These include only one location in Arkansas (Fort Chaffee in Arkansas), and two locations in Oklahoma (McAlester Army Ammunition Plant and Camp Gruber/Cherokee Wildlife Management Area). *Id*. Since these are public lands where the beetle is *already* protected from such land-disturbing activities as oil and gas development, timber cutting, and agricultural conversion, extending the ESA's take prohibition to them serves little purpose.

On the other hand, in every other location in the Southern Plains where conditioning incidental take on conservation efforts for the beetle *would* make an important difference—i.e., the overwhelming majority of the species' habitat—there are no longer any restrictions whatsoever on the nature or extent of incidental take that may occur. *Id.* Hence, the very activities that have contributed to the beetles' demise—including oil and gas development, agricultural conversion, and alteration of forested habitats in areas occupied by beetles—may now occur without any measures

---

[10] In addition to the issuance of incidental take permits through Section 10 of the ESA, an activity with a federal nexus—e.g., because the activity requires a federal permit or license or is federally funded—may obtain incidental take authorization through a consultation process established by Section 7 of the ESA, so long as the Service determines that the activity will not jeopardize the continued existence of the species and prescribes measures for minimizing the impact of the taking on the species. *See* 16 U.S.C. §§ 1536(a)(2), (b)(4).

being undertaken to minimize their impacts on beetles. Measures which, until now, have allowed the beetle to survive. FWS5053.

Insofar as the fate of the beetle is concerned, there is no rational reason for continuing to apply protections against take in the Northern Plains while largely dispensing with them in the Southern Plains. If anything, the need for safeguards in the Southern Plains is demonstrably greater. As explained, not only are the overall threats to beetles greater in the Southern Plains, but the majority of suitable American burying beetle habitat in the Oklahoma part of the Southern Plains is privately owned. FWS5053. A large amount of American burying beetle habitat is owned by Weyerhaeuser, where mature forest habitats that once supported the American burying beetle have been steadily reduced by logging, a soil disturbing activity. *Id.* In its Five-Year Review, the Service determined that this alteration of forest habitat "is likely to have contributed to the decline of the area's ABB population." *Id.* The Service further disclosed that "thousands of acres of [American burying beetle] habitat are affected by pipelines, access roads, drill pads, and other facilities associated with petroleum and natural gas drilling, development, and transportation" – soil disturbing activities that now may proceed in the absence of any safeguards. FWS5053.

The SSA also confirmed that, outside of climate change, the primary threat to beetles in the Southern Plains analysis area is habitat loss from soil disturbing activities, including intensive agricultural land uses and commercial forestry (logging). FWS1386, 1388, 1389. The Service disclosed that the reason the large swaths of potential habitat for the American burying beetle are no longer considered "favorable" is due to "intensively managed pine plantations and forested areas" and grassland/pasture lands used for grazing and hay productions. *Id.* The Service also disclosed that oil and gas activity is "locally high in portions of [the Southern Plains] analysis area."

39

FWS1388. Soil disturbing activities are the major threats to the beetle in the Southern Plains analysis area.  FWS1386, 1388, 1389.

Therefore, the record reflects that the beetle is just as, if not more, harmed by soil-disturbing activities in the Southern Plains as in the Northern Plains due to the amplified effect from climate change and threats from oil and gas development, among other activities. Yet the Service's 4(d) Rule gives a green light to unrestricted take throughout the vast majority of the Southern Plains, where the beetle is most endangered. This can only undermine the survival of the beetle and impede any prospect for its recovery. Accordingly, the 4(d) Rule is the opposite of a "conservation" or "protective" regulation within the meaning of ESA Section 4(d), 16 U.S.C. § 1533(d). And by irrationally treating the Northern and Southern Plains completely differently although soil-disturbing activities threaten the beetle in both areas, the 4(d) Rule "runs counter to the evidence before the agency" and is arbitrary and capricious for that reason as well. *State Farm*, 463 U.S. at 63.

Further, the Service's only explanation for the near-total elimination of take protections in the Southern Plains is woefully deficient. The final rule says that "[o]utside of defined conservation lands, incidental take is not prohibited because the Southern Plains currently has low risks to the species associated with land development," and the "combined permanent loss of habitat due to urban and agricultural expansion is less than 2 percent." FWS193. This explanation makes no sense for multiple reasons. First, by definition, there is *no* "land development" *within* "conservation lands," so that if the potential for harmful land development were, in fact, the dispositive consideration, as the Service suggests, the 4(d) Rule would do the reverse of what it now says: it would *exclude* "conservation lands" from the take prohibition as unnecessary while extending them to areas where the beetle is in fact at considerable risk.

Second, the Service's reference to the "*permanent* loss of habitat projected due to urban and agricultural expansion" fails to define what the Service means by "permanent" and conspicuously excludes oil and gas operations. Again, the 5-Year Review specifically found that such operations have been harmful to the beetle, FWS5053, and the prohibition on take has previously been used to trigger important habitat protection measures by the oil and gas industry as a condition for operating in beetle habitat. *Supra* at 11. Conspicuous by its absence, therefore, is an explanation for the exclusion in the 4(d) Rule of oil and gas operations in the Southern Plains.

Third, even with respect to the loss of habitat "projected due to urban and agricultural expansion," the Service does not explain why a "permanent loss" of 2% of the remaining habitat—for a species that has already lost 90% of its historic range—is inconsequential to the survival and recovery of the species. Nor does the Service identify where this permanent loss is projected to occur, e.g., whether it is in a particularly important part of the species' remaining range, or over what time frame to which the agency is referring.[11]

In brief, because the Service has not even begun set forth an "intelligible decisional standard" for protecting the beetle from incidental take in the Northern Plains but refusing to do so in the Southern Plains, the 4(d) Rule is arbitrary and capricious as well as violative of the statutory definition of "conservation." *See Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (holding that "where an agency's failure to state its reasoning or to adopt an intelligible decisional standard is so glaring . . . the agency action was arbitrary and capricious") (citation omitted).

---

[11] Also, as noted previously, beetle experts have opined that the Service, in the SSA, misstated their views on the extent to which beetle habitat will be lose to agricultural conversion. *See supra* at n.1.

**E.  The Downlisting and 4(d) Rules must be set aside and the 1989 Endangered Rule must be reinstated.**

If this Court finds in favor of the Center, the Court should vacate the Service's Downlisting and 4(d) Rules and reinstate the Service's original 1989 Endangered Rule, 54 Fed. Reg. at 29,652. Vacatur is the presumptive remedy for arbitrary and capricious action. 5 U.S.C. § 706(2)(A) (providing that the reviewing court "shall" set agency action that is arbitrary and capricious and not in accordance with the law); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case.").

Vacatur is especially appropriate here. Stripping the beetle of its endangered status and adoption of the 4(d) Rule has eliminated vital protections for a species that was already in danger of extinction. As the Service found in its 5-Year Review, reducing such safeguards "could leave local populations more vulnerable to population- and/or habitat-related impacts throughout the species' current range." FWS5058. Therefore, vacatur of the Final Rule and reinstatement of the 1989 Endangered Rule is necessary to restore vital regulatory protections needed to ensure the beetles continued existence in the wild.

## IV.  CONCLUSION

For the foregoing reasons, the Center requests that the Court enter summary judgment in their favor and vacate the Downlisting and 4(d) Rules.

DATED March 15, 2021.

Respectfully submitted,

*/s/ Kristine M. Akland*
Kristine Akland (MT Bar No. 13787)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807

Tel: 406-544-9863
Email: kakland@biologicaldiversity.org

Amy R. Atwood (DC Bar No. 470258)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: 971-717-6701
Email: atwood@biologicaldiversity.org

Eric R. Glitzenstein (DC Bar No. 358287)
CENTER FOR BIOLOGICAL DIVERSITY
1411 K St., N.W., Suite 1300
Washington, D.C.  20005
(202) 849-8401
Email: eglitzenstein@biologicaldiversity.org

*Attorneys for Plaintiff*