## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiff*,

v.                                                      Civil Action No. 21-791 (TJK)

U.S. FISH AND WILDLIFE SERVICE et al.,

*Defendants*.

## MEMORANDUM OPINION

The Fish and Wildlife Service recently designated the American Burying Beetle "threat-ened" under the Endangered Species Act after decades of listing the beetle as "endangered."  Plaintiff, the Center for Biological Diversity, disagrees with that decision and alternatively says the beetle requires at least more discretionary protections available to threatened species.  Despite that legal quarrel, the parties essentially agree on how the beetle's future will likely unfold:  The primary threat it faces is climate change, which is likely to extirpate swaths of the beetle between 2040 and 2069.  The core legal dispute is about how to categorize that risk under the statute.

The Court finds that the Fish and Wildlife Service relied on a reasonable interpretation of the statute when it listed the beetle as threatened.  As for Plaintiff's other challenges, it finds that the challenged rule was procedurally proper, adequately explained, and supported by the administrative record.  Thus, it will grant summary judgment for Defendants.

I.    **Background**

A.    **Legal Background**

Congress enacted the Endangered Species Act ("ESA") to promote the conservation of species in danger of extinction and the ecosystems on which they depend.  16 U.S.C. § 1531(b).

The ESA delegates authority to the Secretary of the Interior to implement the statute by regulation. *See id.* §§ 1532(15), 1533.  In practice, the Fish and Wildlife Service ("the Service"), a bureau of the Department of the Interior, carries out the ESA's directives relevant to this case.

The ESA's first directive is to "determine whether any species is an endangered species or a threatened species."  16 U.S.C. § 1533(a)(1).  A species is endangered if it "is in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A species is threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).  The Service must publish a list of all species deemed endangered or threatened.  *Id.* § 1533(c)(1).

Endangered species receive more statutory protections than threatened species.  When a species is listed as endangered, several statutory prohibitions automatically apply to it.  *See* 16 U.S.C. § 1538(a)(1)(A)–(F).  Significant among those are the prohibitions against takings, *id.* § 1538(a)(1)(B)–(C), which can include incidental (nondeliberate) takings, *see Babbit v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 697–703 (1995); 16 U.S.C. §§ 1532(19), 1539(a)(1)(B).  By contrast, for threatened species, the Service has discretion to issue protective regulations that are "necessary and advisable . . . for the conservation of such species." *Id.* § 1533(d).[1]  Such a rule "may . . . prohibit" any of the acts automatically prohibited for endangered species.  *See id.*

The ESA tells the Service more about how to identify an endangered or threatened species. For one thing, the Service must act "solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species."  16 U.S.C. § 1533(b)(1)(A).

---

[1] The parties call such a regulation a Section 4(d) rule after that provision's designation in the ESA as enacted, and the Court will use that convention.

It may base its decision on "any of the following factors: (A) the present or threatened destruction, modification, or curtailment of [a species'] habitat or range; (B) overutilization for [enumerated] purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* § 1533(a)(1).  By regulation, the Service has explained that it may use "any one or a combination of [those] factors." 50 C.F.R. § 424.11(c).

The ESA also directs the Service to "review" listed species "at least once every five years." 16 U.S.C. § 1533(c)(2)(A).  "[O]n the basis of such [a] review," the Service may remove a species from the list or change the species from endangered to threatened (or vice versa).  *Id.* § 1533(c)(2)(B).[2]  Separately, an interested party may petition the Service to alter a species' listing, which can trigger a determination on the species' status.  *See id.* § 1533(b)(3)(A); 5 U.S.C. § 553(e); 50 C.F.R. § 424.14.

Finally, the ESA provides that the Service "shall develop and implement" recovery plans "for the conservation and survival" of endangered and threatened species.  16 U.S.C. § 1533(f). Such plans should describe "site-specific management actions," include "objective, measurable criteria" that would support the species' delisting, and estimate the time and cost required.  *See id.* § 1533(f)(1)(B)(ii).  A recovery plan, however, is "a statement of intention, not a contract." *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012).  Thus, the Service may alter a species' listing even if a goal set in its recovery plan has not been met.  *See id.* at 432–34.

---

[2] The parties call a species' removal from the list a delisting, a change in its status from endangered to threatened a downlisting, and a change in its status from threatened to endangered an uplisting.  The Court will use those conventions.

### B.      Factual Background[3]

This case is about the American Burying Beetle, a carrion beetle named for its distinctive reproductive practices.  *See generally* AR 683–99.  Historically, the beetle lived in much of the midwestern and eastern United States.  *See* AR 690.  But the most recent evidence suggests that its current range is much smaller.  *See* AR 1383.  The Service currently divides the beetle's range into three regions: the Northern Plains, the Southern Plains, and New England.  AR 161.  The two plains regions are also subdivided into "analysis areas."  *See* AR 1385.  By habitat acreage, the two plains regions dwarf New England.  *See* AR 1354, 1385.  By population, the Northern Plains is likely the largest region, followed by the Southern Plains and, more distantly, New England.  *See* AR 1401–11.

### 1.      Original Listing and Recovery Plan

In 1989, the Service listed the beetle as endangered.  AR 734.  The Service had concluded that the beetle had "disappeared from most of its historic range."  Determination of Endangered Status for the American Burying Beetle, 54 Fed. Reg. 29652, 29652 (July 13, 1989).  At that time, only two populations were known.  *Id.*  But the Service acknowledged the possibility "that future search efforts [could] result in discovery of another extant population."  *Id.* at 29653.  Still, it thought that "any newly discovered populations" would also be "vulnerable to whatever factors have caused [the beetle's] disappearance elsewhere," meaning that new discoveries would be un-likely to change the beetle's situation.  *See id.*

That listing decision prompted the Service to adopt a recovery plan for the beetle.  *See generally* AR 4943–5023.  It set two objectives: first, to "reduce the immediacy of the threat of

---

[3] The Court is reviewing the action of an administrative agency.  So the factual account below is drawn from the administrative record ("AR").  Citations to the administrative record are to the original pagination, available in the parties' joint appendix, ECF No. 34.

extinction" to the beetle, and second, in the longer term, "to improve its status so that it can be reclassified from endangered to threatened." AR 4946. It recognized two criteria for the former objective: the "protection and maintenance" of existing populations and the introduction of "at least two additional self-sustaining wild populations of 500 [beetles] each, one in the eastern and one in the western part of the species' historical range." AR 4979. As for the latter objective, it announced that it would consider reclassifying the beetle when three conditions were met: (1) the discovery or reintroduction of the beetle in each of "the Northeast, the Southeast, the Midwest, and the Great Lake states," (2) each of those populations contains at least 500 adult beetles, and (3) each of those populations is self-sustaining. AR 4980.

The recovery plan also summarized the Service's understanding of the causes of the beetle's decline. The Service called the question "complex and difficult." AR 4967. It rejected several possible explanations as inadequate, such as the use of the pesticide DDT, a non-native, species-specific disease, and "the loss of habitat." *See* AR 4967–68. Still, it acknowledged that "habitat loss and alteration" likely contributed to the beetle's decline, at least in isolated populations. *See* AR 4968. It concluded that the best explanation at the time was that habitat fragmentation had both reduced the availability of and increased the competition for carrion, a predicate of the beetle's reproductive success. *See* AR 4969–71. That explanation was "exacerbated," it explained, by "changing land use patterns, including more intensive agricultural practices and grazing." AR 4971. It also noted that the evidence then available was "circumstantial." *Id.*

### 2.    Interim Evaluations

The Service next evaluated the beetle's status in a 2008 review. *See* AR 5024–76. There, it revisited the two objectives from the original recovery plan. It concluded that the "stated intent" of the first objective had been achieved because "[t]he immediate threat of extinction [had] subsided in the 18 years since" the beetle was listed as endangered. AR 5030. It explained that

"additional western populations" had been discovered "across a considerable geographic area." *Id.* But the second objective, it said, was unsatisfied because the beetle "presumably remain[ed] extirpated in most of its historic range." AR 5031. Although the beetle met the previously stated criteria for downlisting in the Midwest, the same was not true for the other three regions listed in the recovery plan. *See* AR 5030–31.

The 2008 review also noted that the recovery plan's reclassification criteria differed from the statutory classification factors. *See* AR 5032. Thus, it announced that it would rely on both the statutory factors and the recovery plan's criteria in making its recommendation. *See id.* It highlighted two of the statutory factors as especially important: (1) habitat- or range-related threats and (2) miscellaneous threats. *See* AR 5052–59; 16 U.S.C. § 1533(a)(1)(A), (a)(1)(E). In the former category, it pointed out that curtailment of the beetle's range was "a primary reason for the original listing" and acknowledged that later discoveries of new populations had "somewhat off-set" that factor's salience. *See* AR 5056. But it also explained that the discoveries were "attributable to better knowledge," not necessarily a true recovery. *See id.* In the latter category, it discussed then-recent evidence suggesting that competition for carrion had been more important in the beetle's decline than was previously understood. *See* AR 5058–59. It also predicted that the beetle might face threats from climate change. *See* AR 5059.

Synthesizing that information, the 2008 review concluded that the beetle remained endangered. AR 5061. It interpreted the recovery plan's downlisting criteria to require "demonstrating that the risk of extinction is no longer probable." AR 5060. Despite acknowledging that "the demographic outlook for the species [was] brighter than thought at the time of listing," the Service thought the available information suggested that "most if not all populations continue to be exposed to the factors that led to listing" and other newly discovered threats. AR 5061. Thus, it

found that the beetle was still "in danger of extinction . . . throughout all its range." *Id.*  Still, it observed that the recovery plan's reclassification factors might eventually require revision because of the "marked differences in abundance and distribution between the eastern and western portions of the species' range." *Id.*

The Service next—and most recently—assessed the beetle's status in a 2019 report.[4]  *See* AR 1321–1553.  There, it distilled the threats facing the beetle to the two most significant factors: "habitat impacts due to land use and effects related to climate change."  *See* AR 1323.  The other factors, it explained, "are all dependent on, or affected by" those drivers.  *Id.*  Thus, the Service framed its analysis by projecting how those threats might evolve.  *See* AR 1324–27, 1355–80.

The 2019 report again observed that more populations had been discovered since the original listing decision, particularly in the western part of the beetle's historical range.  *See* AR 1381–83.  But it did not identify any organic populations that had been discovered since 2008. *See* AR 1381–82.  It did, however, report that two reintroduced populations, one in New England and another in Missouri, showed signs of success.  AR 1382.

Among the previously recognized populations, the Service interpreted trapping data to suggest that only one of the analysis areas experienced a significant decline since 2008.  *See* AR 1404–09.  That was the Red River portion of the Southern Plains, where the data implied that the beetle may have been "extirpated from portions" of the area.  *See* AR 1404–06.  For the remaining five analysis areas in the plains regions, the data were consistent with resilient populations capable of recovering from setbacks such as droughts.  *See* AR 1406–09.  In one of those, the Sand Hills portion of the Northern Plains, the Service concluded that "many more" beetles resided "than

---

[4] As explained below, the Service commissioned the report in response to a petition to delist the beetle filed by a coalition of private parties in 2015.  *See generally* AR 942–74.

previously recognized." AR 1409.  In New England, where the population exists with some human assistance, the Service found the population "relatively stable" despite evidence of year-to-year population fluctuations.  *See* AR 1410.

A major difference between the 2008 review and the 2019 report was the treatment of climate change.  An afterthought in 2008, climate change was central to the Service's 2019 analysis of risks to the beetle and its current and future condition.  *See* AR 1367–78, 1413–19, 1475–97. The Service explained that climate change matters to the beetle because some evidence shows that it has "a limited ability to tolerate warmer temperatures."  AR 1374.  And it cited data showing that global mean temperature has increased substantially, particularly since 1970.  AR 1413–14.

Still, the Service highlighted little evidence of current effect on the beetle.  It explained that the beetle's "reproductive activity may be limited when air temperatures are above 77°F" and that it faces a risk of mortality "when air temperatures exceed 90°F."  AR 1415.  The former condition appears to be occurring more often in the Southern Plains in recent years, but there is no such evidence for the Northern Plains or New England.  *See* AR 1416–17.  The Service noted that warm nights in the Southern Plains could explain the apparent decline in the Red River analysis area, AR 1419, but it also pointed out that "all locations in the southern analysis areas" had experienced similar conditions but did not produce similar observations, AR 1417.

The Service also reported mostly favorable findings about the beetle's current resiliency to harm.  It conducted a resiliency inquiry for each analysis area.  *See* AR 1419.  Resiliency, it explained, "is a qualitative estimate based on . . . analysis of relative abundance, population distribution, . . . known trend," and "the amount of suitable and protected habitat area."  AR 1420.  After recounting the evidence, AR 1421–27, it concluded that the beetle exhibits moderate or high resiliency in six of the seven analysis areas—all but Red River, AR 1427.

But the Service told a different story about the future. It acknowledged again that the beetle's decline appeared to have slowed or even reversed, but it emphasized the persistent uncertainty about the reasons for those trends. *See* AR 1433. And it highlighted the apparent role of climate change in causing the "observed declines" of the number of beetles in Red River. *See id.* Still, it could not "rule out other contributing causes," *id.*, so it projected the likely impacts of both changes in land use and climate change on extant beetle populations, *see* AR 1433–97.

As for land-use changes, the Service considered two possible scenarios. In the first scenario, it assumed (1) a constant rate of change in land use and (2) that active management of existing populations would continue. *See* AR 1439. Under that scenario, it projected no material changes to the beetle's resiliency attributable to future land-use changes in any analysis area. *See* AR 1452–55 (summarizing the Service's findings). In the second scenario, it assumed (1) an accelerating rate of change in land use and (2) "[n]o intentional management" of existing populations. *See* AR 1439. Under that scenario, it projected material resiliency impacts attributable to future land-use changes in two analysis areas. *See* AR 1471–75 (summarizing the Service's findings). Those areas are New England and the Loess Canyons in the Northern Plains. *See* AR 1473.

The Service attributed the former conclusion mostly to the effect of abandoning active management. It explained that the New England populations depend significantly on human provisioning of carrion to aid the beetle's reproduction. *See* AR 1473. Still, it did not dismiss the significance of habitat loss under the second scenario. It noted that one New England island was expected to experience roughly a 30 percent increase in urban acres, amounting to nearly 35 percent of the island's land, which it thought would "significant[ly]" impact the beetle. AR 1469.

In the Loess Canyons, the Service attributed its conclusion to the unusually large projected habitat loss. There, under the second scenario, it forecasted that as much as 15 percent of the

"suitable habitat" might be lost along with "an additional" 30 percent of other habitat.  *See* AR 1472.  By contrast, it expected the rest of the Northern Plains to experience land-use changes in around 5 to 6 percent of the beetle's habitat, and even less to its "suitable" habitat.  *See id.*

The Service also explained why the second scenario did not include material resiliency impacts in the Southern Plains.  In general, it said, the Southern Plains analysis areas are expansive and rural, meaning that even accelerated urban expansion would yield little relative impact.  *See* AR 1471.  Moreover, it observed, the urban areas in the Southern Plains are either far from beetle populations or they are near beetle populations "on protected lands that would not be affected by urban expansion."  *Id.*  Thus, under the second scenario, it projected that the Southern Plains would experience a "combined permanent loss of 1.2% . . . of suitable habitat."

Climate change is another matter, the Service explained.  As with land use, it considered two possible climate-change scenarios: one characterized by moderate future emissions, and one characterized by high future emissions.  *See* AR 1475–78.  The Service considered the predicted impact of those forecasted emissions on air-temperature trends in the beetle's habitats.  *See* AR 1477–78, 1481–95.  Based on the evidence of the beetle's temperature tolerance, it then applied those predictions to estimate the beetle's future resiliency in each analysis area.  *See* AR 1478–95.  No projection contains good news for the beetle, but the magnitude and timing of the projections differ by scenario and analysis area.

Beetles in the Southern Plains, according to the Service, face the most serious climate-change threat.  Indeed, as the Court noted above, the Service found some evidence of some current climate-change impacts there.  AR 1490; *see also* AR 1417–19.  Under both emissions scenarios, the Service predicted that almost all of the Southern Plains would reach inhospitable average temperatures by 2069.  AR 1490.  Under both scenarios, it expects that to happen in the Red River

portion sooner—by 2039.  AR 1487–88.  In the other two portions, it expects the warming climate to reduce the beetle's resiliency to "low" by 2039 and "zero . . . for any longer time frame," again with no material difference between scenarios.  AR 1490.  It also does not think the beetle can adapt to the changed conditions soon enough to avoid catastrophe.  *Id.*  Thus, it considers the beetle's extirpation from the Southern Plains conceivable by 2039, "likely" between 2040 and 2069, and expected by 2099.  *See id.*  Indeed, it considers climate change's projected effects so significant that they render "all other future effects irrelevant" in two of the three analysis areas. *See* AR 1487–89.

The Service's expectations for the Northern Plains are similar, though not so dire.  Under both emissions scenarios, it expects that no analysis area will reach inhospitable average temperatures by 2039.  *See* AR 1488, 1490–91.  Under the moderate-emissions scenario, the same is true by 2069, except for a small fraction of one analysis area.  AR 1490.  Under the high-emissions scenario, however, the Service expects the majority of one analysis area  and "small portions" of the other two to reach inhospitable average temperatures by 2069.  AR 1490–91.  Even so, it predicts that, by 2069, Northern Plains beetles will retain at least low resiliency in all analysis areas— and high resiliency in the Sand Hills.  AR 1488.  In the longer term, its expectation for the beetle's resiliency in the Northern Plains depends on which emissions scenario materializes.  If future emissions are moderate, it predicts no material effect on resiliency between 2069 and 2099; if they are high, it says extirpation is "likely" by 2099.  *See* AR 1488, 1491–92.

The Service's expectations for New England are different.  It thinks neither emissions scenario would "increase temperatures near any possible thresholds by 2099."  AR 1492.  Thus, it predicts that "climate changes [will] have only minor negative effects on the existing New England populations."  *Id.*  It projects no material impact on resiliency in any emissions scenario in any

time period.  *See* AR 1488.

The Service summarized its projections as follows:  Beetles in the Southern Plains face "a high risk of extirpation" between 2040 and 2069.  AR 1495.  It is possible, though unlikely, that beetles there will adapt to the warmer temperatures and stave off extirpation.  AR 1496.  Before 2040, beetles in the Southern Plains will likely experience "reduced resiliency."  AR 1500.  Beetles in the Northern Plains "are also at risk of extirpation due to climate change, but on a longer time frame"—between 2070 and 2099, and even that is "only at the high emissions level of climate change."  AR 1496.  Beetles in New England do not face material risks from climate change, but their resiliency would likely decline without "active management."  *Id.*  In the other two regions, "[l]and use changes are relatively minor in most analysis areas and are no longer relevant when climate changes make these habitats unsuitable."  AR 1499.

### 3.    The Downlisting and Section 4(d) Rule

In 2015, a coalition of private parties petitioned the Service to delist the beetle.  *See generally* AR 942–74.  That is, it asked the Service to reclassify the beetle as neither endangered nor threatened.  AR 948.  It argued that the beetle "is not now threatened and never was at risk of extinction in the foreseeable future."  AR 956–71.  The Service found the petition to have "present[ed] substantial scientific or commercial information indicating that [delisting the beetle] may be warranted."  AR 1317.  Thus, it commissioned the 2019 report, which the Court summarized above, as a "species status assessment report."  AR 1321–53.[5]

Soon after finalizing the 2019 report, the Service proposed downlisting the beetle.

---

[5] As Plaintiff points out, the ESA does not mention a document by that name.  ECF No. 21-1 at 15.  The Service describes it as a "peer-reviewed scientific document . . . that presents a comprehensive summary of the information . . . and incorporates the best scientific and commercial data available."  ECF No. 24-1 at 14.  The 2019 report notes that it is "not a decision document" but is intended only to "inform various types of decisions."  AR 1322.

AR 158–74 (notice of proposed rulemaking).  Along with listing the beetle as threatened instead of endangered, the Service proposed issuing a Section 4(d) rule that would prohibit incidental takings throughout the beetle's range—with the important exception of the Southern Plains outside of "defined conservation lands."  AR 158.  It explained that the 2019 report would be "the scientific basis" for its decision.  AR 160.  Based on that report, it explained its preliminary finding that the "beetle's viability is higher than was known at the time of listing," meaning that it "does not currently meet the definition of endangered under the [ESA] because it is not presently in danger of extinction."  AR 169.  It also proposed disregarding the original recovery plan criteria because the information on which they were based had become "out of date" and was inferior to that provided by the 2019 report.  AR 163.

Recall that the ESA defines endangered and threatened species as those that meet the criteria "throughout all *or a significant portion of* [their] range."  16 U.S.C. § 1532(6), (20) (emphasis added).  When the Service proposed downlisting the beetle, its policy was to implement those definitions in two steps.  First, it would ask "whether the species warrants listing"—as endangered *or* threatened—"throughout all of its range."  AR 169 (quotation omitted).  If so, it would end the inquiry and list the species accordingly.  *See* AR 169–70.  If not, "and only if" not, the Service would ask the second question: whether the species warrants listing—as endangered or threatened—in any significant portion of its range.  *Id.*

Based on that policy, the Service announced that it would not conduct a significant-portion-of-range analysis for the beetle.  AR 169.  That was because it determined that the beetle was *threatened* throughout *all* of its range.  *Id.*  In its view, and under its policy, it was "unnecessary" to ask whether the beetle was endangered in a significant portion of its range.  *Id.*

A court in this district later held that policy unlawful.  In *Center for Biological Diversity v.*

*Everson*, it concluded that the ESA "unambiguously requires" the Service to consider both statutory grounds for listing a species as endangered.  435 F. Supp. 3d 69, 93 (D.D.C. 2020).  It pointed out that "[e]ndangered species are entitled to more legal protection than threatened species."  *Id.*  Thus, it reasoned, the Service's policy was "inconsistent with the design of the [ESA]" because, for any species deemed threatened throughout all of its range, the Service was not considering whether it was "entitled to the greater legal protection provided for in the ESA."  *Id.*  So it held that the ESA foreclosed the Service's interpretation, or, alternatively, that the Service's interpretation was unreasonable.  *Id.* at 93–97.

In response to *Everson*, the Service changed its approach.  In the final rule, it explained that it had analyzed whether the beetle met the statutory criteria for an endangered species in any significant portion of its range.  AR 178.  The answer, it said, was no.  *Id.*  In its view, the updated analysis "did not result in any changes to the proposed rule but [supported] the determination" that the beetle should be listed as threatened.  *Id.*

For these reasons, the Service reclassified the beetle as threatened.  AR 192.  It explained that the beetle's "risk of extinction" had "been ameliorated since the species was listed."  AR 190.  Relying on the 2019 report, it noted that the beetle's "current status includes at least five populations with moderate to high resiliency and several of these populations are relatively large."  *Id.*; *see also* AR 180–86.  It also concluded that the beetle is not endangered in any significant portion of its range, even treating the Southern Plains as a distinct portion.[6]  It reasoned that land-use changes there "are not known to currently cause population-level impacts" and that "[t]he bulk of the impact from climate change . . . [will]occur in the future."  AR 192.  Still, it found that "[t]he

---

[6] The Service did not address whether the Southern Plains is a *significant* portion of the beetle's range because it concluded that the beetle is not endangered there.  AR 191–92.

combined effects of land use and future climate changes are likely to impact the resiliency of most populations" probably between 2040 and 2069, meaning that the beetle "is likely to become in danger of extinction in the foreseeable future throughout all of its range." AR 190–91.

That classification prompted the Service to consider a Section 4(d) rule. After pointing out that it enjoys substantial discretion over the issuance and scope of Section 4(d) rules, the Service announced a rule that it said would "promote conservation of the [beetle] by encouraging management of the landscape in ways that meet both land management considerations and . . . conservation needs." AR 193. As relevant here, the Section 4(d) rule prohibits incidental takings of the beetle in New England and the Northern Plains—but only in "certain conservation lands" in the Southern Plains. AR 193. The Service explained that further restrictions in the Southern Plains are unnecessary because that area faces "low risks to the species associated with land development." AR 194 (citing the 2019 report for the conclusion that "[t]he combined permanent loss of habitat projected due to urban and agricultural expansion is less than 2 percent").

### C.   Procedural History

Plaintiff describes itself as "a nonprofit organization that is dedicated to the protection of native species and their habitats." Compl. ¶ 12. It sues seeking to vacate the Service's downlisting and Section 4(d) rule. *See* Compl. at 22. It moves for summary judgment to that effect, ECF No. 21, and the Service cross-moves for summary judgment in its favor, ECF No. 24. The Service's position is supported by a group of amici. ECF No. 28.

## II.   Legal Standards

Although both parties move for summary judgment, the ordinary summary-judgment standard does not apply. Plaintiff "seeks review of agency action under the APA," so the Court "sits as an appellate tribunal." *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). That is, the Court has no factfinding role because the case presents "a question of law." *See id.* It

must ask "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013). On top of its purely procedural requirements, the APA directs courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2).

When evaluating a claim that agency action is arbitrary or capricious, courts must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009) (quotation omitted). That standard does not empower a court to "substitute its judgment for that of the agency." *Id.* (quotation omitted). In other words, the agency's "policy choices" are not up for debate—only the "explanation it has given." *Id.* at 530. That explanation must include a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). The agency must also consider all "important aspect[s] of the problem"—that is, those Congress considered relevant. *Id.*

The Service also invokes deference under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). *See* ECF No. 24-1 at 30. To decide whether that framework applies, the Court first asks whether the agency has exercised congressionally delegated lawmaking authority, a necessary predicate of *Chevron* deference. *See United States v. Harmon*, 514 F. Supp. 3d 47, 57 (D.D.C. 2020); *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). If it has, the Court should "exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000) (quotations omitted). If Congress has so spoken, the question is answered, and no deference is owed. *Id.* If not, the Court must extend deference to any "permissible agency

interpretation of the statute." *Id.* (quotation omitted).

## III. Analysis

Plaintiff asserts three claims. First, it says the Service violated the ESA by downlisting the beetle based on inadequate data. Compl. ¶¶ 78–84. Second, it thinks the Service violated the APA by downlisting the beetle arbitrarily, capriciously, and contrary to law. Compl. ¶¶ 85–89. Third, it argues that the Service violated the ESA by failing to issue regulations that are necessary to conserve the beetle's population. Compl. ¶¶ 90–96.

Those formulations overlap. The APA "supplies a generic cause of action" to bring claims based on substantive law found elsewhere. *See Trudeau v. FTC*, 456 F.3d 178, 188 (D.C. Cir. 2006) (quotation omitted and alteration adopted). It establishes "uniform procedures" that agencies must follow "when administering public rights established in other statutes," here, the ESA. *See Navab-Safavi v. Broadcasting Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009). But it does not "create any . . . substantive right that might be violated." *Id.* Thus, rather than treating each pleaded claim separately, the Court will address each of Plaintiff's *reasons* for claiming that the challenged rule is defective.

Plaintiff advances four such reasons. First, it claims that interested parties did not get an adequate chance to comment on the proposed rule. *See* ECF No. 21-1 at 30–31. Second, it says the Service's determination that the beetle is not endangered contradicts the data and the ESA. *Id.* at 24–29. Third, it argues that the Service has changed its position on the beetle's status without an adequate explanation. *Id.* at 31–42. Fourth, and alternatively, it contends that, even if the beetle is properly listed as threatened instead of endangered, the Service was still obligated to enact additional protections for the beetle, and that the Service's explanation for declining to do so was wanting. *Id.* at 42–46.

None of Plaintiff's theories finds support in the ESA or the administrative record, as the

Court will explain.  So the Court will grant summary judgment for Defendants.

### A.      Plaintiff Has Not Identified a Defect in the Notice-and-Comment Process

Plaintiff argues that it had an inadequate opportunity to comment on the proposed rule.  ECF No. 21-1 at 30–31.  Specifically, it complains that the notice of proposed rulemaking announced that it was unnecessary to analyze whether the beetle was "endangered . . . throughout . . . a significant portion of its range."  AR 169.  The Service did that because it had determined that the species was threatened "throughout *all* of its range," and under its pre-*Everson* practice, that finding made it "unnecessary to proceed to an evaluation of potentially significant portions of the range."  *Id.* (emphasis added).  But after *Everson*, the Service relied in part on its "significant portion of the range analysis" in promulgating the final rule.  *See* AR 188, 191–92.  In Plaintiff's view, that procedure deprived interested parties "of their right to be apprised of and comment on this critical aspect of the decision under review."  ECF No. 21-1 at 30.  Thus, it argues that the final rule is not a "logical outgrowth" of the proposed rule.  *Id.*

The Service has three responses.  First, it argues that Plaintiff's argument does not really fall under the logical-outgrowth doctrine's umbrella because that doctrine compares a final *rule* to a proposed *rule*.  *See* ECF No. 24-1 at 24–25.  Plaintiff's argument is based, in the Service's view, only on the *reasoning* for the rule, which the Service says is another matter entirely.  *See id.*  Second, it contends that—if the logical-outgrowth doctrine applies—it is satisfied because Plaintiff "at the very least should have anticipated" the Service's consideration of whether the beetle is endangered in a significant portion of its range despite what the Service said in the notice of proposed rulemaking.  *See id.* at 25–26.  Third, it contends that—if the final rule was not a logical outgrowth of the proposed rule—Plaintiff suffered no prejudice anyway because another party commented on the same issue.  *See id.* at 26–27.  The Court agrees with the Service that the cases on which Plaintiff relies do not apply here, so it does not consider the Service's remaining points.

1.       **The Logical-Outgrowth Doctrine Does Not Apply to the Aspect of the Rule Plaintiff Challenges**

The APA requires a notice of proposed rulemaking to notify interested parties of "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).  "After notice," interested parties must have "an opportunity to participate" by explaining their positions.  *Id.* § 553(c).  Thus, courts considering challenges to the adequacy of the notice-and-comment process must balance two competing goals.  On the one hand, adequate notice requires that a final rule does not differ "too sharply" from the proposed rule.  *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983).  On the other, the agency must be permitted to "learn from the comments on its proposals" without having to start from scratch.  *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n.51 (D.C. Cir. 1973).

Those goals are balanced in the logical-outgrowth doctrine.  "[A] final rule need not be identical to the original proposed rule."  *AFL-CIO v. Donovan*, 757 F.2d 330, 338 (D.C. Cir. 1985). If the final rule differs from the proposed rule, courts should ask "whether the final rule is a logical outgrowth of the rulemaking proceeding."  *United Steelworkers of Am.*, 647 F.2d 1189, 1221 (D.C. Cir. 1980) (quotation omitted).  A final rule is a logical outgrowth if its changes were foreseeable enough that interested parties "should have anticipated" them and so "reasonably should have filed their comments on the subject during the notice-and-comment period."  *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004) (quotation omitted).  And it is not a logical outgrowth if "interested parties would have had to divine the agency's unspoken thoughts[ ] because the final rule was surprisingly distant from the proposed rule."  *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (quotation omitted and alteration adopted).

Plaintiff tries to apply the logical-outgrowth doctrine to a change in reasoning behind the rule.  In its initial brief, it cites *CSX Transportation* for the proposition that a final rule can fail the

logical-outgrowth test where it has "no relationship with the *rationale* in the proposed rule."  ECF No. 21-1 at 30–31 (emphasis added).  But no language in *CSX Transportation* supports Plaintiff's reading.  There, the D.C. Circuit considered an application of the logical-outgrowth doctrine as it is usually formulated: a change in the rule's substance, or binding legal requirements, from those suggested in the notice of proposed rulemaking.  *See CSX Transp.*, 584 F.3d at 1082.  Plaintiff elaborates in its reply brief, ECF No. 30 at 7–13, but it still cites no case in which a court has applied the logical-outgrowth doctrine to an analogous situation.[7]  Plaintiff's suggestion thus appears unsupported by caselaw.

Plaintiff's preferred approach is also unmoored from the policy behind the logical-outgrowth doctrine.  Its purpose is to ensure that interested parties can reasonably anticipate "the final rulemaking from the draft rule."  *See Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997) (quotation omitted and alteration adopted).  In other words, the focus is on the "requirement[s] [that] might be imposed."  *See Small Refiner Lead*, 705 F.2d at 549. That is because the notice-and-comment process is meant to ensure "that agency *regulations* will be tested by exposure to diverse public comment."  *Id.* at 547 (quotation omitted and emphasis

---

[7] *See N.J. Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1049–50 (D.C. Cir. 1980) (holding that a comment period was inadequate where it was opened after the final rule was already adopted); *Kooritzky v. Reich*, 17 F.3d 1509, 1512–14 (D.C. Cir. 1994) (concluding that a notice of proposed rulemaking contained "not the merest hint" of a prohibition in the final rule); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107–09 (D.C. Cir. 2014) (holding that an announcement that the agency would "clarify" an existing policy did not suggest that the agency was "open to reconsidering existing policy"); *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 313, 319–22 (D.C. Cir. 2020) (applying the logical-outgrowth doctrine to the methods of calculating emissions standards to which regulated parties would be bound); *Teva Pharm. USA, Inc. v. FDA*, 514 F. Supp. 3d 66, 94–96 (D.D.C. 2020) ("[N]o divination was required on the part of interested parties to predict that that [agency] might adopt the precise definition of [a statutory term] . . . that it had proposed over the course of nearly a decade." (quotation omitted and alteration adopted)); *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000) ("[T]he final rule was not wholly unrelated or surprisingly distant from what [the agency] initially suggested.").

20

added).  Thus, the D.C. Circuit has held that an agency need not open a comment period *at all*

when it reinstates a rule that was previously withdrawn.  *See Am. Mining Cong. v. EPA*, 907 F.2d

1179, 1191–92 (D.C. Cir. 1990); *see also Sprint Corp. v. FCC*, 315 F.3d 369, 375 (D.C. Cir. 2003)

(limiting that holding to situations in which the reinstated rule is "identical to the initial rule").

Especially with no persuasive reasoning supporting Plaintiff's attempt to extend the logical-out-

growth doctrine, the Court takes at face value the D.C. Circuit's command that the "logical out-

growth test applies where an agency *changes its final regulation* in some way from the proposed

regulation."  *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003) (emphasis added).[8]

That understanding makes quick work of Plaintiff's logical-outgrowth challenge.  The Ser-

vice proposed downlisting the beetle and adopting a Section 4(d) rule to prohibit intentional tak-

ings and most incidental takings.  AR 158.  After the comment period, it enacted a rule downlisting

the beetle, AR 192, and, under Section 4(d), prohibiting intentional takings and most incidental

takings, AR 193–95.  The enacted rule contains only one change from the proposed rule: a portion

of the Southern Plains was "removed . . . from [the] definition of conservation lands," meaning

that incidental takings are not prohibited there.  AR 177–78.  Plaintiff does not argue that the

changed definition of conservation lands was "surprisingly distant" from that of the proposed rule.

*CSX Transp.*, 584 F.3d at 1080 (quotation omitted); ECF No. 21-1 at 30–31; ECF No. 30 at 7–13.

It does not mention that aspect of the rule at all.  So the Court finds that the final rule is a logical

outgrowth of the proposed rule.

---

[8] Plaintiff's proposed rule could have harmful consequences even on Plaintiff's own terms.
"[T]he APA requires an agency to explain its reasoning only when it issues a final rule."  *Small
Refiner Lead*, 705 F.2d at 519.  Thus, if an agency had to go through another round of notice and
comment any time it changed its stated reasoning, agencies might withhold their reasoning even
when they have already thoroughly analyzed an issue.  So even if Plaintiff is right that the ability
to criticize an agency's analysis is an important component of a meaningful comment, *see* ECF
No. 30 at 8–10, it is far from clear that adopting Plaintiff's rule would further that objective.

Even if the Court were to look beyond caselaw in this circuit—not to mention Plaintiff's arguments—it would still find no reason to find the Service's comment process inadequate.  Some courts have recognized that a notice of proposed rulemaking fails to provide an adequate opportunity to comment if it disallows or discourages comments on "relevant and significant issues."[9] Under that approach, courts ask whether the notice contains a "content restriction" on comments that is "so severe in scope . . . that the opportunity for comment" was not meaningful.  *See N.C. Growers' Ass'n*, 702 F.3d at 770.

But even if that is a correct approach, it would not apply here because the Service's notice of proposed rulemaking contained no content restriction.  The Service invited comments on "any aspect of [its] proposed rule" and promised to consider "all comments."  AR 158.  It even specifically highlighted the need for comments about "the locations of potential threats to the [beetle] or its habitat."  AR 159.  The Service only later—when explaining its own proposal—said it thought a significant-portion-of-range analysis was "unnecessary."  AR 169.  The Court sees no reason why a commenter would have been dissuaded from arguing to the Service that its proposal was flawed because the beetle faced graver-than-recognized threats in the Southern Plains, a "significant portion of its range."  16 U.S.C. § 1533(6).  In fact, Plaintiff made essentially that argument

---

[9] *See N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 761, 769–770 (4th Cir. 2012) (relying on the fact that the agency explicitly said comments on some subjects would "not be considered"); *Cal. ex rel. Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1174–76 (N.D. Cal. 2019) (relying on the fact that the agency had deferred "consideration of substantive comments regarding the regulations at issue" to a later rulemaking); *Coal. for Workforce Innovation v. Walsh*, No. 1:21-CV-130 (MAC), 2022 WL 1073346, at *9–10 (E.D. Tex. Mar. 14, 2022) (relying on the fact that the agency had expressed its intent to "solicit comments on its substantive proposal" in the future (quotation omitted)); *Puget Soundkeeper All. v. Wheeler*, No. 15-CV-1342 (JCC), 2018 WL 6169196, at *4–5 (W.D. Wash. Nov. 26, 2018) (relying on the fact that the agencies had "expressly excluded substantive comments" on the substantive issues).

in its comment.  *See* AR 1006–10.[10]

      For those reasons, the Court finds that neither the logical-outgrowth doctrine nor the related rule against material comment-content restrictions recognized by other courts renders the notice-and-comment procedures here defective.

### 2.      Plaintiff Identifies No Data that the Service Withheld

      In its reply brief, Plaintiff partially pivots to a novel claim about the substantive adequacy of the notice-and-comment period.  It notes that the Service must "make the underlying analysis of *data* used to develop its decisions available to the public for notice and comment."  ECF No. 30 at 10 (emphasis in original).  And it argues that the Service "not only failed to provide the under-lying *data* ostensibly supporting its decision . . . but it completely failed to provide the analysis and proposed decision, and in effect stymied any opportunity for useful criticism."  *Id.* at 10–11.  To the extent this argument is distinct from Plaintiff's logical-outgrowth argument, it contradicts the administrative record and on top of that, is forfeited.

      For starters, the Service correctly points out that Plaintiff forfeited this point.  ECF No. 33 at 4–5.  In its succinct initial treatment of the purported problems with notice-and-comment process, Plaintiff nowhere mentions a failure to provide essential data.  *See* ECF No. 21-1 at 30–31.  A movant forfeits an argument that it fails to raise in its first brief supporting its motion.  *See Armenian Assembly of Am., Inc. v. Cafesjian*, 924 F. Supp. 2d 183, 191 (D.D.C. 2013); *Lindsey v.*

---

[10] That Plaintiff commented on this subject cannot alone defeat its overall argument that the final rule was not a logical outgrowth of the proposed rule.  Notice "must come—if at all—from the agency."  *Small Refiner Lead*, 705 F.2d at 549.  The logical-outgrowth test, in other words, is whether a change to a proposed rule was "objectively foreseeable."  *See Allina Health Servs.*,746 F.3d at 1110.  The Court observes that Plaintiff raised this issue in its comment only to support a conclusion it independently reaches:  The Service's notice of proposed rulemaking did not restrict the content of potential comments.  *Cf. Shell Oil Co. v EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) (recognizing that another party's comment "can be a factor" in this inquiry).

*District of Columbia*, 879 F. Supp. 2d 87, 95 (D.D.C. 2012).  Still, the Court will exercise its discretion to consider the argument because it is easily rejected.  *See Mo. Dep't of Social Servs. v. HHS*, No. 18-CV-2587 (JEB), 2019 WL 4709685, at *3 (D.D.C. Sept. 26, 2019) (recognizing that a district court has discretion to consider forfeited arguments).

When an agency intends to rely on nonpublic technical data in enacting a rule, it must reveal the information "in time to allow for meaningful commentary."  *See Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 530–32 (D.C. Cir. 1982).  Still, the agency need not explain precisely how it will use the information.  *See id.* at 532 (holding that notice was adequate even though the agency refused "to identify the technical studies upon which the proposed rules were based" because the studies were subject to "adversarial comment").  Instead, the agency's disclosure need only enable "useful criticism" of the data, the ability to "point out where [the] information is erroneous or where the agency may be drawing improper conclusions from it."  *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (quotations omitted).  So an agency may not redact, for example, "parts of the studies that may contain contrary evidence, inconvenient qualifications, or relevant explanations of the methodology employed."  *Id.* at 239.  But this Circuit's caselaw goes no further than to require an agency to "release unredacted versions of the technical studies and data on which it relied in promulgating a rule."  *See Banner Health v. Price*, 867 F.3d 1323, 1337 (D.C. Cir. 2017).

Plaintiff scarcely tries to fit its argument in that framework.  It says, without citation or elaboration, that the agency "failed to provide the underlying *data* ostensibly supporting its decision."  ECF No. 30 at 10.  That is false.  The Service explicitly based its analysis of whether the beetle is endangered in a significant portion of its range on the findings of the 2019 report. AR 191. The Service made the 2019 report public and, in the notice of proposed rulemaking, explained how

to retrieve it.  AR 159.  And Plaintiff cannot claim to have been ignorant of the report's contents because it criticized the report in its comment.  AR 1010–11 (calling it a "sham exercise designed to provide an illusion of the best available science").  So the Court cannot discern what basis, if any, Plaintiff has for complaining about an inadequate disclosure of data.

Plaintiff's remaining contentions along these lines are even less persuasive.  Its assertion that the agency "failed to provide [its] analysis" collapses into its logical-outgrowth argument.  *See* ECF No. 30 at 10.  Plaintiff no more supports its position on that score with caselaw under the *Connecticut Light & Power* framework than it did under the logical-outgrowth framework, so the Court adheres to its conclusion that the Service's analytical change does not render the notice-and-comment process infirm.  And the Court cannot make sense of the claim that the Service did not provide its "proposed decision."  ECF No. 30 at 11.[11]  As it has already explained, the proposed rule and the final rule are all but identical.  *See* AR 177–78.

Plaintiff has failed to establish that the notice-and-comment process was defective.  So the Service is entitled to summary judgment on Plaintiff's Count II, ECF No. 1 at 20–21, insofar as Count II relies on those theories.

### B.    The Downlisting Rule Is Rational and Supported by the Record

Plaintiff's substantive challenge to the downlisting focuses mainly on the Southern Plains.

---

[11] If Plaintiff means to characterize the Service's determination that the beetle is not endangered in a significant portion of its range as *itself* an aspect of the rule, Plaintiff is mistaken. *See* ECF No. 30 at 9–10 ("[T]he decision whether to list a species as endangered based on its status in a significant portion of its range is a decision separate and distinct from the decision to list a species as endangered throughout all its range.").  The hallmark of a rule subject to the APA's notice-and-comment process is its "independent legal effect."  *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83–84 (D.C. Cir. 2020).  The Service's determination that the beetle is not endangered in any significant portion of its range has no legal effect independent of its listing decision.  Thus, the Service's additional analysis cannot qualify as a change to the rule that could serve as a hook for Plaintiff's arguments.

It points out that the Service had to assess whether the beetle faces such a severe threat in any significant portion of its range that an endangered determination is warranted.  ECF No. 21-1 at 24–25 (citing 16 U.S.C. § 1532(6) and *Everson*, 435 F. Supp. 3d at 92).  The Service's factual findings, it says, compel that conclusion.  It reasons that the Service deemed the beetle threatened throughout its range, and acknowledged that the beetle faced the additional "existential" threat of climate change in the Southern Plains.  *Id.* at 25 (quoting AR 187).  That confluence of threats is so serious, it explains, that the beetle could be extirpated from that region in "as soon as 17 years." *Id.* at 25–26 (citing AR 191, 1479, 1490).  And it interprets the record evidence to mean that the extinction is happening now—that "climate change is *currently* causing the extirpation of the beetle in the Southern Plains analysis area."  *Id.* at 27–28 (citing AR 191, 1484–90, 1479, 1497).

Plaintiff believes that timing falls within the statutory definition of endangerment.  It argues that the statute is "future-oriented," pointing out that the statute defines an endangered species as one that is "in danger of extinction," not one that is "going extinct right now."  ECF No. 21-1 at 26–27 (quoting 16 U.S.C. § 1532(6)) (emphasis deleted).  The Service, after all, acknowledges that the beetle will likely be eliminated from the Southern Plains between 2040 and 2069.  AR 192. Because the beetle will be "entirely lost" in that portion of its range in the foreseeable future, Plaintiff argues that it must be "endangered now."  *Id.* at 27 (emphasis deleted).

That conclusion also depends on Plaintiff's assessment that the Southern Plains "constitutes a 'significant portion' of the species' range."  ECF No. 21-1 at 29.  Even after *Everson*, the Service did not address the issue because it "concluded that the Southern Plains populations are not currently at risk of extinction."  AR 188.  Plaintiff disagrees, *see* ECF No. 21-1 at 27–29, and contends that the Southern Plains is a significant portion of the beetle's range because it "accounts for more than half of the species' remaining range."  *Id.* at 29 (citing AR 1500, 195–96).  Thus, it

says, "this issue must [at least] be remanded to the Service for further analysis." *Id.*

The Service rebuts those arguments on both factual and legal grounds. On the facts, it points to its findings reflecting that the beetle "faces a relatively low near-term risk of extinction based on current threats." *See* ECF No. 24-1 at 18–23. On the law, it contends that the difference between a threatened and an endangered species under the ESA is the time at which a predicted extinction appears likely to occur. *See id.* at 30–33. It thus argues that its findings support the beetle's "threatened" designation. *Id.* at 27–30, 33–34.

The Court agrees with the Service on both fronts. First, it will address the ESA's distinction between threatened and endangered species. Then it will apply that distinction to the administrative record and evaluate Plaintiff's challenges to the Service's factfindings.

### 1.    The Service Reasonably Construed the ESA

The Service interprets the ESA to distinguish threatened and endangered species based only on the timing of the threat a species faces. *See* ECF No. 24-1 at 30. In other words, the Service says it need not "account [for] the seriousness of the future threats faced by a species." *Id.* at 28–29. Relatedly, it defends its conclusion that the timing of the threats faced by the beetle constitute a likelihood of becoming "an endangered species within the foreseeable future." 16 U.S.C. § 1532(20); ECF No. 24-1 at 32–33. That is, it defends its interpretation that a risk of extirpation between 20 and 49 years from the decision supports a "threatened" listing. ECF No. 24-1 at 32. It claims these interpretations are entitled to *Chevron* deference. *Id.* at 30.

The Court must apply the *Chevron* framework because the downlisting rule was an exercise of delegated lawmaking authority. The ESA empowers the Service to "determine" "by regulation" whether a species is endangered or threatened. 16 U.S.C. § 1533(a)(1). When the Service issues such regulations, they have the force of law. *See Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1273 (11th Cir. 2009) (citing *Babbit*, 515 U.S. at 708). Thus, the Service's

interpretation of the ESA in issuing such a regulation is entitled to *Chevron* deference. *See Mead Corp.*, 533 U.S. at 226; *see also, e.g.*, *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.* ("*Polar Bear I*"), 748 F. Supp. 2d 19, 24–25 (D.D.C. 2010) (applying the *Chevron* framework to an analogous rulemaking).

Under the *Chevron* framework, the first step is to decide whether "Congress has directly spoken to the precise question at issue." *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 414 F.3d 50, 57 (D.C. Cir. 2005) (quotation omitted). In doing so, the Court must "exhaust the traditional tools of statutory construction." *Nat. Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (quotation omitted). The inquiry ends at step one "[i]f the intent of Congress is clear." *Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 77 (D.C. Cir. 2021) (quotation omitted). In other words, the Court should not defer to the agency if Congress has compelled or foreclosed its interpretation. *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 55 (D.C. Cir. 2018). Congress may foreclose an agency's interpretation "in one of two ways: either by prescribing a precise course of conduct other than the one chosen by the agency, or by granting the agency a range of interpretive discretion that [it] has clearly exceeded." *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011).

If the Court reaches *Chevron* step two, it must ask whether the agency has adopted a "permissible construction of the statute." *Cigar Ass'n*, 5 F.4th at 77 (quotation omitted). A statutory construction is permissible if it reasonably accounts for the language of the statute, the context in which that language is used, and the overall structure of the statutory scheme. *See Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014). Thus, a permissible construction must comply with all the statutory mandates that apply to the agency. *See SoundExchange*, 904 F.3d at 56–57. Further, the agency must provide, in its rulemaking, "a reasoned explanation for why it chose [its]

interpretation." *Vill. of Barrington*, 636 F.3d at 660.  If those conditions are met, the Court should defer to the agency's interpretation of the statute.  *Nat'l Treasury Emps.*, 414 F.3d at 57.

Below, the Court applies that framework to three aspects of the Service's statutory interpretation.  The first aspect is the Service's conclusion that the difference between an endangered species and a threatened one is "the different timeframes" of the danger of extinction.  *See* AR 187. On that point, the Court concludes that the Service's interpretation is compelled by the statute, so it does not progress beyond *Chevron* step one.  The second aspect is the Service's conclusion that current danger of extinction can be low even if the best scientific evidence shows that extirpation is very likely in the far future because of extant forces.[12]  The third aspect is the Service's conclusion that the period in which extirpation is likely in the Southern Plains, 2040–2069, constitutes danger in the foreseeable future within the ESA's meaning.[13]  On the latter two aspects, the Court finds that the statute is ambiguous but that the Service's interpretations are entitled to deference under *Chevron* step two.

### a.      Distinguishing Threatened and Endangered Species

The Service concluded that the only difference between an endangered species and a threatened one is the different timeframes of the danger of extinction.  And indeed, the only textual difference between the ESA's definitions of endangered and threatened species is time.  A species is endangered if it "*is* in danger of extinction."  16 U.S.C. § 1532(6) (emphasis added).  A species is threatened if it "is likely *to become* an endangered species within the foreseeable future."  *Id.*

---

[12] *See* AR 187, 190, 192 ("[T]he current risk of extinction is low," but "beetles in all Southern Plains areas [will] likely be extirpated . . . due to climate change," and beetles there are "currently experiencing the effects of climate change.").

[13] *See* AR 179 ("[T]he foreseeable future is the period of time in which we can make reliable predictions."); AR 191–92 (referring to 2040–2069 as "the foreseeable future").

§ 1532(20) (emphasis added).  By inputting the definition of the term "endangered species" into the definition of "threatened species," it is possible to rewrite the definition of the latter term as a species that "is likely to become [in danger of extinction] within the foreseeable future."  *See id.* § 1532(6), (20).  That formulation makes clear that—whatever the precise meaning of "danger of extinction"[14]—its application to the two statutory terms depends on whether that condition is present or likely to occur later.

That reading is confirmed by the need to construe the ESA as a coherent whole.  "Statutes should be interpreted as a symmetrical and coherent regulatory scheme." *Mellouli v. Lynch*, 575 U.S. 798, 809 (2015) (quotation omitted).  Thus, the words of a statute must be read "in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (quotation omitted).  Here, that task is aided by definitions that expressly tell interpreters how to fit the statute's pieces together.  The use of the "present tense 'is'" connotes, for an endangered species, the contemporaneity of the danger it faces. *See Humane Soc'y v. Zinke*, 865 F.3d 585, 603–04 (D.C. Cir. 2017) (interpreting another ESA term).  By contrast, a threatened species is defined by "future" dangers.  16 U.S.C. § 1532(20).  Those dovetailing definitions amount to a clear direction about how endangered and threatened species relate to one another, meaning that, on this "specific issue," the ESA is neither "silent [n]or ambiguous." *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (quotations omitted).

Plaintiff, however, appears to resist that conclusion.  It says the "mere fact that the predicted extinction will occur in the future cannot be the basis for rejecting an endangered finding."

---

[14] The Court does not doubt that this statutory phrase is ambiguous as applied to a specific species at a given time, as the parties here agree and as it will explain in more detail shortly. *See Polar Bear I*, 748 F. Supp. 2d at 27 ("[T]he overall structure of the ESA suggests that the definition of an endangered species was intentionally left ambiguous.").

30

ECF No. 21-1 at 26.  It reasons that "*every* anticipated loss of a species will occur at some time 'in the future.'"  *Id.*  Under the Service's temporal view, it claims, "even a species whose habitat will be completely eliminated . . . within a short time . . . cannot be considered 'endangered' because the fatal blow will be dealt 'in the future.'"  *Id.*  So, it seems to say, the timing of the predicted extirpation cannot be the basis for distinguishing threatened and endangered species.  *See generally id.* at 24–27; ECF No. 30 at 14–16.  It suggests that the Service should instead consider the "sever[ity]" of the threats.  *See* ECF No. 21-1 at 24–25.

To the extent Plaintiff understands a threat's severity to mean something other than the likely timing of the danger, its reading conflicts with the statute.  As the Court has explained, the ESA uses the same measure of risk for both categories—"in danger of extinction"—and it does so by explicitly incorporating the definition of one category into the definition of the other.  *See* 16 U.S.C. § 1532(6), (20).  Nor does it accurately describe the Service's position to claim that it is impossible to list a species as endangered unless "an extinction event is literally occurring at the very time the Service is making its decision."  ECF No. 21-1 at 26.  Instead, the Service concluded that it must decide whether the *danger* of extinction is present or will exist in the future—that is, a difference in "timeframes."  AR 187.  On that point, the ESA leaves no doubt.

That is not to say that the statutory definitions provide clear answers to all questions.  Far from it.  Indeed, the Court agrees with the *Polar Bear I* court that the ESA does not "bind the [Service] to a particular formula for determining when a species is 'in danger of extinction.'"  748 F. Supp. 2d at 27.  The statute does not separately define key terms such as "danger," "foreseeable future," or even "extinction."  *See generally* 16 U.S.C. §§ 1532–33.  Nor does it provide detailed guidance about how to evaluate the five factors on which it must base its listing decisions.  *See id.* § 1533(a)(1).  Thus, the ESA "allow[s] the agency flexibility to make a case-by-case determination

of when a species is 'in danger of extinction,' based on the five statutory listing factors and the best available science for that species." *Polar Bear I*, 748 F. Supp. 2d at 28.

To the extent the Court disagrees with *Polar Bear I*, it is in that court's rejection of the Service's position that "the only possible difference between a threatened species and an endangered species is the temporal proximity of the threat." 748 F. Supp. 2d at 26. The *Polar Bear I* court appeared to hold that time is merely a nonexclusive "element" of "the distinction between the categories of endangered and threatened species." *Id.* But that conclusion cannot be squared with the fact that the statutory definitions of the terms are identical except for time. And the *Polar Bear I* court cited no authority to support that conclusion—if that holding was even its intention.[15]

Nor does this Court's conclusion that the ESA compels a solely temporal distinction between endangered and threatened species undercut *Polar Bear I*'s key reasoning. Despite the statutory command to distinguish the categories based on the timing of threats to a species, it remains true that the Service must "bring its experience and expertise to bear" and cannot "rest simply on its parsing of the statutory language." *Polar Bear I*, 748 F. Supp. 2d at 27 (quotation omitted). The Service still must answer such questions as: Are threats so serious that they present a danger of extinction? When does the evidence suggest that an extinction is likely to occur? What timing constitutes the foreseeable future? The temporal-distinction principle is not "a particular formula" for making listing decisions, *id.*, but a high-level command about the relationship between the two categories.

Still, within the narrow scope of this aspect of the Service's ESA interpretation, Congress

---

[15] The *Polar Bear I* court specifically rejected the contention that "to be 'in danger of extinction'" according to the ESA's plain meaning, "a species must be in *imminent* harm." *See* 748 F. Supp. 2d at 27 (emphasis added). It also appeared to limit its holding "to the specific issue before [it]." *Id.* at 28–29 (quotation omitted). That interpretation of the definitions is not before this Court, and this Court expresses no opinion about it.

has spoken clearly.  In both the final rule, *see* AR 187, and this litigation, the Service has adopted a "temporal distinction" between threatened and endangered species, ECF No. 24-1 at 30.  The statute's clear, textual evidence supporting that distinction means that Congress has compelled the Service's interpretation, so this part of the Court's inquiry ends at *Chevron* step one.  *See SoundExchange, Inc.*, 904 F.3d at 55.

b.       **In Danger of Extinction**

The Service also concluded that the current "danger" of the beetle's "extinction" is low, even if the best scientific evidence shows that extirpation is very likely in the far future because of extant forces.  But as discussed, the Service's adoption of the solely temporal distinction between threatened and endangered species described above—a distinction required by the statute—does not compel any precise meaning of the phrase "in danger of extinction."  16 U.S.C. § 1532(6).  And as the Court has already explained, the statute does not further clarify that phrase.  Thus, the Court finds, as the parties agree, that the ESA leaves to the Service some discretion to determine what constitutes a danger of extinction in a given case.  *Accord Polar Bear I*, 748 F. Supp. 2d at 28; *In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litig.* ("*Polar Bear II*"), 794 F. Supp. 2d 65, 89–90 (D.D.C. 2011).  Thus, the Court must ask whether the Service's interpretation of that phrase is "permissible."  *See Cigar Ass'n*, 5 F.4th at 77 (quotation omitted).

The Service explained in the downlisting rule that the beetle is not yet in danger of extinction even in the Southern Plains, where it expects the beetle to be extirpated as soon as 2040.  AR 187, 192.  That is because beetles there will experience "[t]he bulk of the impact from climate change . . . in the future."  AR 192.  In other words, to be in danger of a harm is to face a high probability that the harm will soon materialize.  *See* AR 187 (distinguishing between "current status" and "future condition" on extinction).  Because the relevant risk here is "extinction"—a term

33

that "suggests total rather than partial disappearance"[16]—the phrase "in danger" means to the Service that there is a high probability of total disappearance in a short time.  *See id.*

Plaintiff portrays that interpretation as unreasonable.  It points out that "the beetle is *presently* being harmed by the very same threat that is expected to cause its complete extirpation."  ECF No. 21-1 at 26; *see also* AR 192 ("The Southern Plains analysis areas are currently experiencing the effects of climate change.").  It argues that the Service has distorted the statutory language by effectively rewriting the definition of a threatened species as one that "will be entirely *lost* within the foreseeable future" rather than one that will become "endangered within the foreseeable future."  ECF No. 21-1 at 26–27 (quoting 16 U.S.C. § 1532(20)) (alteration adopted).  In other words, Plaintiff would define "in danger" by reference to the presence of the force causing the ultimate harm, rather than to the timing of the harm itself.  That is, it reasons: climate change will cause the species' extirpation; climate change has present effects; and "that necessarily means the species is endangered *now*."  *Id.* at 27.

But Plaintiff's interpretation clashes with ordinary use of the term "in danger."  As far as anyone knows, every person will die someday, from old age if from nothing else.  And aging's effects are felt throughout life.  But ordinarily, one would not say that all people are always "in danger of" death.  That is because the ultimate harm is (hopefully) far off—even though the force is present and the outcome is certain.

Thus, the *Polar Bear II* court deferred to the Service's interpretation of "in danger of" to mean "on the brink of."  794 F. Supp. 2d at 89; *see also Everson*, 435 F. Supp. 3d at 85 (applying *Skidmore* deference and concluding that the same interpretation "is persuasive").  That formulation conveys little distance between the species and the ultimate harm of extinction.  As another court

---

[16] *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1141 (9th Cir. 2001).

in this district put it, "A species teetering on the brink of extinction may be unable to withstand even the slightest degree of additional harm . . . ." *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 246 (D.D.C. 2015). If it is permissible to conclude that a species is not endangered until it is on the brink of extinction, it follows that it is permissible to conclude that a species is not endangered where extinction is unlikely to happen for at least 19 years.

The Service also provided a "a reasoned explanation" for that construction. *See Vill. of Barrington*, 636 F.3d at 660. According to the Service, arguments for listing the beetle as endangered based, like Plaintiff's, on the future harms of climate change "misunderstand[ ] the definitions of threatened and endangered in the [ESA]." AR 187. Thus, it treated "in danger of" to require closeness in time to the ultimate harm, allowing it to distinguish between "current risk" and "future risk." *Id.* That approach tracks the temporal distinction between threatened and endangered species that the statute requires the Service to apply. *Supra* Section III.B.1.a.

For those reasons, the Service's interpretation of "in danger of extinction" is consistent with the statute's plain meaning, ordinary use of the phrase "in danger," and prior judicial constructions of the statute. And the Service adequately explained its reasoning. So the Court will defer to this aspect of the Service's reading of the ESA.

### c.  The Foreseeable Future

The third and final aspect of the Service's statutory interpretation that the Court considers is its treatment of the term "foreseeable future." *See* 16 U.S.C. § 1532(20). The Service explained that the foreseeable future is the period for which it "can reasonably determine . . . both the future threats and the species' responses to those threats." AR 179–80. That period need not always be defined "as a particular number of years," it said, but it should account for the relevant characteristics of the species and the threats it faces. *See* AR 179. Again, the Service's adoption of the

solely temporal distinction between threatened and endangered species that the statute requires says nothing about the meaning of this phrase.

As relevant here, the Service treated the time that it expects the beetle's extirpation to become likely—a period 20 to 30 years away from its decision—as constituting the foreseeable future rather than the present.  AR 187, 192.  Again, the statute does not further define the foreseeable future, and the parties here and other courts have recognized both that the term is ambiguous and that its meaning depends partially on the species in question.  *See Polar Bear II*, 794 F. Supp. 2d at 95.[17]  So the Court will again ask whether the Service's application of the term to the beetle is "permissible."  *See Cigar Ass'n*, 5 F.4th at 77 (quotation omitted).

It is not clear that Plaintiff contests this aspect of the Service's legal reasoning.  It says, for example, that it "does not disagree with the Service's chosen foreseeable future timeframes."  ECF No. 30 at 18.  But it also argues that "a species [that] will be extinct in a significant portion of its range in as few as 17 years meets the definition of endangered."  *Id.*  And it also describes that timeframe as "imminent."  *See* ECF No. 21-1 at 7 (arguing that Southern Plains beetles are "now at imminent risk of being completely lost—as soon as only 17 years from now").  So Plaintiff may mean to contend that, even if the beetle is not "in danger of extinction" until extinction has a high probability of happening soon, the timing of the beetle's likely extinction *is* soon.

The Service mainly justified its application based on its ability to reevaluate the beetle's status before the predicted effects materialize.  It explained that a "threatened" designation "implies a potential need to reclassify the species as endangered" if the projections "are accurate" and

---

[17] *See also In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litig.* ("*Polar Bear III*"), 709 F.3d 1, 16 (D.C. Cir. 2013) (recognizing that the Service has some discretion to choose the "period of foreseeability" "so long as [its] decision [is] justifiable and clearly articulated").

interim conservation measures fail.  AR 187.  And the ESA directs the Service to conduct such reevaluations "at least once every five years."  16 U.S.C. § 1533(c)(2)(A).  So, the Service argues, the fact that the beetle faces threats expected to materialize far later than five years away supports treating that period as the future.  *See* ECF No. 24-1 at 31–32.  It also points out that another court in this district has concluded that a closer period may constitute the foreseeable future.  ECF No. 24-1 at 32–33.  In *Natural Resources Defense Council, Inc. v. Coit*, the court held that the Service had adequately explained its decision to treat a "12- to 18-year window" from the decision point as the foreseeable future.  597 F. Supp. 3d 73, 86–91 (D.D.C. 2022).

The Court finds the Service's explanation reasonable and consistent with the statute.  For one thing, it is hard to argue that a period two decades away could constitute anything but the future as a matter of ordinary meaning.  The Service's invocation of the five-year-review requirement also provides a principled basis for distinguishing present and future effects.[18]  It also accords with the fact that one of the explicit purposes of the five-year reviews is to determine whether a species should be "changed in status" from threatened to endangered.    16 U.S.C. § 1533(c)(2)(B)(iii).  And although the *Coit* court considered different questions,[19] its treatment of the period twelve to eighteen years away—along with a few other, similarly near periods—as constituting the foreseeable future reinforces the Service's approach.  *See* 597 F. Supp. 3d at 87–89 (describing similar periods as "12–24 years" and "10 years" away from the decision point).

---

[18] Plaintiff points out that the Service has historically failed to conduct timely five-year reviews for the beetle.  *See* ECF No. 30 at 18–19 & n.3.  That may be, but it is irrelevant because the question here concerns the distinction between present and future *in the ESA*.  And the ESA unambiguously requires the Service to review a species' status "at least once every five years." 16 U.S.C. § 1533(c)(2)(A).  For purposes of statutory interpretation, there is no reason to consider the Service's past practice.

[19] The most analogous question was whether the chosen foreseeable-future period should have been longer.  *See* 597 F. Supp. 3d at 86–88.

In sum, the Court finds that all the relevant aspects of the Service's interpretation of the ESA are at least reasonable. The approach it took was required by the ESA's plain text in that it temporally distinguished between threatened and endangered species. And its readings of "in danger of extinction" and "foreseeable future" were permissible, adequately explained constructions of ambiguous statutory text.

### 2.    The Administrative Record Supports the Service's Findings

Under that interpretation of the ESA, the Service says the downlisting passes muster.[20]  In response to Plaintiff's criticisms, it highlights the following findings: considerable uncertainty exists about whether the climate-change threat will materialize even by 2040, *see* ECF No. 24-1 at 29 (citing AR 1476–78); only the smallest portion of Southern Plains beetles are "currently experiencing climate-related impacts," *see id.* at 28 (citing AR 1354, 1386–96); the remaining beetles in the Southern Plains "presently have moderate to high resiliency," *id.* (citing AR 1427); beetle habitats in the Southern Plains will experience only marginal destruction, *see id.* (citing AR 183); the beetle might adapt to the changed conditions, in part because of its "current genetic makeup," *see id.* at 28–29 (citing AR 1428–29, 1496); and conservation efforts might establish new beetle populations in regions "safe from climate-related risks," *id.* at 29–30 (citing AR 187). And it says the Court must defer to its findings. *See id.* at 33.

The Service's findings are entitled to deference unless they are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Under that standard, the Court must "presume[ ]" that the downlisting decision is "valid." *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997

---

[20] Analysis of the reasonableness of an agency's statutory interpretation under *Chevron* step two is often coterminous with arbitrary-and-capricious review, but not always. *See Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017). In this section, the Court considers the Service's "application of the statute to the record at hand," a question distinct from its understanding of the ESA. *See id.*

(D.C. Cir. 2008) (quotation omitted).   And it should set aside the decision only if the Service "relied on factors [that] Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence . . . , or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Polar Bear III*, 709 F.3d at 8 (quoting *Am. Wildlands*, 530 F.3d at 997–98).

Far from explaining why the Service's factual analysis fails that standard, Plaintiff seems to agree with it.   Throughout its arguments, Plaintiff operates from the same set of factual conclusions as the Service, such as its contention that "beetles in the Southern Plains analysis area will likely be extinct as soon as 17 years from now."   ECF No. 21-1 at 27.[21]   As the Court has already explained, *supra* Section II.B.1, that premise supports the Service's downlisting decision.   A factual argument that would advance Plaintiff's position is one showing that the Service ignored evidence or reasons why the beetle is likely to be extirpated *sooner*.

If Plaintiff's repeated emphasis of the fact that climate change is already impacting parts of the Southern Plains is intended as such an argument, *see, e.g.*, ECF No. 21-1 at 38, it fails because it identifies no information the Service did not consider.   In the final rule, the Service acknowledged the present effects of climate change but concluded their "magnitude" is "low enough that the species is not in danger of extinction" in that portion of its range.   AR 192.   That conclusion relies on the findings of the 2019 report, which offered two reasons.   First, even in the Red River area, the part of the Southern Plains most vulnerable to climate change, the current effects are limited to parts of the analysis area and their full impact is not projected until 2039.   *See* AR 1486–88.   Second, Red River represents only about 2.7 million acres of the roughly 20 million

---

[21] *See also* ECF No. 30 at 21 ("Defendants cannot reasonably dispute that 'impacts from changing climate are ongoing and populations in the Southern Plains analysis areas are projected to be extirpated within 20 to 30 years.'" (quoting AR 193) (alterations adopted)).

acres of suitable habitat in the Southern Plains.  *See* AR 1385, 182.  Thus, the Service "considered and explained" why that effect is unlikely to cause a more rapid threat of extinction, and so it cannot be the basis for holding the agency's findings arbitrary and capricious.  *See Polar Bear III*, 709 F.3d at 179.

Similarly, Plaintiff's briefs could be read to assert that the Service failed to consider the imminence of the threat from "ongoing habitat loss."  *See* ECF No. 21-1 at 36–42; *see also* ECF No. 30 at 38.  But that contention, too, is wrong.  In the final rule, the Service weighed the projected impacts of future habitat loss and concluded that, even in the Northern Plains, where they are expected to be more serious, AR 183, such forces are "not known to currently cause population-level impacts" and "do not put the species at risk of extinction now," AR 192.  Again, that conclusion was based on the 2019 report, which, as the Court has explained, surmised that the beetle is at least moderately resilient to current habitat-related effects throughout almost all of its range. *See* AR 1421–27.  So facts related to those threats cannot support Plaintiff's challenge either.

At bottom, Plaintiff focused its substantive challenge to the downlisting on the legal significance of harms that—everyone agrees—are most likely to affect the beetle largely between 2040 and 2069.  But the Court has concluded that the Service reasonably interpreted the ESA to categorize such harms, even those that are existential and nearly certain, as supporting a "threatened" determination.  That conclusion leaves Plaintiff with few if any grounds for challenging the rule.  But because that understanding of the ESA means that Congress cannot have "intended [the Service] to consider" such far-off harms as reasons a species must be listed as endangered, *see Polar Bear III*, 709 F.3d at 8 (quotation omitted), the Court cannot conclude that the Service's consideration or explanation of the evidence was inadequate for the reasons Plaintiff asserts.  And ultimately, the decision about how to frame the issues is Plaintiff's.  *See United States v. Sineneng-*

*Smith*, 140 S. Ct. 1575, 1579 (2020).

*     *     *

For all those reasons, the Court finds that the downlisting decision was rational and supported by the record.  The Service's interpretation of the ESA is at least permissible and so entitled to the Court's deference.  And Plaintiff has identified no flaws in the Service's consideration of the evidence that suggest the Service arbitrarily weighed or failed to consider evidence that the beetle faces a risk of extinction sooner than expected.  Thus, the Service is entitled to summary judgment on Counts I and II of Plaintiff's complaint, ECF No. 1 at 19–21, insofar as they rely on contrary theories.

### C.    The Service Has Adequately Explained Any Change in Position

Plaintiff also accuses the Service of an unexplained about-face on the beetle's status.  That charge compares the reasoning supporting the challenged rule to the reasoning of the 2008 review.  *See generally* AR 5024–61 (concluding in 2008 that the beetle "remain[ed] endangered throughout its current range").  According to Plaintiff, the Service "failed even to mention" that review when it downlisted the beetle.  ECF No. 21-1 at 31.  Thus, Plaintiff says, its explanation for the downlisting is inadequate regarding both "the factual underpinnings" of the decisions and "the conclusions" drawn in the analyses.  *Id.* at 33.

Plaintiff focuses this argument on the import of a finding on which it says the Service based the downlisting: the fact that the beetle's "current range is much larger than originally thought when the species was listed [as endangered] in 1989."  AR 178.  Plaintiff argues that the Service has known since 1989 "that new populations might be discovered with additional search effort."  ECF No. 21-1 at 34 (citing AR 5890).  And it says that, in 2008, the Service acknowledged the realization of that prediction, but concluded anyway that "threats to the species have not been abated sufficiently" to warrant downlisting.  *Id.* at (quoting AR 5061).  Yet it more recently

"rel[ied] on the unsurprising fact that more populations had been discovered," Plaintiff contends, without even "acknowledg[ing] its previous conclusion that the beetle should remain listed as endangered *despite* the larger range." *Id.* at 35.

Plaintiff also points out that the situation has worsened since 2008, which it thinks makes the Service's explanation even less rational. *See* ECF No. 21-1 at 36–42. In its telling, the Service recognized threats to the beetle in 2008 that it now characterizes as "relatively minor" without adequate explanation. *Id.* at 36–37 (quoting AR 165). Those harms, it claims, "have continued unabated since [2008]," while the complementary harms caused by "climate change . . . [have] gone from serious to critical." *Id.* at 37. Indeed, it thinks the threat posed by climate change is so serious that, for beetles in the Southern Plains, it overshadows all other threats. *Id.* at 37 n.8 (citing AR 1487). For that reason and others, within the next 20 or 30 years, the only self-sustaining population of the beetle will live in the Northern Plains. *Id.* at 38–39 (citing AR 189). But that population is vulnerable to climate change too, and most of the beetles there live on private land, and so are "most susceptible to habitat destruction and fragmentation and least susceptible to successful conservation efforts." *Id.* (citing AR 192, 1400, 5056). Plaintiff says the downlisting rule "failed to account for this seemingly inevitable scenario." *Id.* at 39.

Plaintiff finds further fault in the Service's explanation for the downlisting decision in its treatment of the changes to conservation measures. ECF No. 21-1 at 40–42. In 2008, Plaintiff explains, the Service announced that "the regulatory protections afforded by an endangered listing 'provide an important safeguard for the beetle in lieu of [the ability to protect the beetle's essential habitats].'" *Id.* at 40 (quoting AR 5058) (alteration adopted). In Plaintiff's reading, the downlisting rule "contains no analysis of the extent to which [it] will . . . result in the reduction of protections and conservation efforts for a species that now needs them more than ever." *Id.* at 41. In

other words, the Service did not explain "what will become of these [conservation] measures with the elimination of endangered status." *Id.*

The Service counters in two ways.  First, it says the 2008 review is not the right benchmark; it must explain a change in policy, and a review recommending no change to the status quo makes no policy.  *See* ECF No. 24-1 at 35–37.  Thus, it argues that it had to explain only why it changed its position since the 1989 listing of the beetle as endangered.  *See id.*  Second—even if 2008 is the right benchmark—it says its explanation was adequate.  It contends that it "explicitly discussed" its reasons for differing from the 2008 review and that the reasons are also "otherwise discernible from the administrative record." *Id.* at 37–38.  It also points out that Plaintiff "acknowledges" that the downlisting rule "did not dispute 'the central factual premises'" in the 2008 review. *Id.* at 37 n.15 (quoting ECF No. 21-1 at 34).  There is thus no contradiction, it says, because the rule relied on "new science and data" that counseled a new path.  *See id.* at 38–40.

In the Court's view, the Service likely *does* need to explain any change in its analysis from that in the 2008 review.  But the Court need not decide that question because the Service did so.

> **1.  The Court Assumes the Service Must Explain Any Policy Changes from the 2008 Review**

The Service "must cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48.  That principle applies equally to fresh and reconsidered decisions. *Fox Television Stations*, 556 U.S. at 514–15.  So even when an agency changes its position, it usually need do no more than "display awareness that it *is* changing position." *Id.* at 515.  A "more detailed justification" is sometimes required, such as when the agency's "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.*  By contrast, such a justification is not required where an agency acts "on an entirely new record" and supports its

decision with "new, [more] specific findings." *See Ark Initiative v. Tidwell*, 816 F.3d 119, 130 (D.C. Cir. 2016). To prevail on a theory that an agency must provide a more-detailed explanation, a challenger must be able to identify "new findings" that contradict prior findings on which the agency relied. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037–38 (D.C. Cir. 2012).

But the Service claims those principles do not apply to the 2008 review because it was "only a recommendation." ECF No. 24-1 at 37. For that proposition, it cited no authority—it simply pointed out that no case cited by Plaintiff applied these principles to departures from agency actions without independent legal force. *See id.* at 37 & n.14. Nor is the Court aware of any authority for that proposition. And, as Plaintiff points out, a recent Supreme Court case seems to undercut the Service's argument. *See* ECF No. 30 at 28–29.

That case is *Encino Motorcars, LLC v. Navarro*, in which the Court concluded that an agency "needed a more reasoned explanation for its decision to depart from its existing enforcement policy." 579 U.S. 211, 223 (2016). And the Court traced that existing policy to an "opinion letter," later memorialized in a handbook. *See id.* at 217, 222–23. In other words, the Supreme Court applied the legal framework surrounding explanations of policy changes even though the changed policy arose from an action without the force of law. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines . . . lack the force of law . . . ."). That application strongly suggests that the same framework applies here.[22]

The Service tries to distinguish *Encino Motorcars*, *see* ECF No. 33 at 15–17, but the Court declines to break new ground. The Court need not resolve this question because the outcome does

---

[22] *Accord Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (applying the framework to a changed policy where the original policy was evinced by testimony to Congress and a "guidance document").

not depend on it.  As the Court will explain, the Service adequately explained any policy changes.

## 2.    The Service Justified Any Policy Changes

Plaintiff offers no reason to think the Service had to provide what *Fox Television Stations* called a "more detailed justification."  556 U.S. at 515.  It identifies no specific factfindings that contradict anything in the 2008 review.  *See Nat'l Ass'n of Home Builders*, 682 F.3d at 1037–38. Indeed, Plaintiff's briefing suggests that its position is that the Service merely failed to provide the ordinarily required "reasoned explanation" for changing positions.  *See* ECF No. 21-1 at 33 (quoting *Fox Television Stations*, 556 U.S. at 515–16).  Thus, the Court will not apply any kind of "heightened standard," *Fox Television Stations*, 556 U.S. at 514, or "elevated burden," *Ark Initiative*, 816 F.3d at 127.

Under the ordinary explanatory standard, the Service faces a "low bar."  *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377 (D.C. Cir. 2013).  Even an explanation with "less than ideal clarity" is sufficient if the Court can "reasonably discern the agency's path."  *Id.* at 376–77 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)) (alteration adopted).  The Court must seek to do that based on "the administrative record as a whole."  *See Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 58 (D.D.C. 2014).

As for Plaintiff's main contention, there is no doubt that, in the downlisting rule, the Service attached less significance to the beetle's absence from its historic range than it had in the 2008 review.  The 2008 review acknowledged that new populations had been discovered, but attributed that fact to "better knowledge rather than repatriation of previously unoccupied habitat."  AR 5056. And it showed concern that even those newly discovered habitats might be facing imminent threats.  *See, e.g.*, AR 5059.  Thus, it concluded that the new discoveries only "somewhat offset" the concern of the historical decline.  *See* AR 5056.

Plaintiff is wrong, however, to suggest that the Service based the downlisting only on the same, prior discovery of more populations.  Instead, the Service relied on the *characteristics* of those populations—new information that was unavailable in the 2008 review.  The 2019 report, for example, included a detailed analysis of the beetle's "current resiliency" based on the Service's summary of the "population and habitat factors" affecting the species.  *See generally* AR 1419–28.  Similarly, the 2019 report analyzed the beetle's "genetic diversity" across its current range to assess "its potential [for] adapting to [environmental] changes."  *See* AR 1428–29.  That analysis was based on updated and detailed evidence compared to the 2008 analysis.  *Compare* AR 1419–29 *with* AR 5034–42.  And it was those characteristics—not just the presence of populations known in 2008 but not 1989—on which the Service justified the downlisting.  AR 187 ("While we recognize the large loss of the historical range, the current range is much larger than originally thought when the species was listed *and* there are several large populations with relatively good genetic diversity and relatively low current risks." (emphasis added)).

So even if the decreased reliance on the beetle's decline from its historic range can fairly be characterized as a policy change, the Service satisfied the legal standard.  It "displayed awareness" of the prior analysis,[23] throughout the 2019 report by recounting the evidence of population change "since 2008."[24]  And a "reasoned explanation" for the reduced reliance[25] appears in the final rule and throughout the administrative record.  *See* AR 187, 1419–29.  Reliance on relevant new data is a powerful explanation for policy change.  *See Mingo Logan Coal Co. v. EPA*, 829

---

[23] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 142 (D.D.C. 2017) (quotation omitted).

[24] *See* AR 1404, 1405, 1406, 1419, 1422, 1423, 1441, 1442, 1457.

[25] *Standing Rock*, 255 F. Supp. 3d at 142.

F.3d 710, 727 (D.C. Cir. 2016).

The same is true of the Service's land-use analysis.  In 2008, the Service analyzed the beetle's "[e]cosystem conditions at the [s]tate level."  AR 5050–52; *see also* AR 5052–56 (applying that evidence to a listing factor).  In 2019, it considered those conditions for each analysis area—that is, at a much more granular level.  *See* AR 1383–97.  It summarized that new information in the final rule, concluding that land-use changes "are not known to currently cause population-level impacts" in the Northern and Southern Plains, and that active management techniques in New England offset such threats.  AR 192.  Again, that explanation "relying on new data" is "sufficient."  *Mingo Logan Coal*, 829 F.3d at 727.

That explanation also rebuts Plaintiff's claim that the Service inexplicably ignored its prior statements implying that habitat-related conservation measures are indispensable.  Although the 2008 review reasoned that "population viability appears to be reliant to some degree upon continuing habitat management and/or provision of carrion," AR 5061, that conclusion was superseded by the more current, detailed data suggesting that, at least in the plains regions, that relevant-term population viability does not depend on those factors.  *See* AR 192, 1383–97.  And in New England, where the situation is different, the Service explained that active "management is expected to continue into the foreseeable future."  AR 192.

As for climate change, Plaintiff's arguments are reheated versions of its prior contentions.  As the Court's prior discussion makes clear, the Service did not "fail[ ] to account for" climate change, ECF No. 21-1 at 39; it analyzed the issue exhaustively.[26]  It did not consider the evidence of climate-change threats sufficient to support an "endangered" designation because, under its interpretation of the ESA, the threats are not likely to materialize soon enough.  AR 187.  Its

---

[26] *See* AR 183–86, 190–92, 1475–97.

prediction was based on agreement between multiple forecasting models and the Service's expert weighing of the cumulative impacts of climate change and other risk factors. *See* AR 186, 1475–78, 1497. Its explanation in the record is cogent, and the Court has already found it a permissible construction of the statute. *Supra* Section III.B.

Thus, the analytical differences Plaintiff identifies were all based on new data and explained throughout the administrative record. For that reason, the Court can easily "discern the agency's path." *Inv. Co. Inst.*, 720 F.3d at 376 (quotation omitted). Accordingly, the record here is very different from those in the cases on which Plaintiff relies.

Take *Humane Society of the United States v. Zinke*, 865 F.3d at 605–07, for example. Plaintiff calls that case "closely analogous." ECF No. 30 at 36. But the Service had there failed to consider—at all—the "immense losses in the [species'] historical range." *Humane Soc'y*, 865 F.3d at 606. Indeed, the Service "[did] not deny" that it had not considered such evidence, and the D.C. Circuit held that it was an indispensable part of an adequate analysis. *Id.* In other words, *Humane Society* is not even a case in which the Service *changed* the significance it attached to a species' retreat from its historical range—let alone one where the updated analysis was explicitly based on new information about the characteristics of extant populations. And so it does not advance Plaintiff's position here.

Or consider *Center for Biological Diversity v. Zinke*, 900 F.3d 1053, 1069–72 (9th Cir. 2018). The problem the Ninth Circuit identified there was that the Service "based [its] determination largely on a study" even though it had earlier concluded that the same study was insufficient. *Id.* at 1070. As the Ninth Circuit put it, the Service had failed to "provid[e] any additional evidence or scientific studies demonstrating" what it belatedly considered credible. *Id.* On another, similar question, however, the court deemed it a sufficient explanation that the Service had "relie[d]

48

primarily on the same information" but *also* a fresh analysis from another scientist.  *Id.* at 1071.

That case amply supports the Court's conclusion here, where the record shows a much more thorough reliance on new information never before considered.

So too with *Center for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067–70 (9th Cir.

2021).  In that case, the Service had determined that a species should be listed as at least threatened in a 45-page document that "contained specific findings, replete with citations to scientific studies and data, that detailed the multiple stressors facing the [species] and explained why those findings justified listing."  *Id.* at 1064–65, 1068.  Then it disclaimed that conclusion in a "3-page" decision document that the court called "spartan" and characterized as "containing a general summary of the threats facing the [species] and the agency's new uncertainty on the imminence and seriousness of those threats."  *Id.* at 1068.  Here, by contrast, the updated analysis in the 2019 is much more detailed and specific than that in the 2008 report, and the Service explained how the information informed its conclusions in the final rule.

\*       \*       \*

Because the Service explicitly supported its analysis with "new, [more ]specific findings," *see Ark Initiative*, 816 F.3d at 130, the Court finds that it has "cogently explain[ed]" any analytical differences between the 2008 review and the 2019 report, *see State Farm*, 463 U.S. at 48.  That conclusion follows not only from the final rule, but also from "the administrative record as a whole."  *Nat. Res. Def. Council*, 71 F. Supp. 3d at 58.  So even if the analytical differences represent policy changes that require explanation, the Service has satisfied the legal standard.  Thus, the Service entitled to summary judgment on Counts I and II of Plaintiff's complaint, ECF No. 1 at 19–21, insofar as those counts assert otherwise.

### D.      Plaintiff Has Not Shown that the Section 4(d) Rule Is Arbitrary or Capricious

Finally, Plaintiff challenges another aspect of the rule.  Its primary position, as reflected in

the Court's prior analysis, is that the beetle should be listed as endangered. Alternatively, though, it contends that the Service must protect the beetle with a more stringent rule under Section 4(d) of the ESA even if the beetle remains listed as threatened. ECF No. 21-1 at 42–46. Plaintiff attacks the Service's Section 4(d) rule on two grounds: first, the need for greater protections, and second, the adequacy of the Service's explanation. Neither is persuasive.

### 1. The Findings Supporting the Section 4(d) Rule Have a Substantial Factual Basis

Plaintiff's first argument again concerns the beetles in the Southern Plains. *See* ECF No. 21-1 at 42–45. It points out that beetles there enjoy conservation measures inferior to those employed in the Northern Plains and New England. *See id.* at 43. Specifically, it observes, beetles in those regions are protected against incidental takings, while that is true only for Southern Plains beetles in "certain narrowly defined 'conservation lands.'" *Id.* (quoting AR 196). But, Plaintiff says, such protections are unnecessary because "land-disturbing activities [such] as oil and gas development, timber cutting, and agricultural conversion" are already prohibited there. *Id.* Meanwhile, beetles in other parts of the Southern Plains need—and lack—protection. *See id.* at 43–45.

In Plaintiff's view, the need for more protection in the Southern Plains stems from the beetle's vulnerability to "habitat loss from soil disturbing activities." ECF No. 21-1 at 44. It points out that the Service found in 2008 that habitat destruction in part of the Southern Plains "is likely to have contributed to the decline of the area's [beetle] population." *Id.* (quoting AR 5053). Similarly, it notes that the Service has more recently confirmed that "the primary threat to beetles in the Southern Plains . . . is habitat loss from soil disturbing activities." *Id.* (citing AR 1386–89). So, it contends, a failure to protect the beetle from soil-disturbing activities in that region, *i.e.*, "a green light to unrestricted tak[ings]," violates both the ESA and the APA by disregarding "the evidence before the agency." *Id.* at 45 (quoting *State Farm*, 463 U.S. at 43).

The Service characterizes Plaintiff's view as "based on . . . outdated information."  ECF No. 24-1 at 47.  In fact, it says, the beetle faces "dramatically different [risks] in different geographic regions."  *Id.*  Specifically, it contends that Southern Plains beetles are much less vulnerable to habitat loss than beetles in other regions, and so do not require additional protection against that risk.  *Id.* at 47–48 (citing AR 194–95).  It points to its finding that Southern Plains beetles exist in "large areas of known and potential habitat" that "buffer the effects of most land-use changes."  *Id.* at 48 (citing AR 1385, 1401, 1471).

Recall that the ESA directs the Service to craft Section 4(d) rules that it "deems necessary and advisable" for the "conservation of [threatened] species."  16 U.S.C. § 1533(d).  That language delegates to the Service "the responsibility of determining what measures" to enact.  *Polar Bear II*, 818 F. Supp. 2d at 230.  In claiming the Service "exceeded [its] authority or abused [its] discretion in issuing the [rule]," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 172–73 (1978), Plaintiff faces an uphill climb.  Without "specific reasons to discredit [an agency's] factual findings," this Court must "defer to the agency.  *Apache Powder Co. v. United States*, 968 F.2d 66, 71 (D.C. Cir. 1992).  When the findings implicate "scientific considerations," the agency's "technical expertise and experience" require the Court to "defer to its analysis unless it is without a substantial basis in fact." *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 83 (D.C. Cir. 2006) (quotation omitted).

Plaintiff's attempt to show that the Section 4(d) rule will not conserve the beetle in the Southern Plains is based only on its own contrary interpretations of evidence the Service considered.  Plaintiff calls "habitat loss from soil disturbing activities" in the Southern Plains a "primary threat" to the beetle.  ECF No. 21-1 at 44.  But no matter where that threat ranks among potential perils, the Service found that the current absolute risk is "low," AR 194, based on its analysis of evidence suggesting that only small fractions of the relevant habitat areas are susceptible to urban

expansion, agricultural development, and oil-and-gas activity, *see* AR 1385–89.  Similarly, Plaintiff points out that many beetles in the Southern Plains live on privately owned land.  ECF No. 21-1 at 44.  That may be, but the Service expressly acknowledged that "[m]ost populations" live "on private lands," AR 1397, and yet concluded that beetles in the two most important analysis areas in the Southern Plains were sufficiently distributed throughout the area that they are at least moderately resilient, *see* AR 1423–24.  For that reason and others, the Service concluded that "impacts to habitat are not likely to affect the viability of the species" in the Southern Plains.  AR 195.

Because Plaintiff identifies only evidence that is thoroughly addressed in the final rule and the 2019 report, the Court concludes that the Service's findings have a substantial basis in fact.  Thus, the Court cannot find that the Service erred in finding the Section 4(d) rule "necessary and advisable to provide for the conservation" of the beetle.  16 U.S.C. § 1533(d).

### 2.    The Service Adequately Explained the Challenged Features of the Section 4(d) Rule

Plaintiff also finds fault with the Service's stated rationale for its Section 4(d) rule.  ECF No. 21-1 at 45–46.  The Service explained that it did not prohibit incidental takings in the Southern Plains outside of "conservation lands" because the beetles there face "low risks" from "land development."  AR 194.  It quantified that risk by projecting a "permanent loss of habitat . . . due to urban and agricultural expansion [at] less than 2 percent."  *Id.*  Separately, it provided a more specific estimate: 1.2 percent.  *See* AR 183.  Moreover, it said that conservation lands "provide relatively large protected areas of habitat with good populations [of beetles]."  AR 194.  It concluded that those populations, when protected against incidental takings, are "compatible with recovery for the" species in the Southern Plains.  AR 194–95.

Plaintiff advances three reasons why that explanation is insufficient.  First, it claims that the rule protects only beetles who already face *no* risk from land development, and so the decision

to apply protections against land development only to such beetles means that the desire to guard against that risk cannot explain the Service's decision.  ECF No. 21-1 at 45.  Second, it says the two-percent figure fails to define "permanent" and "conspicuously excludes oil and gas operations," which it says have harmed the beetle.  *Id.* at 46 (citing AR 5053).  Third, it argues that the two-percent figure lacks an explanation why it "is inconsequential to the survival and recovery of the species" and missing geographic and temporal specificity.  *Id.*  For those reasons, it argues that the Service has failed to articulate an "intelligible decisional standard."  *Id.* (quoting *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999)).

The Service explicitly disputes the first two points.  On the first, it says Plaintiff disregards its region-specific land-use analysis.  *See* ECF No. 24-1 at 41 (citing AR 183, 1383–1397).  It conferred greater protections on beetles in the Northern Plains, it says, because it predicts "more effects from land-use changes" there.  *See id.* (citing AR 192–95).  And it explains the disparity between Southern Plains beetles on and off conservation lands by pointing out (1) that land development can occur there, *id.* at 48 (citing AR 183, 194), and (2) that those areas "have higher concentrations of the [beetle] than other areas in the Southern Plains," *id.* at 48–49 (citing AR 1387).  On the second point, it says its rule defined temporary effects as those that "allow for population recovery in the affected area in later years" and permanent ones as those that do not.  *See* ECF No. 33 at 25 n.10 (citing AR 190, 1356, 1436).  And it claims that oil and gas operations impact only a small part of Southern Plains habitats.  *See* ECF No. 24-1 at 48 (citing AR 1385, 1401).  The Service does not directly respond to the third point, but it does contrast the 1.2 percent figure with figures from other regions, such as "five to fifteen percent" for the Northern Plains.  *See id.* at 47–48 (citing AR 194).

Again, the Court asks whether it can "reasonably . . . discern" "the agency's path."  *State*

*Farm*, 463 U.S. at 43 (quotation omitted).  The Service's job was to "articulate an *adequate* explanation for its action."  *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 628 (D.C. Cir. 2016) (quotation omitted and alterations adopted).  So the Court should interpret the explanation "in context" and cannot demand perfect reasoning.  *Id.* at 642.  The Court must also consider "the record as a whole."  *Id.* at 666.  An agency's explanation fails under this standard if it "entirely fail[ed] to consider an important aspect of the problem," "relied on [irrelevant] factors," or "runs counter to the evidence."  *Mingo Logan Coal*, 829 F.3d at 719 (quoting *State Farm*, 463 U.S. at 43).

Plaintiff's first reason for questioning the explanation fails to identify an explanatory defect.  Plaintiff does not support its assertion that "land-disturbing activities" are already prohibited in conservation lands, meaning that the Section 4(d) rule's protections there "serve[ ] little purpose."  ECF No. 21-1 at 43.  The final rule explicitly recognizes that activities that could cause incidental takings may occur on conservation lands; it exempts such activities if they comply "with a Service-approved integrated natural resources management plan."  AR 193.  The Service also explained that conservation areas in the Southern Plains are especially important because they "provide relatively large protected areas of habitat with good populations."  AR 194.  The 2019 report supported that finding by noting, for example, that a concentration of beetles in the most important analysis area in the Southern Plains includes a conservation area.  *See* AR 1387.  Meanwhile, some evidence suggested that the beetle's current population is sparser in the parts of that analysis area "more affected by habitat loss and alteration," areas closer to cities and farms.  *See* AR 1388.  Given that the stated objective of the Section 4(d) rule was to "tailor . . . protections" to avoid restricting "activities that have only minor or temporary effects and are unlikely to affect the [beetle's] resiliency," AR 193, it was reasonable to focus protections on the areas considered most likely to have important beetle populations.  In other words, the agency articulated a rational

connection between the facts it found and the choice it made.  *See State Farm*, 463 U.S. at 43.

Plaintiff's second reason is even more easily rejected.  It is strange to complain that the agency fails to explain what it means by a common term—"permanent"—that has only one potential meaning in this context: "[c]ontinuing or designed to continue or last indefinitely without change."[27]  Anyway, the record makes it clear that a permanent habitat loss is one that will not be "restored to suitable [beetle] habitat within five years."  AR 1388 (defining "temporarily" just after using the term "permanently" in the same context).  Nor is the figure's exclusion of oil-and-gas-related effects especially "[c]onspicuous."  *Contra* ECF No. 21-1 at 46.  The Service found that, even in the part of the Southern Plains where such activity is "locally high," its effects are "minor compared to agricultural land uses."  AR 1388.  Thus, when the Service noted that "[t]he combined permanent loss of habitat projected due to urban and agricultural expansion is less than 2 percent," AR 194, its meaning was reasonably discernible and there is no basis for thinking that it disregarded an important aspect of the problem.[28]  *See State Farm*, 463 U.S. at 43.

Plaintiff's third reason also cannot defeat the Service's explanation.  True, the Service did not explain in the final rule exactly why it equated the "less than 2 percent" figure with "low risk."

---

[27] 3 Oxford English Dictionary (2d ed. 1989) (Mar. 2023 update), https://perma.cc/CLE4-JRU4.

[28] Plaintiff does not point to any evidence suggesting that the Service erroneously concluded that oil-and-gas extraction has only minor impacts on Southern Plains beetles.  It says the 2008 review "specifically found that such operations have been harmful to the beetle."  ECF No. 21-1 at 46 (citing AR 5053).  The review, however, merely suggested that such operations were responsible for annually "affecting" roughly 4,500 acres of potential habitat in Oklahoma.  AR 5053.  The 2019 report updated and analyzed a comparable figure, noting that under the "Industry Conservation Plan" now in place, "357 acres of occupied or assumed [beetle] habitat have been permanently impacted . . . 602 acres have been converted to another habitat type . . . still suitable for the [beetle], and 1,459 acres [have been] impacted temporarily."  AR 1388.  Plaintiff never explains why those figures are so significant that the Service's explanation relying on a figure that does not include those effects falls below the legal standard.  And such an explanation would be dubious given the millions of acres of habitat in the Southern Plains.  *See infra* note 29.

*See* AR 194; ECF No. 21-1 at 46.  But in the 2019 report, it pointed out that, in the Arkansas River analysis area, even habitat loss (including temporary impacts) much more severe than that predicted under the more dire potential scenario would "still leave[ ] about 10,739,971 acres of suitable habitat."  AR 1459.  That analysis area is especially significant because it has the "[l]argest amount of suitable habitat," of which over 8 million acres are "favorable habitat."  AR 1459–60. And in the other two analysis areas, similar investigation predicted that, at worst, suitable habitat would remain between 1.5 and 2 million acres.  *See* AR 1456–57, 1460–61.  In other words, the projected land-use changes are not just small in *relative* terms; their *absolute* impact would leave what the Service described as a "high" amount of favorable habitat.  *See* AR 1460.[29]

Besides, it is self-evident that 1.2 percent is a small figure.  That is especially true when contrasted with a figure the Service *did* consider sufficient to warrant protections against incidental takings: 5 to 15 percent in the Northern Plains.  AR 194.  Indeed, one analysis area in the Northern Plains could face impacts to 30 percent of its total habitat, and an island in New England could experience urban expansion affecting as much as 35 percent of its total land area.  *See* AR 1469, 1473.  That juxtaposition is enough to reasonably discern why the agency applied the rule in New England and the Northern Plains but not the Southern Plains.  *See State Farm*, 463 U.S. at 43 (quotation omitted).  The Service need not make every interstitial detail of its analysis explicit as long as a rational factual basis for its judgment appears in the record.  *Cf. Tex. Mun.*

---

[29] It is also inaccurate to suggest that the Service did not "identify where this permanent loss is projected to occur, e.g., whether it is in a particularly important part of the species' remaining range, or over what time frame to which the agency is referring."  ECF No. 21-1 at 46.  For each analysis area, the Service noted the proportions of the projections that were likely to occur on favorable, suitable, conditional, and marginal habitat.  *See* AR 1456–62.  And the scenario on which these projections are based is explicitly a projection of "land use changes by 2099." AR 1456.  The whole point of the analysis was to synthesize all risk projections, including those based on land-use changes climate change, until 2099.  *See* AR 1497.

*Power Agency v. EPA*, 89 F.3d 858, 869–70 (D.C. Cir. 1996) ("[T]he failure of an agency to identify every detail of a process before it is used does not automatically require judicial interference in matters that must be thought to lie within the agency's expertise.").

*    *    *

At bottom, Plaintiff offers only reasons why it disagrees with the Service's explanation. But whether or not it has the better view of the evidence, the Service's explanation is reasonably discernible from the record, has a substantial basis in the evidence, and rationally connects the facts found to the choice made. So the Court cannot say that the Section 4(d) rule violates the ESA or is arbitrary and capricious under the APA. The Service is thus entitled to summary judgment on Count III of Plaintiff's complaint, ECF No. 1 at 21.

## IV.   Conclusion

For all the above reasons, the Court will deny Plaintiff's motion for summary judgment and grant Defendants' cross-motion for summary judgment. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 30, 2023